EXHIBIT B -1

IN THE

# Court of Appeal of the State of California

IN AND FOR THE

## Fifth Appellate District

People of the State of California
vs.
Oldright, William
In Re William Oldright On Habeas Corpus
F016858    Old No.  CON18241
Kern County No. 46078



*  *  *    REMITTITUR    *  *  *

I, KEVIN A. SWANSON, Clerk of the Court of Appeal of the State
of California, for the Fifth Appellate District, do hereby certify
that the original opinion or decision entered in the above—entitled
cause on August 25, 1993 has now become final.


_____Appellant(s)    _____Respondent(s) to recover costs
_____Each party to bear own costs
__✓__Costs are not awarded in this proceeding




WITNESS my hand and the seal of the Court affixed at
my office on November 23, 1993


KEVIN A. SWANSON, Clerk


**ANTHONY LAURIA**

Deputy Clerk

*H 14131*

COURT OF APPEAL
FIFTH APPELLATE DISTRICT
FILED

AUG 25 1993

KEVIN A. SWANSON, Clerk

By_____
                        Deputy

RECEIVED
'93 SEP 23 AM 8 12
FACILITY MAKING

*CTF-C*

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| THE PEOPLE, | ) | |
| Plaintiff and Respondent, | ) | No. **F016858** |
| v. | ) | |
| WILLIAM G. OLDRIGHT, JR., | ) | (Super. Ct. No. 46078) |
| Defendant and Appellant. | ) | |
| In re | ) | No. **F018241** |
| WILLIAM G. OLDRIGHT, JR., | ) | |
| On Habeas Corpus. | ) | **O P I N I O N** |

Original Proceeding and Appeal from a judgment of the Superior Court of Kern County.  Roger Randall, Judge.

Jim Fahey, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Roger E. Venturi and Edgar A. Kerry, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

*AFFIRMED*

## STATEMENT OF THE CASE

On or about May 29, 1991, an information was filed in Kern County Superior Court charging William G. Oldright, Jr., with premeditated murder (Pen. Code,[1] § 187) involving the personal use of a firearm (§ 12022.5). Oldright pleaded not guilty and denied the special allegation.

After various pretrial proceedings which will be discussed as they become relevant to the instant appeal and writ, trial began on August 19, 1991. On August 29, a jury convicted Oldright of second degree murder and found the firearm use allegation to be true. Oldright's subsequent motion for new trial was denied and he was sentenced to 15 years to life in prison for the murder, plus an additional 3 years for the firearm use.

Oldright filed a timely notice of appeal (F016858). He later filed a petition for writ of habeas corpus in this court (F018241). The actions have been consolidated.

## STATEMENT OF FACTS

### Prosecution Case

Ronald Tucker was killed on April 14, 1991. He was 31 years old. His fiancee, Jerrise Cobb, had known him since October 1990. When they met, Tucker was a patient, and Cobb was employed as a rehabilitation assistant, at the Centre for Neuro

---

[1]   All statutory references are to the Penal Code unless otherwise indicated.

2

Skills (CNS).

Velma Oldright was Tucker's mother and Oldright's wife.[2] She and Oldright met on March 30, 1990 and married on October 27 of that year. At the time of the homicide, they lived on a five-acre parcel at 8832 Kernita. Tucker once told Velma that he did not particularly care for Oldright and did not want her to marry him, but his main desire was for her to be happy.

Tucker and Oldright did not get along well. For instance, there was to be a wedding announcement on Christmas Eve at the home of Cobb's parents. The Oldrights were invited, but Velma was unable to attend. This so upset Tucker that he initially did not invite Velma to the wedding. Tucker blamed Oldright for this state of affairs.

Cobb and Tucker attended a Christmas party at Oldright's house in 1990. A number of people were present and had eaten throughout the house. According to Cobb, Tucker was eating a cracker when Oldright accused him of dropping crumbs on the floor. Tucker protested that a hundred people had been in the house, eating all over. Oldright accused Tucker of acting like a child, then shoved a plate at him. Tucker threw down the cracker, then he and Cobb left. Tucker did not visit Velma's house between Christmas of 1990 and April 13, 1991. He told Velma he did not come during that time because he and Oldright

---

[2]     For the sake of clarity, Velma Oldright will be referred to as "Velma." No disrespect is intended.

3

did not care for each other and Tucker did not want to cause any problems.

Some time prior to Velma's marriage to Oldright, she gave each of her children a credit card. She retained the right to cancel the card if a child failed to pay his or her bill. Tucker ran up a bill of around $800. Velma cancelled the card. Oldright had nothing to do with this. However, Velma believed Tucker thought Oldright was behind the cancellation, because Oldright kept telephoning Tucker about the payments. Velma did not ask Oldright to do that. She received a letter from Tucker about the situation. The letter was postmarked February 15, 1991.

In January 1991, shortly before the credit card was cancelled, Oldright posted bail for Tucker. He later removed his name from the bond. Cobb and her mother then signed the bond. Tucker was extremely upset at Oldright's action. However, Velma never heard Tucker threaten Oldright. To the best of her knowledge, Oldright never said he was afraid of Tucker.

Velma was aware that Tucker had drug problems prior to 1989. She did not know if he used drugs after 1989. At some point, Tucker told her God had helped him and he had changed his life. When Tucker wrote her (apparently in the letter about the credit card), he said he was in Charter Hospital. Charter is a hospital for people with drug, alcohol, and other dependencies. Velma was unaware of any dependency Tucker had at that time.

On April 13, 1991, Cobb and Tucker attended a church conference about the inner healing of family relationships.

4

Afterward, they went to the home of Velma and Oldright. Tucker told Cobb he wanted to make things better. He wanted his mother to be involved in the wedding. He and Cobb visited Velma around 11:30 that night. Oldright was asleep. Tucker spoke with Velma about his relationship with her and Oldright. Velma asked Tucker and Cobb to return to the house the next day for a barbecue. Tucker asked Velma to make sure it was all right with Oldright, because he did not want to come if he was not welcome. Velma said she would talk to her husband. Tucker did nothing to make Velma believe he was under the influence of drugs on this occasion.

The next day, Sunday, April 14, Velma asked Oldright if he objected to Tucker being at the barbecue. Oldright said he did not. Later, Tucker telephoned Velma, then he and Cobb came to the house. They arrived around 2:00 or 2:30.

There were a number of family members at the house when Tucker and Cobb arrived. Shortly after they got there, Tucker asked Velma to pray for him, as he was going to talk to Oldright. Velma and Cobb both saw Tucker go outside and approach Oldright. Neither woman could hear what was said, but both saw Tucker hold out his hand as if to shake hands. Cobb turned to speak with someone; Velma saw Oldright shake his head "no" and make a side-to-side movement with his hands, crossing them in front of him with palms down. Tucker then walked back to the house and told Cobb they were leaving. He was very upset and told Velma he had to go because Oldright said he could not be there. He told Velma he would call her and it was going to be all right. He and Cobb

then immediately left.  Tucker told Cobb that he had tried to apologize to Oldright, but Oldright refused it and said that things could not be that simple.  When they left, Tucker was driving Cobb's car, a white Oldsmobile.

When Oldright came inside a few minutes later, Velma was in the bathroom, crying.  She asked why he had told her it would be all right for Tucker to come, and then he treated Tucker like he did.  Oldright said he was sorry and had changed his mind, and "[t]his is the way it is."  Oldright then went back outside and continued working in the yard.

About 30 minutes later, Velma received a telephone call from Tucker.  He was still upset and apologized for what had happened.  He told Velma that he had done all he could at that time; he had offered his hand and Oldright rejected it.  He admitted it took all he had to keep from striking Oldright.  He said he would talk to Oldright about it later, and that he was going to take his medication and go to bed.[3]

At some point while he and Cobb were at their apartment that afternoon, Tucker ingested prescription medication.  He had three or four different kinds; Cobb believed he took Xanax, which was for anxiety.

Tucker subsequently telephoned Oldright.  Cobb was not in the room during part of the conversation.  She did not hear

---

[3]   Velma knew Tucker was taking medication because of an injury.  She did not know what kind of medication.

Tucker call Oldright any names, but she heard Tucker say to just tell him a time and a place. Tucker was angry and upset. Cobb assumed the two men were going to fight.

According to Velma, Oldright received a telephone call on his pager perhaps 20 minutes after she spoke with her son. Oldright called his answering service. Velma testified: "He said Ron, Ron who, Ron Tucker. Paused. Then I heard him say, you know where I am at, Kernita. And he paused. Then I heard him say, Weedpatch and Kernita. Okay." She also heard him call Tucker names. After the telephone call, Oldright left the room. Velma called to him, but he was angry and just kept going. Pretty soon she saw his truck go down Kernita Road.

Oldright kept a small gun in the bedroom. Velma never knew him to carry it in his truck.

Kelly Scott, Velma's daughter, was at the house that day and saw Oldright after the telephone conversation with Tucker. Oldright was angry. He told Scott to get back in the house; her mother was going to need her.

Tucker and Cobb drove to Weedpatch and DiMiller. Cobb drove; Tucker was in the passenger seat. When they arrived some 15 to 20 minutes later, Cobb parked on a side road off of Weedpatch Highway. Tucker just told her to pull over at the side of the road. He had calmed down from his earlier anger. He said he was going to "kick" Oldright's "ass." To Cobb's recollection, Tucker never said he was going to "beat the shit out of" Oldright with a baseball bat.

7

The two waited for 10 to 15 minutes. Cobb wanted to leave; Tucker said to give it five more minutes and if Oldright did not show up, he would forget the whole thing. Shortly thereafter, Cobb saw Oldright's truck quickly approaching. When Oldright neared them, he skidded to a stop and jumped the curb, pulling in at an angle right in front of their car. Cobb backed her vehicle up because she thought Oldright was going to hit it. Tucker was standing to the side and a little in front of the passenger door. He never moved away from the door except to step out of the way when Cobb backed up. Her backing placed him right in front of the door.

Oldright quickly exited his vehicle. Cobb did not hear Tucker say anything to him. Tucker did not move forward or lunge. When Oldright got out of the truck, he "looked out of control and just wild." He walked at a very fast pace, and came right around his truck and straight at Cobb's car. He "immediately" had a gun in his hand, and he was holding it in the air and pulling at it. He said, "I'm not going to take it any more, Ron." Then Cobb heard the shot. Oldright did not slow down or stop between the time he pulled at the gun and the shot was fired. When he fired the shot, he was within arm's reach-- about two feet--of Tucker. Everything happened within a matter of seconds.

Because of the way she was seated in the car, Cobb could not see the gun, nor could she see the men from the shoulders up. She could not see what Tucker's hands were doing or how he was moving. However, he had no weapon of any kind with

8

him. Cobb could not see Oldright's hand just before she heard the shot. After the shot was fired, she saw Tucker fall. He did not take any steps first.

Oldright looked into the car at Cobb. His eyes were "wild." Then he said, "[O]h, my God, get out here and help me." When Cobb reached Tucker, the latter was on his back. Oldright was kneeling beside Tucker. As soon as Cobb got there, Oldright went to his truck, which contained a telephone. He told Cobb that he had dialed 9-1-1, and to hold the telephone and wait for an answer. The truck was not running; Cobb was unaware it had to be running for the telephone to work. Eventually, a family with a car phone drove up and emergency personnel were summoned. Before they arrived, Cobb saw Oldright pumping on Tucker's chest or stomach.

The 9-1-1 call was received at approximately 4:46 p.m. Captain Curran and Engineer Froggatt, emergency medical technicians with the Kern County Fire Department, responded to the scene. A group of people were attending to Cobb. Tucker was on the ground; Oldright was cradling his head with his hands on both sides of the wound. Tucker and Oldright were right outside the open passenger door of the white Oldsmobile.

According to Curran, Tucker was lying parallel to the vehicle, with his head toward the rear right, outside the open passenger door. The edge of the door was close to Tucker's chest area. When Curran was working on Tucker, the door was right behind Curran. He was at Tucker's chest and head area. According to Froggatt, Tucker's body was lying on the dirt by the

right front tire of the vehicle, with the head facing toward the
rear of the car. Tucker's feet were close to the front of the
automobile. His head was approximately five feet out from the
door and maybe one or two feet ahead of the end of the door. The
center of his body was at about the front wheel of the car. He
was within a couple feet of the curb. He was lying on his left
side with his legs drawn up in somewhat of a fetal position. It
appeared he had been lying on that side and in that spot for a
period of time. There were splatters of blood on the hood of the
car, by the right front fender.

Oldright said he thought Tucker still had a pulse and
was breathing. However, Curran could see Tucker was very blue
and had lost a lot of blood. He did not appear to be breathing
and there was no pulse. Curran was able to tell the wounds were
through the neck, just below the ear lobes. Despite their
attempts to resuscitate Tucker, Curran and Froggatt were never
able to get a pulse or heartbeat.

After looking around the scene, one of the fire
fighters asked Oldright if he knew who shot Tucker. Oldright
said yes. Froggatt asked, "[I]t wasn't you, was it?" Oldright
replied affirmatively. He never said it was an accident, that
the gun went off, that he himself was hurt, or that he was sorry
it happened. When asked the whereabouts of the gun, Oldright
said it was in his back pocket. He described it as a nine
millimeter. Froggatt asked how far away he was. Oldright
motioned with his hand, paused a couple of seconds, and said 10
feet. He did not appear to be upset. Curran and Froggatt

stopped questioning him, then Oldright spontaneously stated that
Tucker was a felon, that he had threatened Oldright and had
threatened to kick his ass, and that he (Oldright) had just done
society a favor.[4]

Deputies Clark and Lostaunau arrived simultaneously
with fire department personnel. A group of people were trying to
comfort Cobb, who was hysterical. Oldright was holding Tucker,
who was lying right about at the end of the open passenger door.
Lostaunau did not remember him being in front of the door in any
way.

The deputies first approached Cobb. Clark then went
over to Tucker and saw that emergency personnel were
administering first aid. Clark returned to Cobb, who was giving
a statement to Lostaunau. At the same time, Curran and Froggatt
waved Clark back over. They indicated Oldright was involved in
the conflict. Oldright was supporting Tucker's head and
attempting to stop the bleeding from the neck.

As Lostaunau came up to him, Oldright said he shot
Tucker, and that the gun was in his back pocket. Oldright did
not appear to be upset; he said nothing about it being an
accident. Lostaunau told him to leave his hands on the victim,
then he removed the weapon, handcuffed Oldright, and placed him

---

[4]    Curran did not remember hearing Oldright say he was one of
the good guys. He did hear Oldright say he had done society a
favor. Froggatt remembered Oldright describing himself as one of
the good guys, but did not hear Oldright say he had done society
a favor.

11

into the patrol vehicle.  The weapon was then seized.  Lostaunau
recalled there being one shell in the chamber and three left in
the clip.  After Oldright was taken into custody, he asked how
Tucker was.  When Froggatt said it did not look good, Oldright
disgustedly shook his head.

Velma saw Oldright at the scene of the incident, but
did not get to speak to him then.  She next spoke with him while
he was in jail.  During one of their conversations, he told her
it was an accident.  He said that he and Carlos (an employee)
waited 10 or 15 minutes, but Tucker and Cobb never showed up.
Oldright then drove Carlos home.  When he returned, he saw Tucker
and Cobb and drove over to them.  He took the gun when he got out
of the truck.  He was waving it, showing Tucker the weapon, and
it went off.  When Velma asked why Oldright took the gun, he said
he was scared of Tucker.

Detective Brown of the Kern County Sheriff's Department
arrived on the scene at approximately 5:45 p.m.  He observed a
white Oldsmobile parked along the south curb line of DiMiller,
directly west of Weedpatch Highway.  The vehicle was headed in an
easterly direction.  Brown also observed Oldright's pickup truck,
which was parked on the dirt area south of the south curb line of
DiMiller Road.

Deceleration skid marks from the truck were found.  The
closest was approximately 15 to 20 feet from the front of the
Oldsmobile.  It appeared the front tires had jumped the curb and
had come to rest on the dirt just south of the curb line.  From
the various marks, Brown believed the truck came in at a

12

45-degree angle in a southwest direction. The front tires stopped just on top of the curb.

There were spatters of blood in the gutter near the right front tire of the Oldsmobile. There were also blood spatters on the car's right front fender, and a large pool of blood in the dirt directly south of the right front wheel, adjacent to the curb. The passenger door was open. Inside the area of that door, as if someone were just stepping out of the vehicle, were small splatters of blood. The pool of blood was beneath the open door, but slightly to the outside of it. Just south of that location was an expended .380 caliber shell casing.

The gun seized from Oldright was a .380 caliber semi-automatic pistol. Three live rounds were recovered from the magazine. A loose live round was also recovered. The pistol had a safety which had to be depressed before the weapon could be fired.

Dr. Camici, a neurosurgeon at Kern Medical Center, saw Tucker when the latter was brought into the emergency room on April 14. Tucker was in very critical condition. He had sustained a disruption on the high cervical spine, along with massive intraventricular hemorrhage and massive brain edema. There was a hole on each side of the neck, approximately at the level of the mandible. Tucker would not have survived the wounds, even with immediate medical attention.

These types of injuries paralyze from the level of the injury down. A person receiving such an injury would be unable to perform any kind of movement and would immediately fall down.

13

Tucker, who had been kept on life support for the purpose of organ donation, was declared brain dead the next morning. He died as a result of the gunshot wound to the neck area.

Dr. Holloway performed the autopsy. Tucker had a through-and-through gunshot wound to the head and neck as a combined region. The entry wound was just under the right mastoid region. The bullet then passed through the soft tissue of the neck and into the cervical spine, shattering the second cervical vertebrae and portions of the third, and destroying the spinal cord at those levels. At this point, the bullet was directed slightly downward. It was then deflected upward and ultimately exited through the left auditory canal, i.e., the opening of the ear.[5]

The brain was extremely swollen; the basal skull was not penetrated. Brain death occurred not long after Tucker was shot due to cerebral edema. The cause of death was massive cerebral edema, due to perforation of the cervical spine from a through-and-through gunshot wound to the neck. Someone shot in this manner and with severance of the spinal column would have promptly collapsed.

---

[5]    There was some question whether the bullet exited out the ear or the other side of the neck, and whether it took a slightly upward or downward trajectory. For our purposes, what matters is that it killed Tucker.

14

"Tattooing" refers to particles of burned or partially burned gunpowder being forcibly interjected into the skin. The particles are deposited in a pattern which varies with muzzle distance and increases in diameter as the muzzle distance increases, up to a certain point that is characteristic for that weapon and ammunition. Dr. Holloway found no evidence during the autopsy of tattooing or soot. The soot could have been brushed off during the rendering of medical aid. Beyond a muzzle distance of approximately 16 inches, no tattooing will usually be found.

Tucker weighed 221 pounds after donation of the heart and kidneys, and was 6 feet 2 inches tall.

Criminalist Gregory Laskowski performed the firearm analysis in this case. The weapon was an AMT brand .380 caliber (also known as a 9 millimeter) short backup semi-automatic pistol. A semi-automatic pistol will fire each time the trigger is pulled, as long as there are rounds in the magazine. The weapon is not ready to fire just because a loaded clip is placed in it; the slide first must be pulled back manually to charge the weapon.

Laskowski tested the trigger pull, i.e., the amount of force necessary for the trigger to pull back and disengage the hammer. This weapon had a nine-pound trigger pull. The gun also had two safety mechanisms. One was a regular thumb safety, which consisted of a small lever. The other was a grip safety, which was located at the base of the grip. In order for the gun to be fired, the thumb safety had to be in the "fire" position and the

15

grip safety had to be depressed.

Laskowski test-fired the weapon and reviewed the autopsy report and crime scene photographs in order to determine muzzle-to-target distance, i.e., the measurement from the front end of the barrel to the surface of the target. He determined that the minimum muzzle-to-target distance in this case was 24 inches. In other words, Tucker's neck was probably 24 inches or more away from the muzzle of the gun when he was shot. The distance could have been from 24 inches to 10 feet.

Laskowski also analyzed Oldright's clothing for blood splatters, which can give an indication of the distance and position of the shooter. The patterns he found were consistent with Oldright having been near Tucker's body in attempting CPR. Laskowski could not determine if there was originally a high velocity blood spatter, such as would have been caused if Oldright was within a few feet at the time of the shooting. It may have been absent, or it may have been covered by additional blood.

Bakersfield Police Narcotics Detective Roark had arrested at least 100 people for being under the influence of PCP as of the time of trial. He had also received education and training in the area of narcotics. The symptoms seen in someone under the influence of PCP depend on the degree of influence, tolerance of the drug, and other factors. Common symptoms are rigid muscles, blank stare, nystagmus, a chemical odor, or bizarre behavior. Bizarre behavior generally is seen with higher doses or low tolerance. Normally, a person under the influence

16

of PCP is not violent. However, PCP is an unpredictable drug. The reaction of the user often depends on whether that person is involved in a calm or confrontational situation.

### Defense Case

Oldright presented evidence concerning Tucker's behavior on various occasions.

Robert West was married to Velma from 1975 to 1985. Velma's children, including Tucker, lived with them for a time. Tucker was around 14 years old when Velma and West married.

In December 1983, when Tucker was about 22 years old,[6] West was watching television when Tucker came into the room with a plate of food. West told him to eat it in the kitchen. In response, Tucker stuck West in the stomach with a fork. The fork went through West's shirt and left red marks on his skin. Tucker said West didn't tell him what to do. West went after Tucker and beat him in the back yard. West then returned to the house and locked the kitchen door. Tucker beat on the door with a piece of firewood until it opened. He then threw the wood at West. The wood struck West in the head and cut him. West went into the bathroom to wash off the blood, and he shut and locked the door. He had seen Tucker coming into the house with an ax. The next thing he knew, an ax came through the wall and then the door. It

--------------------------------------------------------

[6]    West first testified this incident occurred around 1978 and that it was earlier than the summer of 1984 or 1985. He later said it took place "closer" to 1985, in 1985, and then he settled on the 1983 date.

was a two-bladed ax meant for splitting wood.  The second time,
it stuck about two inches through the door.  West opened the
door, grabbed Tucker and the ax, got Tucker outside, and had a
fight with him.  Finally the incident ended; Velma arrived home
about that time and took West to the hospital for stitches.  He
received stitches in his head and hand.  West felt Tucker had to
be under the influence of some substance during the incident; he
did not act this way otherwise.  Sober, "[h]e was the nicest kid
you ever want to meet . . . ."  When he was on drugs, sometimes
he would be calm, but other times he would get "hot."  West made
these observations about the personality changes over the 10
years that he and Velma were married.

      During the marriage, Tucker took West's guns without
permission.  He took a 12-gauge shotgun, three .356's, a high-
powered rifle, a .22, a snubnose .38 pistol, and a long-barreled
.38 pistol.  One day West discovered they were gone; sometime
later, they were back again.  Awhile after that, they were gone.
Velma retrieved the guns from a pawnshop.  The pistols belonged
to her; as far as West knew, they never got those back.

      West never told Oldright about the incidents with the
ax or guns prior to the date of the shooting.  He never told
Oldright anything about Tucker.

      Tami Lamas and Tucker lived together off and on from
approximately 1981 to 1986, and had a child together in 1982.
After Lamas ended their relationship, Tucker continued to contact
her for almost four years.  During the time they lived together,
Tucker frequently was violent toward Lamas.  The frequency

18

depended on what he was doing and who he was with. Tucker used PCP (phencyclidine) whenever he could get it. He would use it daily if he could afford it. He would dip a cigarette in the liquid and smoke it. Occasionally he would sprinkle a crystalline form in parsley and make that into a cigarette.

When Tucker used PCP, his behavior changed. He became angry and violent. On some occasions, he physically attacked Lamas. One particular incident occurred near the end of their relationship. Tucker telephoned and asked Lamas to pick him up, as he had been drinking. Lamas went to get him. Tucker got in the back seat of the car. As they were driving, he became violent and began striking her. He told her to pull over. When she did, he said he was going to kill her. He choked her into unconsciousness. When she awakened, Tucker was screaming and crying. He told her to drive home and said he was going to kill her when they got there. When they arrived, she managed to get out of the car first. She grabbed her son and ran into her neighbor's house.

Tucker physically attacked Lamas many times while he was under the influence of PCP. When Lamas was pregnant, she planned to have a caesarean section on a particular day. They were fighting that day; Tucker, who had been drinking and doing "his things," wanted to take the car, but Lamas told him no. Tucker took a knife and sliced all four of Lamas's new tires. Lamas had to walk to the store next door to telephone her parents. Meanwhile, Tucker was hitting her. He also threw a bottle at her that was partially full of pennies.

On another occasion when Tucker was under the influence of PCP, he threw every knife in the house at Lamas. She had to dodge the knives. Tucker also stabbed the walls and pictures, including one of their son. There were many other incidents as well. Lamas communicated a number of these violent acts to Oldright.

During the last year of his life, Tucker did not commit any acts of violence against Lamas's person, although he made threats. The acts of violence to which she testified all occurred more than five years before trial.[7]

Bakersfield Police Officer Tunnicliffe interrogated Tucker on January 8, 1991, after Tucker was taken into custody. Tunnicliffe asked Tucker what was in the cigarette he had been using; Tucker said it was PCP. Tucker said he had smoked it approximately one hour before their conversation. It was crystalline PCP dispersed through parsley leaves in a hand-rolled cigarette. Tucker said he had been using PCP off and on for 10 years. When asked about its effects, Tucker said it mellowed him out, although sometimes he "freak[ed] out." Tucker said he suffered pain as a result of neurological problems from a job

---

[7]    According to Lamas, Cobb telephoned her the night after the shooting. When Lamas asked why Oldright and Tucker were meeting, Cobb said they were fighting. She said Tucker was upset and called Oldright to meet him at a certain place, and that Tucker was going to beat Oldright with a baseball bat. Cobb said they were going to wait a few more minutes for Oldright, then they were going to leave. Cobb denied saying anything to Lamas about a baseball bat. There was no bat in the car; she and Tucker had no weapon with them.

injury. He described the drug as being his escape from pain and
said it acted as a sedative.

Tunnicliffe performed a routine battery of field
sobriety tests to determine whether Tucker was under the
influence. In his opinion, Tucker was under the influence of PCP
at the time Tunnicliffe contacted him.

At the time of the arrest, Tucker was not angry, but
instead was very cooperative. Tunnicliffe has arrested probably
35 or 40 people for suspicion of being under the influence of
PCP. Of the people he has arrested for PCP use, probably between
10 and 15 percent were violent. He responded in those instances
because the people were violent originally. To his memory, no
one suddenly turned violent when he arrested them. However, PCP
is an unpredictable drug.

Bail bondsman Jim Conners posted a bond for Tucker on
or about January 9, 1991. Oldright and Cobb signed the papers.
The bond was for $7,500 on a felony charge. Had Tucker failed to
appear in court, Oldright would have forfeited the entire $7,500.

Tucker made his first appearance, but failed to appear
for a February 7 hearing because he was in Charter Hospital.
Oldright decided to remove his name from the bond. He told
Conners that he and Velma could no longer put up with the way
Tucker was treating them and what he was putting them through.
They did not want to be responsible for $7,500 in case he went on
another drug or alcohol binge and left the county.

Conners informed Tucker of the situation on February 18
and gave him a chance to get another person to secure the bail.

21

Tucker telephoned his mother.  During the conversation, Tucker essentially told Velma that he was going to get even with Oldright, and that he was going to have "his Mexicans" take care of him.  A lot of times he referred to how much he hated him.  He was very angry and using many cuss words directed at Oldright. He also commented that he knew Oldright hated him and that they both despised each other.  After the conversation, Tucker reiterated to Conners how much he hated Oldright.  He said that some day he was going to "kill that son of a bitch."  He said he had "some Mexicans" who could take care of Oldright.

Before Tucker was killed, Conners never told Oldright what he heard Tucker say about him.  Conners spoke with Oldright a few days after the shooting; as of that time, Conners was unaware whether Oldright knew about the threats made by Tucker in February.

Penny Coodey is Oldright's daughter.  Around the end of January or beginning of February 1991, Oldright spoke to her about threats he had received from Tucker after withdrawing the bail.  Oldright asked for advice because he had been told Tucker had hired "some Mexican hit men," and Tucker was threatening to kill him.  Coodey told him that he could call the sheriff's department and make a report, but that nothing really would be done.  As far as Coodey knew, Oldright did not make such a report.

Oldright also testified in his own behalf and presented evidence with regard to his conduct on the date in question.

Oldright was 54 years old as of the time of trial. He was a landscaping contractor and also had a plumbing business.

Oldright first met Tucker when he and Velma were planning to be married. At the time, Tucker was in jail. Tucker told Oldright that if he ever heard of Oldright being mean to or mistreating Velma, he (Tucker) would "get" him.

Velma and Oldright picked Tucker up when he was released. He lived with them for a short time. Oldright helped arrange an early release for Tucker by writing to the parole board and saying he would give Tucker a job. When Tucker was released, Oldright put him to work for his plumbing company. Tucker later quit after Oldright told him how to do a particular task.

On October 2, 1990, Tucker telephoned and told Velma he had taken a drug overdose and was trying to commit suicide. Velma and Oldright went to his residence and found him unconscious. They took him to Mercy Hospital, where he spent the night. He was then transferred to Kern General, after which he was admitted to CNS.

Tucker was at CNS because he had had an accident in 1989 in which he fell on his head and suffered brain damage. He could not control his anger. Velma and Oldright visited him on numerous occasions, and Velma attended virtually all of his counseling sessions. CNS always sent a summary of whatever transpired at the conference. Oldright read two of the conference summaries. He saw that Tucker was being treated for frontal lobe brain damage and incontinence, as well as the fact

23

he could not control his temper.

Oldright did not recall seeing any references to himself in the CNS documents he read.  He remembered reading something about discipline problems CNS was having with Tucker in terms of him going to classes or testing, as well as his use of foul language.

Velma and Oldright held a Christmas party shortly before Christmas Day 1990.  After most of the party was over, Tucker was sitting in the living room, eating a piece of cake out of his hand.  He was spilling it all over, and Oldright asked him if he would get a plate, or Oldright would get him one.  Tucker said he did not have to, because it was his house.  He then threw the cake on the floor and left with Cobb.

Tucker and Cobb had planned an engagement party for Christmas Day.  Oldright had had a ring designed for Tucker to give to Cobb.  Velma and Oldright were invited to the party, but did not attend because Oldright arrived home late and Velma was not feeling well.  Velma telephoned and said she was ill.  Tucker blamed Oldright.

Velma had provided a credit card to Tucker for which she had cosigned.  The bills came to her residence.  Around the first of 1991, the balance on the card was between $750 and $800.  Velma grew concerned because it was an American Express card that had to be paid right away.  Velma asked Oldright to give the bill to Cobb, which he did.  She also asked him to make sure Tucker knew, so Oldright telephoned their residence.  When Tucker did not pay anything on the card, Velma cancelled it.  Oldright did

24

not have anything to do with that, but Tucker became very upset.

On January 8, 1991, Tucker was arrested on felony drug charges. Oldright pledged the home he owned before marriage as collateral for Tucker's bail. However, Tucker failed to make a court appearance. In addition, Velma received a letter from him in which he called Oldright an "ungrateful S.O.B." Oldright did not see any point in trying to help Tucker anymore, so he contacted Jim Conners and told him to take his name off the bond.

Tucker's letter was postmarked February 15, 1991. Around that time, Oldright received information that Tucker was threatening him. One day when Oldright came home, Velma was talking to Tucker by telephone. She was crying. She later told Oldright that Tucker was threatening him because he blamed the two of them for taking the bond away. Tucker said he was going to get "some Mexicans" and they were going to "get" Oldright. He also said he was going to kill Oldright. This threat was conveyed to Oldright by both Velma and Conners.

Oldright was aware of Tucker's problems with PCP prior to April 14. Velma had told him numerous times that Tucker had been addicted to the drug, and she related different incidents in which he tried to supply his habit. Although Oldright did not know exactly what happened in the incident with Bob West, he knew there was an ax involved and West had been hurt. In addition to being threatened by Tucker the first time Oldright met him at the jail, on a subsequent visit Tucker said something about being moved to another cell because he had been fighting. The autumn before the shooting, Tucker went to the fair and said he had seen

his girlfriend's boyfriend and had "stomped" him.  He thought

that was great.  In addition, Oldright overheard Tucker threaten

to beat up and kill Lamas if he did not get to see his son.

Oldright was asleep and had no contact with Tucker on

April 13.  The next morning, Velma told him about the visit.  She

wanted to know if it was all right for Tucker to come to the

family barbecue that day, and Oldright said it was.

Oldright and Carlos Cabello planned to work in the yard

all day on April 14.  At some point, Tucker approached Oldright

as if he wanted to shake hands.  Oldright told him no, that he

could not "dump on" someone for months and then just make it go

away.  Oldright said to give him some time.  Tucker said nothing,

but turned and went back to the house.

Oldright did not think much about the incident.  He

felt he had been "dumped on" because for months Tucker had

telephoned Velma at work and "cussed her out" about the credit

card and bail revocation.  He made sure she knew she was not

invited to his wedding.  In addition, Tucker told Oldright that

he was going to get somebody to get Oldright, and that he

(Tucker) was going to kill him.  It was an overall thing that

Tucker had been doing for the preceding three or four months.

As Oldright was returning to the house, he saw Tucker

speed off down the road.  Velma was in the bathroom, crying.

When he inquired what was wrong, she asked why he told Tucker to

leave.  Oldright denied doing that and said Tucker just had to

give him some time to see that he was changing.  As far as

Oldright was concerned, Tucker was welcome on his property.  He

never told him to leave.

This all occurred sometime around 1:30. Oldright went
back outside for a short time, after which Velma said Tucker had
called twice. She did not say much about the first call, but the
second time she said he was sorry for any problems and he
understood that Oldright just needed a bit of time. Velma was
still crying, but Oldright was not angry with Tucker at this
point.

Oldright was again outside working when his pager went
off. It was the answering service for his plumbing business,
telling him there was someone on the telephone who wanted to talk
to Oldright. In order to take the call, Oldright had to go
inside and telephone the answering service. He was told the call
was from Ron; he thought it was Ron Scott, his son-in-law. When
the call was patched through, he recognized Tucker's voice.

Tucker called Oldright a "slimy son of a bitch" and a
"cock sucker," and said he wanted to meet him right then.[8]
Oldright said Tucker knew where he was. Tucker said he wanted to
"beat the shit out of" Oldright. Oldright said he would meet
Tucker in 10 minutes at the corner of Kernita and Weedpatch.
After calling Oldright another name, Tucker hung up. During the
conversation, Oldright also said some nasty words. He was angry

---

[8]    Angela Hill took the call for the answering service. Tucker
was rude and refused to give his last name. Before she
disconnected after patching through the call to Oldright, she
heard Tucker say, "You sorry son of a bitch."

with Tucker when he hung up.

Oldright went outside and told Cabello, who had to get home, to load his bicycle and tools in Oldright's truck. Oldright then went back into the house and got his pistol out of the dresser drawer. He kept it in a paper bag because he normally carried it inside a pouch in a box in his truck. He had been carrying it in his truck for perhaps 10 years. He kept it there because he sometimes went on service calls at night into dangerous areas. Oldright kept the shells in the clip, but did not keep a live round in the chamber. The gun was not in the truck on this occasion because he and Velma had been moving. He went and got the gun because he "sure wasn't going to go down there without it." Oldright put the bag with the gun into his pocket and went out to the truck. Then he placed it in a box on the seat of the truck. It was just sitting on the top of the box.

Oldright and Cabello then went to the corner of Kernita and Weedpatch. Oldright told Cabello that he was stopping there because he was going to talk to Tucker. Cabello was Tucker's friend; Oldright felt that with Cabello present, there would not be any violence. They waited for 10 to 15 minutes, and when Tucker did not come, Oldright believed he had calmed down. He then took Cabello home.

After he dropped Cabello off, Oldright headed home. As usual, he exited the freeway at Weedpatch Highway. As he approached DiMiller, he saw the white Oldsmobile in which Tucker had left the house. Oldright thought Tucker was driving.

Oldright feared an ambush, because the car was parked so that
Tucker could see Oldright coming from any direction. Oldright
pulled in on DiMiller; he was not going to go down Kernita
because it is a very narrow street and he was concerned Tucker
might come in behind him.

Oldright intended to park beside the other car and talk
to Tucker from that location. At the last second, he changed his
mind because he realized Tucker's door would be by his own door,
and Oldright wanted to keep his truck between the two of them.
He then pulled in the other way and, because he was going so
fast, skidded for a couple of feet and then drove over the curb.
He drove over the curb so he would not be in the street where
Tucker could ram him. He did not block the other car, but
instead parked about 20 feet away.

When Oldright pulled up, he could see the other vehicle
was being driven by a female. When he stopped, he could see
Tucker standing inside the open passenger door. It appeared he
had just gotten out of the vehicle. He was looking in Oldright's
direction.

Because Oldright was alone, he pulled his pistol out of
the pouch. He was not going to get out alone; Tucker outweighed
him by 75 pounds. At that point, there was no shell in the
chamber of the weapon.

Oldright got out of his truck and started walking
around to the front. Tucker was moving around the door, over to
Oldright's side. Oldright walked over to Tucker's car. He
walked parallel with that vehicle. Tucker kept moving around the

29

car door. He was not really walking, but appeared to be maneuvering like he was going to jump or something. He looked strange; his eyes were piercing, as if he wanted somebody dead. Tucker was basically in a wrestler's stance; his feet were apart and his hands were up and out in front of him. Oldright felt Tucker looked like someone on drugs. He had a look of "pure hate."

Tucker only moved to about the front of the car. At the same time, Oldright was moving parallel. Oldright came no closer to Tucker than 10 to 12 feet. He knew he was no match for Tucker, who was taller and weighed more. He felt Tucker would "make mush" out of him.

When Oldright was within 10 to 12 feet of Tucker and parallel with the front of the car, he cocked his weapon to show that it was a real gun. Oldright was holding his arms up in the air. He cocked the gun by pulling back the bolt on top. That chambered a round. Oldright had had the gun for many years and knew how to use it. He knew he was putting a live round in the chamber. He did it to show Tucker it was a real weapon and that all they were going to do was talk. He expected Tucker to stop and talk. Instead, Tucker continued walking toward the front of his car. He was still maneuvering as if he wanted to attack or jump Oldright. Oldright could see there was nothing in Tucker's hands at the time he cocked his gun. The testimony on this subject, elicited during cross-examination of Oldright, reads as follows:

30

"Q.  And where were you located when he got
around the corner of the [car] door?

"A.  I had started walking parallel in front
of my truck past my truck.

"Q.  So he walked out in a wrestler's stance
like this.  Is that correct?  I have my feet
apart, I have my hands up.  Is that right?  Like
this?

"A.  Similar to that.

"Q.  And he had nothing in his hands?

"A.  When he walked around the door, he had
nothing in his hands.

"Q.  His hands were up and out in front of
him?

"A.  Basically, yes.

"Q.  And you had a gun that you had cocked
and loaded.  Is that right?

"A.  Yes, sir.

"Q.  When did you cock and load it?

"A.  When I got over where I was parallel
with the front of the car.

"Q.  So you walked out around your truck, he
walked out, he had nothing in his hands, you
cocked and loaded your weapon?

"A.  Yes, sir.

"Q.  Is that right?

"A.  Yes, sir."  (Emphasis added.)

Oldright continued to hold his arms up above his head,

with the gun in clear view.  He started talking, because he had

already pulled back the bolt and showed Tucker that it was a gun.

31

Oldright is right-handed, and the gun was in that hand. Oldright told Tucker that he couldn't take this anymore, and that he wanted Tucker to leave him alone. Tucker looked like he was going to jump at Oldright. Oldright told him, Ron, no, and then there was a bang.

At the time the gun discharged, Oldright was just trying to show Tucker that he had a live gun. Oldright's finger was on the trigger; the gun has to be held like that for stability. He had a firm grip on the pistol; his two middle fingers were wrapped around the handle. His pinky was sticking out. He had the weapon like this because he was not planning on using it. He was not walking directly at Tucker, but he was facing him. He was holding the gun up in the air. His testimony was that the gun, pointed up, shot Tucker in the neck.

Oldright had traveled about 20 feet between the time he exited his vehicle and the time the shot was fired. Tucker had traveled six to eight feet during that time. When Oldright first saw him standing behind the car door, he could not tell if Tucker had anything in his hands. After Tucker started moving around the car door, Oldright was able to see that there was nothing in his hands.

Oldright did not intentionally fire the gun. He did not point the gun at Tucker or intend to shoot or kill him. His gun did not have a hair trigger. However, Oldright did not believe one had to consciously pull the trigger to fire that gun. He explained: "If you have an involuntary action, meaning if you have it and like I did, I had fear, and he was starting to move

32

toward me like he was going to jump me, and if he jumped my hand
would have went like that I know.  Just like if somebody jumps at
you, you have an automatic reaction.  It's an involuntary action,
you automatically do something.  At least I do."

When the weapon fired, Oldright said, oh, my God, help
me.  He was in shock.  He put the gun in his back pocket.  Tucker
fell right by the front fender of the car.  Oldright ran to him
and put his fingers in the two holes in Tucker's neck.  He also
administered mouth-to-mouth resuscitation and attempted CPR by
pushing on his stomach.

At first, Tucker was lying on his back.  Oldright later
had someone help him roll Tucker over in an attempt to get some
of the fluid out of his throat.  They rolled him onto his side.
Other than that, the body was not moved.

After Oldright administered mouth-to-mouth
resuscitation but before he started CPR, he went to his truck,
turned on his phone, and dialed 9-1-1.  He pushed "send," but
nothing happened.  He tried again, but still received no
response.  He then returned to helping Tucker.  Oldright sought
Cobb's help, but she was hysterical.  Finally, he was able to
explain to her how to use the telephone.  She dialed 9-1-1, but
said she did not hear a dial tone.  About that time, Oldright
waved over a passerby.  Oldright sent him to find a telephone.
Another person came by and this person had a car phone.  He
called 9-1-1.

Fire department personnel arrived first.  They asked
Oldright to help put compressive bandages on Tucker's neck.

33

Oldright did tell the fire fighters that he was one of the good guys. He said this because he had blood all over him and he wanted them to know he was not dangerous. Their recollection of his statements was basically correct, except he never said he had just done society a favor. He did not feel that way about Tucker. He did tell the fire fighters that Tucker was going to "kick his ass" and he shot him, and he never told them it was an accident.

Photographs of Oldright's right hand, which were taken on April 16, showed two small cuts on his pinky finger. Oldright received these injuries when the gun fired. With this pistol, there are only two fingers on the handle. The other finger is curled up underneath. If this finger is not curled underneath, the clip juts out. If the finger is not curled underneath the pistol, it will be cut when the weapon discharges. Oldright did not have a firm grip on the handle of the pistol when it fired. The clip cut his finger.

Carlos Cabello basically confirmed Oldright's account. As of the time of trial, Cabello had worked for Oldright for a number of years. Tucker and Cabello were on a friendly basis.

On Sunday, April 14, Cabello was with Oldright all day, working at Oldright's home. Early that afternoon, he saw Tucker at the house and they exchanged greetings. Cabello had to be home at 5:00; around 4:00, Oldright said he would give him a ride home.

Oldright told Cabello to put his (Cabello's) bicycle inside the truck. He then said he was going inside and that he

34

would be right back.  Cabello waited in the truck, then Oldright
returned and they left.  Oldright said he wanted to talk to
Tucker.  He said they would wait a little while on Weedpatch
Highway.  The two men then waited at the corner of Weedpatch and
Kernita.  After about 15 minutes, Oldright said he guessed Tucker
was not going to show up and so he was going to take Cabello
home.  Oldright did not say why he wanted to talk to Tucker.  He
did not appear to be upset or angry.  Oldright then dropped
Cabello off at the latter's home and left.

On rebuttal, Samuel Wiseman, who was Oldright's
employee from April until July and a coworker of Cabello,
testified that about three days after the shooting, he saw
Oldright telling Cabello to do something.  Oldright was moving
his hand back and forth and seemed very upset.

Wiseman subsequently spoke with Cabello about what had
transpired.  Cabello said Oldright wanted him to lie for him in
court.  Cabello did not want to because he was afraid of going
back to jail.  Cabello said he was there when Oldright went into
his bedroom and got a gun.  He said Oldright was angry.  Cabello
described Oldright yelling on the phone and saying something
about meeting on Highway 58.  Oldright went into the bedroom;
when he came back out, he was tucking an object into his pants.
Cabello said it was a gun.  When Cabello told Wiseman this, he
seemed slightly nervous.  He seemed scared about going back to
jail.  Cabello said he did not want to lie for Oldright.

At trial, Cabello denied being asked to lie by Oldright
or telling Wiseman anything like that.  He denied seeing Oldright

tuck anything into his waistband when he came out of the house, or telling Wiseman anything about that.  Cabello never saw Oldright carry a gun in his truck.

Oldright testified that he was in custody on the date Wiseman said the conversation took place, as he remained in custody from April 14 to April 29.  According to Oldright, Cabello was not inside the house during the telephone conversation with Tucker and there was no discussion about meeting Tucker on Highway 58.

Oldright also presented medical, psychological, and scientific evidence.

Ronald Smith, a forensic toxicologist for Kern County who is connected with the coroner's office, collected various samples from Tucker.  Samples are taken in all cases of traumatic death.  Where, as here, the individual was hospitalized for a period of time, the toxicologist automatically obtains admission specimens from the hospital.  Smith obtained a blood, serum, and urine sample.  A label on the blood sample indicated it had been drawn at 5:25 p.m. on April 14, 1991.  The serum, which separates from the red blood cells when those cells clot in a sample that has been taken, was drawn at the same time.  The urine sample bore a notation that it had been taken on April 14, but did not indicate the time.

Smith performed toxicological analyses on the samples. The alcohol and barbiturate studies were done on blood taken antemortem.  The basic neutral drug study was done on the blood retrieved at the autopsy.

36

The antemortem blood sample was negative for alcohol and barbiturates. The blood sample taken at the autopsy was positive for desipramine and phencyclidine. Desipramine is an antidepressant. The urinalysis was positive for a metabolite of cocaine, phencyclidine, and desipramine. Smith did not perform a quantitative analysis. However, he sent the serum to the Central Valley Toxicology Laboratory in Clovis for further analysis. He requested a quantitative analysis for PCP and cocaine. The serum was sent to Central Valley Toxicology on April 19. In serum, the levels of PCP and cocaine/cocaine metabolite will not degenerate over time so as to alter the results.

One of the places PCP is stored is in the fatty tissue of the body. It can be released from this tissue into the system. The positive PCP screening obtained on the postmortem specimens from Tucker's body could have been the result of him burning fatty tissue and releasing PCP into his system. However, Smith felt the drug was in the postmortem samples because it is also stored inside the red blood cells. In order to obtain a true level of PCP in the blood, a whole blood sample is preferable. Here, the cells apparently were coagulated.

Symptoms of PCP use include nystagmus, hyperthermia, hypersalivation, a blank stare or more of a catatonic state, muscle rigidity, and various mental manifestations. If, at the time of the shooting, Tucker was not exhibiting any of these symptoms, the PCP found in his blood and urine might be the result of release of PCP into his system due to the traumatic event of being shot. Another explanation would be that he was on

a low dose of the drug at that particular time.  A third
explanation would be tolerance--his body had grown used to the
drug.

PCP does not always make an individual violent.
However, one of the characteristics of PCP is its
unpredictability.  Even a low dose can cause bizarre behavior.

Bill Posey, a forensic toxicologist and owner-director
of Central Valley Toxicology in Clovis, received the serum sample
from Smith on April 22, 1991, with a request to confirm the
presence of cocaine and PCP.  The confirmation included a
quantitative level.  The analysis was performed the following
day.

Whole blood is usually preferable to serum in terms of
analysis.  In the case of cocaine, this is not a major factor.
In the case of PCP, blood tends to be about five times higher
than the serum.  However, the blood level could be the same as
the serum level, or the ratio could be anything in between.

In Tucker's sample, Posey found cocaine and its primary
metabolite, benzoylecgonine (b-e).  The cocaine was present at a
level of .034 milligrams per liter.  The b-e was present at a
level of .040 milligrams per liter.  PCP was detected at a level
of .034 milligrams per liter, plus or minus .004.  Cocaine and
b-e are not the same; as the body detoxifies itself of the
cocaine, the drug is converted to an inactive form called b-e.
The presence of both is indicative of use of the drug.
Conversion of cocaine into the metabolite can occur even after
the sample is collected.  Determining the rate of conversion is

virtually impossible.   The maximum possible amount of cocaine in this case was .070.   With regard to the PCP, given the studies which indicate the serum levels can be five times less than the blood levels, the results in this case could give a blood level of approximately .20 milligrams per liter.[9]

A level of .034 is typical of the level seen in people who would be considered to be driving under the influence of PCP. They may or may not drift in and out of a semicomatose condition. They would definitely show signs of impairment such as muscle rigidity, increased body temperature, and problems with coordination and in particular slow coordination.   A level of .20 would be consistent with individuals who are found to be walking on the street under the influence of PCP.   It is an advanced stage of intoxication.   Such people generally are very warm and will remove their clothing.   They will have obvious rigidity and will tend to moon walk rather than have a normal gait.

In both cases, the PCP user can be environmentally stimulated to have violent, or at least abnormal, behavior. People under the influence of PCP are very sensitive to light and sound.   Loud noises cause them to become very irritated.   Posey has not seen any indication that PCP users overly react to situations where they are subjected to stress or anger.   Most of the time, the individuals are rather subdued and lethargic.

---

[9]   Research does not indicate a major difference between blood, urine, and serum levels where cocaine is concerned.

39

Posey would not expect someone with a blood level for PCP of .20 milligrams per liter to be able to walk, talk, and converse normally.  While the person's tolerance for the drug would be a factor, .20 would be a high amount even for a chronic user.  Someone with a blood level closer to the lower level--.030 (.034 with the margin of error)--would exhibit fewer and to a lesser degree the symptoms of PCP.  The behavior aspect fluctuates; the user's behavior can quickly change, and the blood level does not necessarily dictate whether this will occur.  Much depends on the outside stimulation to which the user is subjected.  If that person is in a calm situation, he may be expected to react to that in his behavior.  If he is subjected to a stressful, angry, or violent situation, he may become violent in return.  This kind of reaction can occur with very minimal levels of the drug.

Dr. Couture, a clinical neuropsychologist, evaluates people who have neurological dysfunctions.  A major portion of his practice involves people who have suffered brain trauma from head injuries.  He once was affiliated with CNS; he remained a consultant to that organization.  CNS utilizes multiple disciplines in an attempt to rehabilitate the injured person.

Couture never met Tucker.  Pursuant to defense request, he reviewed Tucker's records from CNS.  Tucker was an in-patient there from October 2, 1990 to January 9 or 10, 1991.  Couture

40

also reviewed the records of Tucker's stay at Charter Hospital.[10]
Tucker was a patient there from late January to early February
1991. Couture also reviewed records from Mercy Hospital dated
October 2, 1990, and records from Kern Medical Center bearing the
same date. Couture read Tucker's arrest records from 1979 to
1991, as well as some probation reports. Finally, he interviewed
Bob West. Additionally, prior to his involvement in this case,
Couture was asked by Dr. Schenkman, Tucker's treating
psychiatrist at Charter, to review Tucker's records. Couture
performed that consultation in approximately February 1991.

From his review of the various records, Couture
concluded Tucker was apparently suffering from a head injury. On
December 7, 1989, he fell about 12 feet from a ladder while he
was working, struck the back of his head, and was rendered
unconscious. He was treated at CNS for the complications from
that injury.

CNS psychologists diagnosed Tucker as having atypical
or mixed organic brain syndrome and postconcussion syndrome.
Atypical or mixed organic brain syndrome means something is wrong
with the person's brain, but it is not well specified.
Postconcussion syndrome falls within this category. Basically,
this means the person has a specific constellation of strengths
and weaknesses that are usually seen with people who have a brain

---

[10]    Charter Hospital is an in-patient psychiatric facility in
Bakersfield. It is a general psychiatric hospital; it has a unit
that is devoted to drug rehabilitation.

injury which is not severe enough to constitute dementia.
Couture believes Tucker also suffered from frontal
lobedysfunction.

A concussion basically is a bruised brain.  When Tucker
struck the back of his head, the brain struck the front of the
cranium.  The brain is divided into halves.  Each half contains
four lobes which do fairly specific things.  The frontal lobe
essentially processes information and is involved with planning
motor movements, emotional control, and with thinking such as
abstraction, cognition, and "putting it all together."  Frontal
lobe syndrome involves a disruption in this complicated,
integrated system.  Disruptions here cause disruptions in
planning, emotional control, and the ability to govern one's
behavior.

The frontal lobe is the area where emotions are
inhibited.  The inhibitory centers in the frontal lobe act on the
limbic system of the brain.[11]  When there is decreased
inhibition--decreased ability to shut down the limbic system--
there will be symptoms of emotional discontrol, such as immediate
anger.  A person with this problem will be anxious, tense, and
irritable.  He or she will tend to either act out, turn the anger
inward (depression), or experience a combination of the two.
There may be paranoia and misinterpretation of things.

---

[11]    The limbic system is part of the "old" brain; humans share
it with reptiles.  It is the portion of the brain that makes a
lizard run when it is scared.

One of the characteristics of postconcussion syndrome
and of brain injury in general is an increase in lability, i.e.,
the quickness with which a person changes.  Changing from extreme
anger to conciliation and back again within a fairly short period
of time is one characteristic of this kind of disorder.  A
person's environment contributes to his or her reaction; the
person may react accordingly to a confrontational environment.  A
person's reaction to a confrontational situation will also depend
upon that person's previous personality; someone who was
extremely aggressive will be more likely to become aggressive.
Couture felt that when stressed, Tucker would have been more
likely to respond with aggression than conciliation or
withdrawal.

Couture also diagnosed Tucker as having antisocial
personality disorder.  A person with this disorder has a
consistent pattern since childhood of antisocial behavior, with
little remorse.

Couture found manifestations in the records by Tucker
of an inability to control emotions.  For example, shortly after
his injury, Tucker angrily and impulsively destroyed a lot of
material that he and his girlfriend were going to use to set up a
business.  In addition, there were a high number of angry and
confrontational interactions with the CNS staff.  While Tucker
might have done these things before his injury, he appeared to be
doing them more often or more quickly.  It also appeared from the
CNS counseling records that feelings of anxiety, depression, and
fearfulness were in evidence in his behavior.  In addition,

Tucker was substantially more aggressive and confrontational than most patients at Charter Hospital.

In Couture's opinion, Tucker's discontrol of emotions was both the result of the head injury and was a long-standing personality manifestation. A head injury does not reinvent a person; it takes what that person was before and exaggerates it.

A head injury changes a person's response to drugs. The effects of drugs in general are more pronounced. Use of drugs would have further lessened Tucker's ability to control his emotions. However, Couture was unable to say with certainty whether, on any given occasion, Tucker would have become more aggressive if he ingested PCP. Officer Tunnicliffe's arrest report--which described Tucker as cooperative and not hostile-- was consistent with Couture's opinion. A person on PCP may or may not act violently. All Couture could do was give an opinion concerning what Tucker would be more or less likely to do.

It appeared to Couture that Tucker carefully tried to manage the presentation of himself to others. He may have done it more than most people. In the presence of a relatively new girlfriend--Cobb--Tucker probably would have been disposed to act in a very macho and threatening manner. In a confrontational situation involving the presence of someone of whom he thought highly, Tucker would probably have felt the need to stand up for himself. Couture could not say whether Tucker acted aggressively or passively toward Oldright when they met at the time of the shooting. However, Tucker had a history of violence within his family unit. Also, he would have been in front of an audience

44

during the confrontation.

Dr. Joseph Shannon is a psychiatrist who has an extensive background in the field of drug abuse and who, at the time of trial, was treating patients who were addicted to cocaine and PCP. At defense request, he reviewed various records from CNS and Charter Hospital, probation reports, arrest and police reports concerning the shooting, and Tucker's toxicology report.

The earliest record Shannon had regarding Tucker's drug abuse was from 1979. Most of Tucker's arrests and/or convictions involved the use of PCP, although there were a number of references to alcohol and driving under the influence of alcohol. It was clear to Shannon that as of April 1991, Tucker had an ongoing problem with PCP. He would be properly termed PCP-addicted and at times in remission in the sense that he was not actively on the drug at a particular time.

PCP, which is found in both liquid and crystal forms, can be ingested in a number of ways. Most users smoke cigarettes dipped in the liquid. The effect is prompt. Users like the drug's pleasurable visual effects and its tranquilizing effect. There is also a feeling of omnipotence. A PCP high usually lasts five to seven hours, although the effects can be felt for ten to twelve hours. If a high dose is involved, the adverse side effects can last for 24 or more hours.

Some of the adverse side effects of PCP are emotional lability and hostility, although hostility is probably generated more by the atmosphere than by the drug itself. The drug is a stimulant. If the user gets into a negative situation, such as a

45

confrontation or a potential arrest, the person may become violent.  PCP is an anesthetic agent, so a user involved in a fight, for instance, is much less aware of the trauma he or she is suffering.  The stimulant effect also allows a person to do extraordinary things.

PCP can be found in the user's urine for up to seven days after ingestion.  Urine concentration will increase with chronic use.  PCP is readily stored in the fatty tissues of the body.  It is also readily released.  PCP does not necessarily make a person violent.

Shannon reviewed Tucker's toxicological report.  Anyone who has PCP in his blood system is considered to be under the influence of PCP.  From a clinical standpoint, there was sufficient PCP at .034 milligrams per liter for Tucker to be under the influence.  However, what that means depends on the person's size, the situation he or she is in, his or her personality, and whether the person is a chronic user or is not tolerant of the drug.  If Tucker were a non-tolerant person, .034 milligrams per liter would be more significant in terms of the behavioral effects of the drug.  Tucker would be classified as a chronic user of PCP, and Shannon believed he was tolerant of the drug.  Therefore, the effect of PCP would be less visible to other people because he would not be as agitated or exhibit the classic signs of PCP intoxication.  Shannon saw nothing in the reports of the April 14 incident to indicate Tucker exhibited any of the classical physical signs of being under the influence of PCP.

Given a single blood sample with this level of PCP, Shannon could only say that Tucker took PCP within the preceding week. A second sample, taken a number of hours later, would have been needed to establish whether the drug was recently ingested.

Cocaine is a stimulant which produces euphoria. It also speeds up bodily functions such as pulse, and increases blood pressure. Cocaine has typical stimulant side effects such as nervousness. When taken continuously over an extended period of time such as three or four days, it renders the user psychotic.

Most cocaine users smoke the drug in the process known as free basing. In snorting cocaine, close to 50 percent of the drug does not get into the bloodstream. The effects are slower and not as strong, although they last longer. Shannon saw evidence in the materials he reviewed that Tucker had a free base kit. When cocaine is free based, its effects are felt within about 30 seconds. The high lasts only 20 to 40 minutes. The effects last four to six hours if the drug is snorted, with onset in about 15 or 20 minutes.

Both cocaine and PCP remain in the urine longer than in the blood. Cocaine will be gone from the bloodstream within about three days. PCP remains in the bloodstream for four to five days and will be gone from the urine within a week.

Based on the toxicological reports, Shannon was able to say that Tucker had taken cocaine within the previous 24 to 48 hours.

A person who has significant levels of both PCP and