EXHIBIT B-2

cocaine in the bloodstream is doubly intoxicated.  The
combination of drugs will produce a more emotionally labile
person, i.e., a person who is less in control of his or her
emotions.  The person will be more likely to respond to a
stressful situation in an emotional or potentially hostile
manner.

Frontal brain lobe syndrome, which Tucker was diagnosed
as having, can cause behavioral manifestations such as anger and
violent outbursts.  PCP and cocaine would have had an additive
effect, whether the discontrol problems resulted from trauma or
personality.

Based on Tucker's records, especially the frequency of
altercations with the law and of being on probation and dependent
on the criminal justice system, Shannon felt Tucker had
antisocial personality disorder.  Part of the definition of being
an antisocial personality is a person who violates court orders.
Tucker was under court order not to use drugs.

<u>DISCUSSION</u>

I.      <u>Failure to Disclose Evidence</u>

Oldright contends he was entitled to a new trial
because the prosecutor failed to disclose what Cobb knew about
Tucker's ongoing drug use.  He argues this point in terms of
discovery and prosecutorial misconduct.  In this section, the
prosecutor's actions will be evaluated according to pertinent
rules of discovery.  Prosecutorial misconduct will be considered
in section II, <u>post</u>.

48

A.    Facts

On or about June 13, 1991, Oldright filed a motion for discovery of, inter alia, the names and addresses of witnesses the prosecutor intended to call at trial, all statements of those witnesses, and information which might be used to impeach those witnesses. With exceptions not relevant here, the motion was granted on July 26.

During trial, defense counsel questioned prosecution witness Jerrise Cobb about how long she and Tucker had lived together in the apartment where they resided at the time of Tucker's death. This exchange took place:

> "Q. A couple months. During the time that you lived there did Ron [Tucker] keep any -- to your knowledge did Ron have any drugs there?
>
> "A. Prescribed drugs.
>
> "Q. What prescribed drugs did he have?
>
> "A. The only one I can remember is Xanax.
>
> ". . . . . . . . . . . . . . . . .
>
> "Q. Did Ron smoke cigarettes?
>
> "A. No.
>
> "Q. Do you know what PCP is?
>
> "A. Just that it's a drug.
>
> "Q. Pardon me?
>
> "A. Just that it's a drug. I don't know --
>
> "Q. Phencyclidine?
>
> "A. -- exactly what it is.

"Q.  Have you ever seen it used or been around people who use it?

"A.  No.

"Q.  Do you know how it is used?

"A.  No.

"Q.  You don't know how it is taken?

"A.  No.

"Q.  Do you know what cocaine is?

"A.  Yes.

"Q.  Do you know how people use that?

"A.  Yes.

"Q.  How do they use it?

"A.  Can snort it or -- I guess there's other ways, I don't know."

Velma Oldright subsequently testified for the prosecution.  When asked by defense counsel if her son had a problem with drugs, she said she thought he did at one time, before 1989.  She never saw him use drugs, and did not know if he used drugs after 1989.  Velma testified that at one point, Tucker told her he had a drug addiction problem and needed some help. He also said he had changed his life with the Lord's help.  Velma did not know when this conversation occurred.  She knew Charter Hospital was a hospital for people with drug, alcohol, and other dependency problems, and she had heard Tucker had gone there.  As of January 1991, she knew of no dependencies Tucker had that would cause him to check into Charter Hospital.

After the jury rendered its verdict, Oldright moved for

50

a new trial on grounds which are not relevant to this issue. The

motion was to be heard on October 10, 1991, the date originally

set for sentencing.

On October 10, defense counsel requested a continuance

because he had just received the probation report that morning.

The court granted the request, but permitted Jerry Cobb

(Jerrise's father) to make a statement for consideration in terms

of sentence.

In part, Mr. Cobb objected to the way Tucker had been

portrayed during the trial. He stated:

> "And as I -- and as I said previously, ninety
> percent of the trial was about the wrong things
> that Ron had done and that he was still on dope.
> Well, they didn't bring out the part that he was
> working for undercover agents, making buys to help
> get dope off the streets, or ninety percent of
> this trial could have been avoided. And that Ron
> was aware that one day by making these buys that
> he'd have to take dope in front of people so they
> would believe that he was one of the dopers. And
> that day happened just a few days before you shot
> him.
>
> "THE COURT: I don't want you talking to the
> Defendant. You talk to me, sir.
>
> "JERRY COBB: Okay. They told him that he
> would have to take some dope maybe in front of
> some people. So that day come that they had the
> deal set up, he had to take it, that's how come
> the dope was in his system. . . ."

At defense counsel's request and on the representation

that he had never heard about this before, the court had Mr. Cobb

sworn and permitted questioning by counsel. Mr. Cobb explained

that he knew Tucker worked as an undercover agent because Jerrise

told him. Jerrise also told him Tucker was aware he might have
to take drugs in front of people in order to make a drug buy, and
that he in fact had had to do this a few days before he was shot.

In light of Mr. Cobb's testimony, defense counsel
requested an order that he be entitled to interview Jerrise. He
represented that he had never been provided with her address and
did not know how to get in touch with her, and that he wanted to
include newly discovered evidence as a basis for his motion for
new trial. When the prosecutor mentioned that Cobb was present
in the courtroom, the court declined to order her to submit to an
interview, but said defense counsel could question her if he
wanted. The court commented:

> "I would observe again that to me this is a non-
> issue. I cannot conceive of any way in which it
> would have been consistent with the defense's
> theory of this case to put on evidence that Ron
> Tucker was working as an undercover operator. I'm
> certainly not impressed affirmatively or
> negatively with regard to the evidence that came
> in about Ron Tucker with Mr. Cobb's testimony that
> he was working as an undercover operator. To me
> that issue, that is, whether he was working
> undercover or not, is a non-issue to the issues in
> this case."

Oldright subsequently filed an amended motion for new
trial based on newly discovered evidence. He claimed the
evidence was highly relevant because it tended to show bias on
the part of several law enforcement witnesses; and impeached
Cobb's testimony that Tucker had not used drugs for over six
months prior to the fatal shooting.

Jerrise Cobb testified at the hearing on the new trial

52

motion.  She and Tucker lived together for three to four months.
During the time they knew each other, Tucker told her he was
working as an undercover agent for a law enforcement agency.
Cobb believed he first told her this in January of 1991.  He did
not specify which agency, although she heard the names "Scott"
and "Bailey."  Tucker had been arrested in January for possession
of PCP.  He was on probation during 1991.  She understood him to
be doing this drug work so he would not have to go to jail.

In January or February, Cobb came in contact with Scott
when she took Tucker downtown to meet with him.  After the
meeting, Tucker told Cobb they had to set up a deal.  Cobb did
not know when the deal was to take place.  On other occasions,
she heard Tucker say he was going to meet Scott, but this was the
only time she was present.

Cobb never went with Tucker to participate in any kind
of undercover activity.  Tucker said he was supposed to go in and
make sure there were drugs in the house.  He was supposed to buy
drugs.  Cobb did not know if he was given money for that purpose.
She knew he completed the deal in question because she heard
Tucker speak with Scott by telephone and tell him the deal had
happened.

Sometime after January or February, the case was turned
over to Bailey, and Tucker began working with him instead of
Scott.  Cobb never met Bailey.  Tucker and Bailey frequently
spoke by telephone, but Cobb did not know how many times they
actually met.  Tucker met with Bailey within the week before the
shooting.  Tucker did not tell Cobb what was discussed.

When Tucker first began working undercover, he told Cobb that he might have to take drugs. She did not know if Tucker ever told her that he actually took drugs as a result of a drug buy; she could just tell when he had had to. Tucker did not say what kind of drugs, but she sometimes noticed he was under the influence.

Cobb could tell Tucker had taken drugs as a result of the meeting during the week before the shooting. When he came home, his eyes were red and he was "real mellow." She had seen him like that a couple of times before. He did not tell her what kind of drugs he had taken. The last time Cobb saw Tucker possibly under the influence of drugs was several days before his death.

Following Cobb's testimony, the trial court denied a defense request for continuance to locate Scott and Bailey. The court felt that confirming Tucker was in a buy program would not lead to any evidence which would assist the defense, as putting such evidence before the jury would "undo" all of the defense efforts to show at trial that Tucker was a violent, hostile, antisocial person about whom Oldright was rightfully concerned.

The court next turned to the merits of the new trial motion. With regard to this particular aspect, defense counsel argued that Cobb's testimony contradicted her testimony at trial, where she said she had no evidence Tucker used any drugs. Counsel also felt law enforcement witnesses would say their operatives never used drugs while working under police supervision, thereby calling Cobb's credibility into question.

54

Counsel argued that as a percipient witness, her testimony was critical.

Robert Carbone, the prosecutor, admitted he had information during trial that Tucker was working with the police department. He obtained this information from Cobb. It was Carbone's position this was confidential information and should be kept confidential. He did not feel the information was relevant in the circumstances of this case, and was concerned other people (Cobb, for example) might be endangered if the information was released.

According to Carbone, Cobb told him that Tucker had said he had had to use drugs for the police. However, she did not say she had seen him use drugs or be under the influence of drugs. When she testified at trial, Carbone did not hear anything inconsistent with what she had told him. During trial, Carbone was stopped in the court hallway by a member of the Bakersfield Police Department narcotics squad, who asked if Carbone knew Tucker had worked for them. Carbone indicated he had that information, but did not speak to anyone specifically about Tucker's actions. To Carbone's knowledge, none of the investigating officers in this case knew anything about Tucker's work, nor were they from the agency with which he was involved. Carbone did not know of the extent of Tucker's work with the police department.

The court then recessed in order to read the reporter's transcript of Cobb's trial testimony. It subsequently informed both counsel that Cobb was asked whether, during the time Tucker

55

was a patient at CNS, she became aware Tucker was using drugs.
She said she was aware he was using prescribed drugs. She was
later asked whether, during the time she lived with Tucker, he
kept any drugs and she said prescribed drugs. She mentioned
Xanax. She testified he did not smoke cigarettes, that she did
not know about PCP other than that it was a drug, and that she
did not know how it was used. She did know about cocaine, but
she was not asked whether Tucker was using it. She further
testified that on the day of the shooting, she saw Tucker taking
prescribed medication, which she thought was Xanax. The court
concluded:

> "So, I do not find -- and I'm satisfied now
> after reading my notes and the reporter's
> testimony that Jerrise Cobb did not testify and
> was not asked whether the victim had taken drugs
> within a period of time prior to the incident.
>
> "Now, the reason that I have spent that time
> is I agree with you, Mr. Lemucchi [defense
> counsel], that if Jerrise Cobb had testified at
> the time of trial contrary to her testimony today,
> then counsel's failure to inform you of the
> information he had would be significant enough to
> grant a new trial. There's no question in my mind
> about that. And also to justify disciplinary
> action against him. However, she did not so
> testify. And so what Jerrise Cobb knew and what
> the prosecutor knew that you did not know was that
> Ron Tucker . . . had apparently been working on an
> undercover buy program and Jerrise Cobb believed
> that that had somehow caused him to be able to
> take drugs from time to time and that she had seen
> him ingest drugs within the week of the incident."

Defense counsel protested that the withheld information
could have helped the expert witnesses in terms of establishing a

56

time frame in which the PCP was taken, thereby helping the defense show Tucker consumed drugs much closer to the time of the incident. This would have assisted the experts in opining whether Tucker was under the influence and, if so, the likely consequences. Counsel also argued that failure to reveal possible exculpatory evidence was prosecutorial misconduct and would have led to considerable discovery regarding the police officers and Tucker's conduct. Counsel asserted he would have asked the officers about Tucker's behavior and any aggressive tendencies. He would also have wanted to know the names of people with whom Tucker engaged in the buys, so as to ask them the same types of questions.

The court ruled as follows:

> "All right. I do not condone the District Attorney's office being in possession of this information of the victim having been in a buy program and not conveying that to the defense and specifically not conveying to the defense the fact that Jerrise Cobb was aware or thought that he was using drugs. However, under [Penal Code section] 1054.1, in the absence of a written report in the hands of a prosecutor, I do not believe that that section was violated. More to the point, whether it was violated or not, I cannot conclude -- and that's the standard I have to use on a motion for new trial, that possession of the information that we have heard about here in testimony would have created a different result in this case. To my mind and I'm sure in the jurors' minds there was substantial evidence that the victim had used drugs, two drugs, recently enough to the incident that he had substantial levels of both of those drugs in his system. And, of course, the jury had the advantage of hearing testimony from experts as to how those drugs affected a person's activities. And it is my recollection of the experts'

testimony as to how long he would be under the
influence of those drugs that it would not have
been affected, had there been testimony, about a
week before this incident, somebody had seen the
victim mellowed out and obviously under the
influence of some unknown drug. I cannot
conclude, therefore, that this material would have
created a different result in this case in all
probability.

"I also would observe that it appears to me,
based upon the showing made by the defense, that
it would have been counterproductive to the
defense to have put in evidence that Ron Tucker
was working undercover. I would also observe that
it seems to me that it wouldn't have affected the
jury's views of the kind of person Ron Tucker was
positively or negatively. But it seems to me the
defense would not want to put that sort of
evidence in for fear that some juror might feel
that Ron Tucker was somehow justified in using
drugs, which is the last thing the defense would
have wanted the jury conjecturing about."

The prosecutor subsequently commented that the decision
not to reveal the information was not made on his own, but in
conjunction with his supervisor and the Special Prosecution Unit
of the District Attorney's Office, of which the prosecutor was a
member. The court then noted it did not condone the actions of
the prosecutor or his supervisor's recommendation in that regard.

B.   Legal Principles

"A motion for a new trial is made to the sound
discretion of the court, and its ruling will not be disturbed
except on a showing of clear abuse." (People v. McDaniel (1976)
16 Cal.3d 156, 177.) In ruling on a new trial motion, the trial
court is "guided by a presumption in favor of the correctness of
the verdict and proceedings supporting it." (People v. Ross

58

(1988) 205 Cal.App.3d 1548, 1553.)

Oldright claims his motion for new trial should have been granted because the prosecutor violated general discovery principles which exist as a matter of federal constitutional law. Oldright does not appear to contend the prosecutor also violated section 1054 et seq. Accordingly, the statutory discovery provisions will not be addressed.[12]

"Under the due process clause of the Fourteenth Amendment to the United States Constitution, the prosecution has a duty to disclose all substantial material evidence favorable to an accused, including evidence bearing on the credibility of a prosecution witness; the duty exists whether or not the evidence has been requested, and it is violated whether or not the failure to disclose is intentional." (People v. Hayes (1990) 52 Cal.3d 577, 611; People v. Morris (1988) 46 Cal.3d 1, 29-30; People v. Ruthford (1975) 14 Cal.3d 399, 406.) "[E]vidence is 'material' which 'tends to influence the trier of fact because of its logical connection with the issue.' [Citation.] Thus, the prosecution's duty of disclosure extends to all evidence that reasonably appears favorable to the accused, not merely to that

---

[12]    Section 1054 et seq. was added by Proposition 115, an initiative measure which voters approved on June 5, 1990. Section 1054.1 sets out the prosecution's duty of disclosure to the defense. The due process clause of the United States Constitution imposes a duty of disclosure which is wholly independent of, and unlimited by, the statutory scheme. (Izazaga v. Superior Court (1991) 54 Cal.3d 356, 378; People v. Hayes (1992) 3 Cal.App.4th 1238, 1244.)

evidence which appears likely to affect the verdict." (People v. Morris, supra, 46 Cal.3d at p. 30, fn. 14.)

"'[A]bsent some governmental requirement that information be kept confidential for the purposes of effective law enforcement, the state has no interest in denying the accused access to all evidence that can throw light on issues in the case, and in particular it has no interest in convicting on the testimony of witnesses who have not been as rigorously cross-examined and as thoroughly impeached as the evidence permits.' [Citations.]" (People v. Memro (1985) 38 Cal.3d 658, 677.) However,

> "[f]ailure to disclose evidence relevant to the impeachment of a prosecution witness requires reversal 'only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial.' (United States v. Bagley (1985) 473 U.S. 667, 678.) Otherwise stated, reversal is required 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' (Id. at p. 682.)" (People v. Hayes, supra, 52 Cal.3d at p. 612, parallel citations omitted; see also People v. Pensinger (1991) 52 Cal.3d 1210, 1272.)

C.    Analysis

Under the principles set forth in People v. Morris, supra, 46 Cal.3d at pages 29-30 and People v. Memro, supra, 38 Cal.3d at page 677, the information in question arguably should have been disclosed.[13] However, "a constitutional error occurs,

---

[13]    If a prosecutor (with or without the input of other

(fn. continued)

and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." (<u>United States</u> v. <u>Bagley</u> (1985) 473 U.S. 667, 678; <u>People</u> v. <u>Hayes</u>, <u>supra</u>, 52 Cal.3d at p. 612.)

In this case, reversal is not required because there is no reasonable probability the result would have been different had the information been disclosed to the defense. (<u>United States</u> v. <u>Bagley</u>, <u>supra</u>, 473 U.S. at p. 682; <u>People</u> v. <u>Hayes</u>, <u>supra</u>, 52 Cal.3d at p. 612.) The materiality of omitted evidence is evaluated in light of the whole record. (<u>People</u> v. <u>Andrus</u> (1990) 226 Cal.App.3d 73, 80.) Where, as here, the issue of improper disclosure is raised via a motion for new trial, the trial court is in a good position to evaluate the failure to disclose. (<u>Id</u>. at p. 82.) The trial court did so here, even going so far as to read Cobb's trial testimony in order to assess the impact of the undisclosed information. The court's ruling is fully supported by the record.

Oldright claims on appeal, however, that had the

---

(continued)
prosecutors and supervisors) has a question about whether an item of information should be disclosed, we believe he or she should err on the side of caution and disclose that information, rather than run the substantial risk of reversal on appeal. If the possibility exists that disclosure of the information may endanger someone or hinder other law enforcement investigations, the prosecutor could request in camera review of the information and a protective order, along the lines of the procedure provided for in Evidence Code section 1042, subdivision (d). In fact, section 1054.7 permits the trial court to allow a showing of good cause for denial of disclosure to be made in camera, with a sealed record of the showing.

undisclosed evidence been presented to the jurors, they might
have (1) disbelieved Cobb's trial testimony that she had never
been around people who used PCP; (2) disbelieved Cobb's
implication that Tucker did not keep illegal drugs at their
apartment; and (3) inferred Tucker told his mother, in addition
to Cobb, about his use of illegal drugs, thus undermining Velma's
testimony about his drug use after 1989.  Had the jury decided
Velma and/or especially Cobb gave willfully false testimony on
any of these points, so the argument runs, the credibility of the
prosecution's most important witnesses would have been
significantly compromised.  Oldright also claims Tucker's work
gave police a reason to be biased in his favor, and thus against
Oldright, at trial, and the jury should have been permitted to
consider this possibility in weighing the officers' testimony.

         In addition, in conjunction with his writ petition,
Oldright has filed a declaration by trial counsel in which
counsel states that had the information been known to the
defense, it "could" have been used for the following purportedly
exculpatory purposes:  (1) to impeach Cobb's testimony that she
had never been around PCP users; (2) to question Officers Bailey
and Scott about Tucker's use of drugs three days before the
shooting; (3) to question Bailey and Scott about Tucker's
response when under the influence of drugs (i.e., violence,
temper outbursts, etc.); (4) to question Bailey and Scott about
how long Tucker had been involved in the drug buy program and
about whether they would tolerate their operatives using illegal
drugs; (5) to question Bailey and Scott about whether the drug

buy Tucker participated in three days before his death involved the purchase or use of cocaine and/or PCP; (6) to give the expert witnesses a basis for opinions about the effect of PCP and/or cocaine on Tucker's behavior, assuming those drugs were ingested three days before Tucker's death; (7) to imply that since Tucker told Cobb he was using illegal drugs as an undercover agent, he also told Velma, and to cross-examine Velma about the undisclosed information; and (8) to question Bailey and Scott about anyone else who might have seen Tucker during a drug buy and who might have made observations about Tucker's demeanor and behavior, thereby leading to other potential witnesses such as police officers, narcotic suspects, and civilians.

In our estimation, none of these possibilities is sufficiently concrete or relevant to justify a conclusion that the nondisclosure of Tucker's undercover work affected the outcome of the trial. Even though the prosecutor attempted to show that the PCP resulted from fatty tissue release due to the trauma of the shooting, the evidence overwhelmingly established that Tucker had PCP and cocaine in his system when he was shot. Dr. Shannon pinpointed the time of cocaine ingestion at 24 to 48 hours before the shooting, but could only say PCP was taken within a week. The assumption, based on the new information from Cobb, was that Tucker ingested the drugs about three days before the shooting. However, the record contains absolutely no suggestion the experts' opinions about Tucker's behavior would have changed had the time of ingestion been so specified.

We fail to find materiality in the source of the drugs

in Tucker's system, or in whether Officers Bailey and Scott would
have condoned the use of such drugs by an undercover operative.
As the trial court pointed out, the undisclosed information could
very well have left the jury with the impression Tucker was
somehow justified in taking drugs in order to protect his cover,
regardless of whether the conduct was approved by his
supervisors.[14]  In addition, the lack of information did not
prohibit defense counsel from questioning Cobb about Tucker's
drug use and behavior.

   Moreover, there was more than ample reason for the jury
to conclude Cobb and Velma were biased by virtue of their
relationships with Tucker.  Substantial portions of Cobb's
testimony were corroborated by physical evidence and rescue and
law enforcement personnel.  It is pure guesswork to believe those
law enforcement officers may have been biased toward Tucker (and
hence against Oldright) because Tucker was working undercover for
another law enforcement agency.  Significantly, Oldright himself
admitted he was angry when he finished speaking with Tucker by
telephone, and that shortly after, he got his gun.  While he and
Cobb differed over what he did once he got out of his truck at

---

[14]  Oldright speculates the officers would have testified they
would not have approved of Tucker's conduct in taking drugs.
Speculation is not available to us as a basis for decisions.  If
we were to guess, however, it would be equally reasonable for us
to presume the officers would have further testified they would
not have permitted Tucker to work as an undercover operative had
he exhibited any violence or bizarre behavior.  Either way, the
implication would not have helped the defense.

the scene of the crime, by his own admission, he chambered a round in the gun <u>after</u> he saw that Tucker's hands were empty. This was a crucial bit of evidence that worked against Oldright's version of events.

While it is <u>conceivable</u> the undisclosed information might have affected the verdict, the existence of such a possibility does not require reversal. As the United States Supreme Court stated with regard to the scope of a prosecutor's duty to disclose, "a jury's appraisal of a case 'might' be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt." (<u>United States</u> v. <u>Agurs</u> (1976) 427 U.S. 97, 108-109.) "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." (<u>Id</u>. at p. 109; see also <u>People</u> v. <u>Fauber</u> (1992) 2 Cal.4th 792, 829.)

Under the circumstances of the instant case, there is no "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (<u>United States</u> v. <u>Bagley</u>, <u>supra</u>, 473 U.S. at p. 682.) Accordingly, no constitutional error has occurred and reversal is not required. (<u>Id</u>. at p. 678; <u>People</u> v. <u>Hayes</u>, <u>supra</u>, 52 Cal.3d at p. 612.)

II.      <u>Prosecutorial Misconduct</u>

In his appeal, Oldright contends he was entitled to a new trial because of prosecutorial misconduct. He claims the

prosecutor in this case "was simply out of control."  In his writ

petition, he elaborates about the factual bases for his

allegations and the claim of prejudice.  He does not ask this

court to find reversible error in any single instance of alleged

misconduct (with the exception of the prosecutor's failure to

disclose Cobb's knowledge of Tucker's drug use), but claims the

cumulative effect of the purported wrongdoing was sufficient to

abrogate his constitutional rights to a fair trial and due

process of law.

  A.  <u>Legal Principles</u>

  "In general, a prosecutor commits misconduct by the use

of deceptive or reprehensible methods to persuade either the

court or the jury."  (<u>People</u> v. <u>Price</u> (1991) 1 Cal.4th 324, 447.)

The rules governing review of contentions of prosecutorial

misconduct are well settled:

> "'[T]he initial question to be decided in all
> cases in which a defendant complains of
> prosecutorial misconduct for the first time on
> appeal is whether a timely objection and
> admonition would have cured the harm.  If it
> would, the contention must be rejected [citation];
> if it would not, the court must then and only then
> reach the issue whether on the whole record the
> harm resulted in a miscarriage of justice within
> the meaning of the Constitution.'  (<u>People</u> v.
> <u>Green</u> (1980) 27 Cal.3d 1, 34.)
>
> "Generally, in order to raise the alleged
> misconduct on appeal, the objection must be both
> timely and specific.  (<u>People</u> v. <u>Simon</u> (1989) 208
> Cal.App.3d 841, 849.)  Moreover, where defense
> counsel objects during trial but does not request
> an appropriate instruction or admonition in order

to lessen the possible prejudicial effect on the
jury, the asserted objection is waived for
purposes of appeal. (<u>People</u> v. <u>Ghent</u> (1987) 43
Cal.3d 739, 762.) 'Simply to object or make an
assignment of misconduct without seeking a
curative admonition is generally not enough.
[Citation.] "The reason for this rule, of course,
is that 'the trial court should be given an
opportunity to correct the abuse and thus, if
possible, prevent by suitable instructions the
harmful effect upon the minds of the jury.'"
[Citation.]' (<u>People</u> v. <u>Bonin</u> (1988) 46 Cal.3d
659, 689.)

"The rule that a defendant must object and
request an admonition at trial in order to
preserve the issue for appeal, however, 'applies
only if a timely objection or request for
admonition would have cured the harm.'
Accordingly, the rule is not applicable where any
objection by defense counsel would almost
certainly have been overruled. (<u>People</u> v.
<u>Hamilton</u> (1989) 48 Cal.3d 1142, 1184, fn. 27.)
Likewise, where such an objection is overruled,
failure to request an admonition is excused
because there is no opportunity to do so. (<u>People</u>
v. <u>Green</u>, <u>supra</u>, 27 Cal.3d at p. 35, fn. 19.) [ ]

"A jury will generally be presumed to have
followed an admonition to disregard improper
evidence or comments, as '[i]t is only in the
exceptional case that "the improper subject matter
is of such a character that its effect . . .
cannot be removed by the court's admonitions."
[Citation.]' (<u>People</u> v. <u>Allen</u> (1978) 77
Cal.App.3d 924, 934-935.) However, in some
situations an admonition will actually exacerbate
the prejudice to the defendant. (<u>People</u> v. <u>Bolton</u>
[(1979) 23 Cal.3d 208,] 215-216, fn. 5.) Thus,
where improper comments and assertions are
interspersed throughout trial and/or closing
argument, repeated objections might well serve to
impress upon the jury the damaging force of the
misconduct. (<u>People</u> v. <u>Kirkes</u> (1952) 39 Cal.2d
719, 726.) In such a situation, a series of
admonitions will not generally cure the harmful

effect of such misconduct.  (Ibid.)"  (People v.
Pitts (1990) 223 Cal.App.3d 606, 691-692, fn. and
parallel citations omitted.)

Where the claim of misconduct focuses on comments made
by the prosecutor before the jury, the reviewing court must
determine whether there is "a reasonable likelihood that the
comment could have been taken to bear the implication defendant
asserts."  (People v. Clair (1992) 2 Cal.4th 629, 664.)  We must
remember that:

> "'"[i]t is the province of a district attorney to
> state to a jury the various conclusions that he
> draws from the evidence, and to make it clear to
> the jury what conclusions in his opinion should be
> drawn from the evidence introduced, so long as he
> keeps within the scope of conclusions which may
> properly be drawn."  [Citation.] "The right of
> counsel to discuss the merits of a case, both as
> to the law and facts, is very wide, and he has the
> right to state fully his views as to what the
> evidence shows, and as to the conclusions to be
> fairly drawn therefrom.  The adverse party cannot
> complain if the reasoning be faulty and the
> deductions illogical, as such matters are
> ultimately for the consideration of the jury."
> [Citation.]  In the argument before the jury, any
> reasonable inference may be drawn from the
> evidence, and it is a matter within the discretion
> of the trial court to determine whether counsel
> stays within the permissible range of discussion.'
> [Citation.]"  (People v. Beivelman (1968) 70
> Cal.2d 60, 76-77, overruled on other grounds in
> People v. Green (1980) 27 Cal.3d 1, 33-34.)

In this case, Oldright made various claims of
prosecutorial misconduct in his motion for new trial.  He repeats
those claims here.  However, he implicitly concedes the foregoing
rules are applicable; in response to the Attorney General's
arguments of waiver based on failure to object, Oldright asserts

the misconduct was so pervasive and extreme that it could not be cured by admonition.  As will become apparent, the record does not support this proposition.  (Contrast, e.g., People v. Pitts, supra, 223 Cal.App.3d at pp. 692, 694-815.)

In denying the motion for new trial, the trial court necessarily decided that any misconduct by the prosecutor did not require a new trial.  The trial court is in a better position that an appellate court to determine the probable effect of misconduct.  (People v. Hardy (1992) 2 Cal.4th 86, 213; People v. Sarazzawski (1945) 27 Cal.2d 7, 15.)  Where prosecutorial misconduct is raised as the ground for a new trial, the trial court's conclusion on that question will not be disturbed "unless in the circumstances it is plainly wrong."  (Ibid.; Hardy, supra, at p. 213.)

B.    Failure to Disclose Cobb's Information About
      Tucker

The prosecutor's failure to disclose what Cobb knew about Tucker's drug use and work as an undercover operative is fully discussed in part I, ante.  Even if the prosecution's omission was misconduct, it was not, as we have held, prejudicial.

C.    Failure to Disclose Cobb's Address

Oldright claims the prosecutor willfully violated the court's discovery order by failing to disclose Cobb's address. In his discovery motion, Oldright requested disclosure of the names and addresses of people the prosecutor intended to call as witnesses at trial.  In their response, the People stated they

69

had no objection to this request. During the hearing on the
motion, defense counsel said he needed Cobb's address and wanted
to interview her. The prosecutor responded that he would be
"happy" to provide the information to counsel as long as counsel
agreed not to provide Oldright with it. The trial court
subsequently granted the discovery request "as prayed."

According to the declaration of trial counsel Timothy
Lemucchi, which is attached to Oldright's writ petition as
exhibit A, Cobb's address was not furnished prior to trial. It
does not appear from the record or counsel's declaration that any
objection was raised to Cobb's testifying. However, after Mr.
Cobb testified in conjunction with the sentencing hearing,
defense counsel requested an order allowing him to interview
Cobb, as he had still not been provided with her address. Cobb
was present in the courtroom at that time, but, according to
Lemucchi's declaration, she rebuffed his attempt to contact her
after consultation with the prosecutor.[15]

Oldright subsequently filed a motion to compel release
of Cobb's address so that he could subpoena her for the hearing
on the new trial motion. The motion was later dropped after the
issue was resolved. Cobb testified at the hearing on the motion.

Sections 1054.1 and 1054.1, subdivision (a)
specifically require the prosecutor to disclose, to the defendant

---

[15]    The trial court properly declined to compel Cobb to submit
to an interview. A court has no authority to make such an order.
(Walker v. Superior Court (1957) 155 Cal.App.2d 134, 140.)

or defense counsel, the names and addresses of persons the prosecutor intends to call as witnesses at trial.  Section 1054.2 prohibits an attorney from disclosing a witness's address to a defendant "unless specifically permitted to do so by the court after a hearing and a showing of good cause."  While this statute appears to prohibit either the prosecutor or defense counsel from providing Cobb's address to Oldright, the record does not suggest any valid reason for the prosecutor's failure to disclose Cobb's address to defense counsel.  If the prosecutor was worried about Cobb's safety even in light of section 1054.2, he should have sought restricted disclosure pursuant to section 1054.7.  The mere statement that he did not want her address provided to Oldright was insufficient.  (See generally Montez v. Superior Court (1992) 5 Cal.App.4th 763 [witness's address need not be disclosed when doing so would endanger witness; as proponent of witness, People bear burden of so showing by competent evidence].)

Trial counsel now states that had Cobb's address been furnished prior to trial, an interview of her might have disclosed what she knew about Tucker's involvement in the drug buy program and his use of drugs.  However, in the memorandum of points and authorities filed in support of Oldright's amended motion for new trial, counsel asserted the evidence could not have been discovered or presented at trial because Cobb was a hostile witness "and any attempt to contact and interview this witness prior to trial would have been futile."  Oldright cannot have it both ways.

71

In any event, had counsel elicited such information, he claims he would have used it "as exculpatory evidence in all the manners" discussed in part I, ante. As previously discussed, Oldright was not prejudiced by the nondisclosure of the information Cobb had about Tucker. It follows, therefore, that he was not prejudiced by nondisclosure of her address.[16]

D.    Threat to Carlos Cabello

The substantive testimony of defense witness Carlos Cabello is set out in the Statement of Facts, ante. According to Lemucchi, Cabello told him, prior to testifying, that he had been summoned to Carbone's office the previous morning, and that Carbone had accused Cabello of lying and had threatened him with prosecution for perjury.

At trial, defense counsel sought to question Cabello about the meeting with Carbone. Carbone requested and was granted a sidebar conference. According to Lemucchi and Oldright, Carbone objected to the line of questioning. He was chastised by the trial court. At no time did Carbone deny threatening Cabello with a perjury prosecution.[17]

---

[16]    This is not a situation in which the defense sought Cobb's address in order to examine her reputation for veracity in her own neighborhood, or in which such reputation was in issue. (See, e.g., Montez v. Superior Court, supra, 5 Cal.App.4th at pp. 768-770 & fn. 2, and cases cited therein.)

[17]    Appellate counsel states he has been informed by several Kern County attorneys that Judge Randall, the trial judge in the instant matter, conducts many conversations in off-the-record sidebar conferences. Counsel asks us to advise Judge Randall

(fn. continued)

The court then went on the record outside the presence of the jury. When the court stated it had ruled defense counsel could ask some questions in this area, Carbone uttered a remark. The court told Carbone that if he made disparaging comments about the court's rulings in the future, it could cause him to be held in contempt.

In the jury's presence, Cabello testified that Carbone accused him of lying and asked if Cabello knew how long he could be in jail for being a liar. Cabello replied that he knew. Cabello testified this did not concern him. He said he told Carbone he had not seen Oldright with a gun stuck in his pants; this was the truth, as he did not see anything. On recross examination, Carbone asked if he had made Cabello afraid. Cabello replied, "Not me."

Oldright contends the prosecutor committed misconduct in his dealings with Cabello, and further that this misconduct impinged on his constitutional right to present witnesses on his

---

(continued)
against the pervasive use of off-the-record conferences. As counsel recognizes, however, it is trial counsel's responsibility to ensure that a complete record is made. Although sidebar discussions are a permissible part of the record on appeal, there is no case authority requiring that in every instance they must be reported. (People v. Pinholster (1992) 1 Cal.4th 865, 920.) Section 190.9, which requires the reporting of "all proceedings," applies only in capital cases; Code of Civil Procedure section 269 is not explicit on the point. (1 Cal.4th at p. 920.) On numerous occasions, Judge Randall gave both attorneys the opportunity to place something on the record. On one occasion, in fact, defense counsel asked to go off the record.

73

own behalf.

Relying on the leading California case of <u>In re Martin</u> (1987) 44 Cal.3d 1, 30-32, the California Supreme Court has recently summarized the applicable law as follows:

> "A defendant's constitutional rights to compel the attendance of witnesses, as guaranteed by the Sixth Amendment, and to due process, as guaranteed by the Fourteenth Amendment, are violated when the prosecution interferes with the defendant's right to present witnesses. [Citation.] The defendant, however, bears the burden of showing that the prosecutor's conduct was entirely unnecessary to the proper performance of the prosecutor's duties and was of such a nature as to transform a defense witness willing to testify into one unwilling to testify. In addition, the defendant must establish interference, that is, a causal link between the prosecutorial misconduct and the defendant's inability to present the witness. [Citation.]" (<u>People</u> v. <u>Mincey</u> (1992) 2 Cal.4th 408, 460.)

It may be constitutionally permissible for a prosecutor to give a witness a "mere warning" of the dangers of perjury. (<u>In re Martin</u>, <u>supra</u>, 44 Cal.3d at p. 41, fn. 8.) However, in <u>People</u> v. <u>Bryant</u> (1984) 157 Cal.App.3d 582, this court dealt with a situation in which the prosecutor had already charged a defense witness with perjury. The prosecutor subsequently told the witness that if he testified at the defendant's probation revocation hearing as he did at the preliminary hearing, he would be facing another count of perjury. (<u>Id</u>. at pp. 587-589.) We found misconduct by the prosecutor: his statements "went far beyond reminding the witness of the duty to tell the truth or advising him of the consequences of perjured testimony . . . ."

74

(<u>Id</u>. at p. 589.)  We reversed, finding a violation of the federal Constitution.  (<u>Id</u>. at p. 594.)

In <u>Martin</u> and <u>Bryant</u>, however, <u>the defense witness refused to testify</u>.  (See, e.g., <u>In re Martin</u>, <u>supra</u>, 44 Cal.3d at p. 37; <u>People</u> v. <u>Bryant</u>, <u>supra</u>, 157 Cal.App.3d at pp. 587-588.)  Here, Cabello not only testified, he stated the prosecutor's conduct did not frighten or concern him.  He was certainly not transformed into a witness who was unwilling to testify, nor has Oldright shown an "inability to present the witness."  (<u>People</u> v. <u>Mincey</u>, <u>supra</u>, 2 Cal.4th at p. 460; <u>In re Martin</u>, <u>supra</u>, 44 Cal.3d at p. 31.)  A constitutional violation has therefore not been demonstrated.

Moreover, assuming the prosecutor committed misconduct, Oldright has failed to show he was prejudiced thereby.  (Cf. <u>People</u> v. <u>Siripongs</u> (1988) 45 Cal.3d 548, 579 ["you know more than you are telling" not a threat and in any event not prejudicial because no evidence witness refused to testify].)

Oldright says it is unreasonable to suppose a prospective witness "could be wholly unfazed by a threat of prosecution and imprisonment for perjury."  This is, again, nothing but speculation.  The record contains absolutely no suggestion Cabello's testimony was affected in any way by his meeting with Carbone.  Cabello gave statements to an investigator for the district attorney's office and to the defense well before this meeting occurred.  We have little doubt that if Cabello's testimony had differed from his statements, someone would have questioned him about the discrepancy.

75

E.    Lack of Timely Disclosure of Wiseman's Testimony

Sam Wiseman's testimony, to the effect that Cabello said Oldright asked him to lie, is set out in the Statement of Facts, ante. Oldright claims the prosecutor committed misconduct by failing to disclose a report of an interview with Wiseman in a timely manner.

According to her report, Cheryl Gottesman, an investigator for the district attorney's office, interviewed Wiseman on August 8, 1991. Gottesman's report of the interview, which contained the substance of Wiseman's trial testimony, was dated August 14, 1991. On August 20, 1991, during jury selection, defense counsel stated he had not been furnished with the report until that morning. As a result, he requested that the prosecution be precluded from calling Wiseman as a witness.

Carbone responded that although the report was dated August 14, there was normally a delay in preparation, in addition to which a weekend fell between August 14 and August 20. Carbone represented that the report was in his in-box when he returned to his office the night before (i.e., the 19th). He denied intentionally withholding the information and said he did not anticipate Wiseman would testify until late in the trial. He noted that he could only provide defense counsel with reports as he (the prosecutor) received them, which he had done. He requested that the court grant defense counsel adequate time to prepare for Wiseman's testimony, if preparation was counsel's concern.

The court found the report to be "very significant."

It further found that the report was not furnished to defense counsel in a timely manner. It ordered both attorneys to meet and confer over the noon hour concerning what discovery had been provided. The court ruled Wiseman would be allowed to testify, but it warned Carbone that if the situation arose again, it would impose sanctions at least in the form of comment to the jury about the district attorney not complying in good faith with discovery, and possibly in the form of exclusion of the witness's testimony.

Carlos Cabello testified on the afternoon of August 22, 1991. Wiseman did not testify until the afternoon of August 27.

Section 1054.7 provides that if information required to be disclosed "becomes known to, or comes into the possession of, a party within 30 days of trial, disclosure shall be made immediately . . . ." Section 1054.5, subdivision (b) allows the court to "make any order necessary to enforce the provisions of [section 1054 et seq.], including, but not limited to, immediate disclosure, contempt proceedings, delaying or prohibiting the testimony of a witness or the presentation of real evidence, continuance of the matter, or any other lawful order. Further, the court may advise the jury of any failure or refusal to disclose and of any untimely disclosure." Subdivision (c) of section 1054.5 prohibits the court from precluding a witness's testimony unless all other sanctions have been exhausted.

The record supports the trial court's determination that the report was not provided to defense counsel in a timely manner. While it does not appear the prosecutor was personally

responsible for the delay or that the untimeliness was wilful, the prosecutor was aware of the substance of Gottesman's conversation with Wiseman and should have taken the necessary steps to ensure the report would be promptly furnished to defense counsel.

However, where a failure to disclose is not wilful, it is sufficient if the offended party is given the opportunity to meet the new evidence.  (People v. Reyes (1974) 12 Cal.3d 486, 502.)  The burden is on the defendant to show such a remedy is inadequate because the resulting prejudice was so great it could not have been cured by the granting of a continuance.  (Ibid.; see also People v. Pinholster, supra, 1 Cal.4th at p. 941.)

Under the circumstances of the instant case, the omission--assuming it was in fact prosecutorial misconduct--was harmless.  If defense counsel needed more time to decide whether, in light of the potential impeachment, to call Cabello as a witness, or to prepare to meet Wiseman's testimony, he should have requested a continuance.  As in People v. Pinholster, supra, 1 Cal.4th at page 941, here "[t]here is no suggestion that the defense would have been different had defendant been aware of [the witness's] testimony before trial.  As a matter of due process there was no suppression of material evidence favorable to the accused, and any failure to timely disclose the witness was harmless and did not undermine the reliability of the proceedings."

F.   Attack on Dr. Couture

As previously set out in the Statement of Facts, Dr.

78

Couture testified for the defense concerning Tucker's brain injury and psychological problems. Oldright now contends the prosecutor committed misconduct by casting "a grossly improper aspersion" on Couture's integrity.

On cross-examination, Couture testified that (1) he had worked with Lemucchi's law firm on several previous occasions; (2) he had received a retainer in this case of $1,500; (3) he was being paid $200 an hour to testify; and (3) he charged $115 an hour for any work performed in his office. At one point, Carbone noted Couture's opinion that Tucker had an antisocial personality disorder. When Carbone asked whether, since Couture never met Tucker, his statement was "based upon the truth being adequately recorded in the documents" he reviewed, Couture replied, "In psychology we seldom use words like truth."

During his opening argument, Carbone stated:

"Now this is exactly what the defense is all about. Dr. Gene Couture, my favorite witness, tells us by the end of his testimony that he doesn't rely on the truth, he is a part of one of the newest professions in our society of clinical psychologist and yet he personally in this courtroom acted as if he were a part of the oldest profession. For the money he was paid, he was going to come in here and tell us what a bad guy that Ron Tucker was.

"What kind of man works for a place like Charter Hospital on a consultation for a person like Ron Tucker who's there to get help, voluntarily went there saying I have a problem, trying to deal with my problem. Does it cost the patient. Fine, makes a finding he has problems, he's depressed, he had some problems. Takes money for that. And then after he is killed, testifies for the killer, and says he was a bad guy, he was

79

really bad.  I read some more things now and now
you think he's a bad guy, really violent, they
would have acted violently.  He is dead."

It was not improper for the prosecutor to question
Couture about, then note to the jury, the compensation he was
receiving in this case.  The compensation to be paid to an expert
witness is a proper subject of inquiry, as it is relevant to that
witness's credibility and the weight of his or her testimony.
(People v. Price, supra, 1 Cal.4th at p. 457; People v. Medina
(1990) 51 Cal.3d 870, 895.)  Here, the facts supported an
inference of Couture's economic motive to testify.  It was
therefore within the bounds of proper argument to attack his
credibility, and the weight to be given his testimony, based on
his compensation and the fact of his employment.  (People v.
Babbitt (1988) 45 Cal.3d 660, 702.)

As for specific comments likening Couture to a
prostitute, the fact a personal attack may have been insulting in
its implications does not mean it amounted to a deceptive or
reprehensible method of persuasion.  (Cf. People v. Rowland
(1992) 4 Cal.4th 238, 277.)  In any event, any claim of
misconduct was waived by the defense's failure to object.  (See,
e.g., People v. Visciotti (1992) 2 Cal.4th 1, 81, fn. 44
[prosecutor referred to defense expert as a "prostitute;"
assuming characterization exceeded bounds of permissible
argument, "it was not so potentially prejudicial that a prompt
objection and admonition could not have averted any such
prejudice"]; People v. Coleman (1988) 46 Cal.3d 749, 788 & fn. 33
[prosecutor made various comments about testimony of defense

psychiatrist, including, "Psychiatrists will testify about anything for anyone;" admonition would have cured, so defendant's claim of misconduct rejected based on failure to object]; see also People v. McCracken (1952) 39 Cal.2d 336, 348-349 [prejudice from prosecutor's comment about defense counsel, "What some people won't do for a fee," cured by prompt objection and admonition to disregard].)

Oldright seeks to avoid the effect of the doctrine of waiver by presenting the following explanatory statement by his trial counsel: "Carbone's comment was totally unexpected, giving me no opportunity to object. Had I known the comment was going to be made, I would have objected." This excuse is nothing but after the fact rationalization. Had counsel anticipated objectionable comments about Couture, presumably he would have sought appropriate orders from the trial court beforehand. Virtually all improper argument is unexpected, and that fact has never, to our knowledge, furnished a reason to excuse the requirement of an objection and request for admonition.

Oldright relies heavily on People v. McGreen (1980) 107 Cal.App.3d 504 (disapproved on other grounds in People v. Wolcott (1983) 34 Cal.3d 92, 101) as support for his assertions that it is improper for a prosecutor to suggest defense witnesses are no more than prostitutes who provided the results for which they were paid, and that the purported misconduct was not waived by failure to object. In McGreen, the prosecutor questioned a defense expert witness so as to claim the witness resigned from a professional organization because he committed perjury in another

case.  The prosecutor also questioned the witness about whether
his testimony was stricken in that case.  A defense request for
mistrial was denied, although the trial court immediately
cautioned the jury.  (107 Cal.App.3d at pp. 514-517 & fn. 10.)
The prosecutor returned to this theme in argument and accused the
witness of selling his credentials and of being a chronic and
habitual liar.  (Id. at p. 517.)  The Court of Appeal found
flagrant misconduct which was not just an isolated incident, and
concluded the defendant had been severely prejudiced by the
cross-examination and "inflammatory rhetoric" of argument.  (Id.
at pp. 517-519.)  Although the defendant failed to object at
trial, the court concluded an admonition would not have cured the
prejudice from what was said to the jury "in such indelible
language."  (Id. at p. 519.)

     McGreen is factually different from the instant matter.
Contrary to Oldright's overall contention, there was no pervasive
misconduct during his trial.  In this regard, People v. Medina,
supra, 51 Cal.3d 870, is instructive.  In that case, the
prosecutor accused the defense expert of "'prostituting' the
judicial system, of 'selling out,' and of earning 'a thousand
dollars on this case.'"  The prosecutor also said the witness was
"'dishonest'" and "'motivated solely by greed.'"  (Id. at p.
894.)  On appeal, the defendant conceded the prosecutor was
entitled to point out that the witness was a paid expert and to
otherwise question his competency or credibility based on
evidence in the record.  However, relying in part on McGreen, the
defendant claimed the accusations of prostitution, dishonesty,

82

and greed were unnecessary and excessive.  (51 Cal.3d at p. 895.)
The California Supreme Court replied:

> "We need not decide whether the prosecutor's
> remarks exceeded fair comment on the evidence
> elicited at trial, because defendant failed to
> object to the foregoing comments or seek an
> appropriate admonition, and must be deemed to have
> waived his objection.  [Citations.]  Although
> defendant suggests the misconduct was so pervasive
> and offensive that an admonition would have been
> useless [citation], a timely objection and
> admonition by the court at the outset might have
> tempered the prosecutor's aggressiveness before it
> became so extreme.  That being so, it seems
> reasonable to place on defendant the burden of
> making a timely objection."  (Ibid.)

Oldright claims Medina is not relevant because there,
as here, the remark came without warning.  Nothing in Medina
suggests the prosecutor's first questionable comment in that case
was anticipated.  As already discussed, this argument is hardly
worth discussing.

Finally, the remark was not prejudicial in any event.
Here, there was sufficient record evidence from which inferences
of Couture's bias and motive to testify could be drawn, so that
the gist of the prosecutor's argument was not totally divorced
from the evidence adduced at trial.  Moreover, as defense counsel
pointed out, many of the people involved with the case (including
the prosecutor and investigating officers) were being paid for
their time.  In addition, the jurors were instructed more than
once by the court, and reminded by both counsel, that the
attorneys' statements were not evidence.  Assuming misconduct
occurred, there was no prejudice.

G.    Assertion Oldright Was a "Liar"

Oldright complains that the prosecutor called him a liar.  It is true the prosecutor used that term and stated Oldright was a killer.  However, the remarks must be placed in context.  (People v. Perry (1972) 7 Cal.3d 756, 790.)   The prosecutor argued:

> "Let's talk now about the Defendant.  Was he believable in this case.  Everybody else lied.  He never said I did society a favor, Jim Conners told him about these threats, the victim in this case had threatened him at Lerdo, even though Velma says no. . . .  He was rehearsed on the stand. Yesterday's testimony was unbelievable. . . .

> "How can that be accounted for that he be believed in this case.  If he shot a man by accident, you wouldn't just be sitting there cool and calm, you would be telling people, telling anybody that listened.  And, of course, the first time he said it's an accident is here for you.  He said he was afraid of the victim, his actions don't show that he was afraid of the victim. Maybe he didn't think he could whip him in a fight, maybe that's true.  Maybe he thought Ron Tucker would whip him.  That means that you go and shoot him?  No.  Certainly not a reasonable man. A reasonable man would never do what the Defendant did.

> "The Defendant, quite frankly, is a gentleman [sic], he is a liar.  He is a liar.  I say that easily because he is also a killer, which is far worse.  And the defense is not required --

> "MR. LEMUCCHI:  I will object and cite counsel as misconduct, your Honor.  He is stating his opinions of the Defendant.

> "THE COURT:  Well, counsel is not to state

84

his opinion and the -- of course it is the opinion
of the jury that is the informed decision of the
jury that will govern. Proceed, counsel.

"MR. CARBONE: Thank you, your Honor.

"The defense is not required to produce
evidence. Mr. Lemucchi is under no obligation to
bring witnesses in here, to produce any evidence.
But he chose to do so. And you may consider that
evidence, whether it tends towards guilt or
innocence in this case, including the Defendant
testifying."

We fail to perceive any misconduct. A prosecutor may

characterize a defendant's testimony as lies so long as the

inference is based on the evidence rather than the prosecutor's

personal belief, resulting from his or her personal experience or

evidence outside the record. (People v. Sully (1991) 53 Cal.3d

1195, 1236; People v. Edelbacher (1989) 47 Cal.3d 983, 1030.)

Thus, where the People's evidence points to guilt and is

inconsistent with the defense, a prosecutor does not commit

misconduct by arguing the witness lied. (People v. Reyes, supra,

12 Cal.3d at p. 505.) A prosecutor may use appropriate epithets

where warranted by the evidence. (People v. Adcox (1988) 47

Cal.3d 207, 237.) As our state Supreme Court recently stated:

"[T]he prosecutor is entitled to comment on the
credibility of witnesses based on the evidence
adduced at trial. [Citation.] He may
characterize testimony as perjurious if the
evidence so warrants. 'The words "lie" and
"perjury" are the expressions commonly used to
describe willfully false testimony, and there is
no reason why a prosecutor must resort to
circumlocutions when discussing this distasteful
but pertinent subject.' [Citations.]" (People v.
Thomas (1992) 2 Cal.4th 489, 529; see also People
v. Pinholster, supra, 1 Cal.4th at p. 948.)

Here, Carbone's assertion that Oldright lied was clearly based on the evidence before the jury. His contention Oldright was a killer was unobjectionable; Oldright admitted killing Tucker. From a fair reading of the remarks in question, it appears Carbone strayed into the realm of personal opinion, if at all, in commenting that a killer was worse than a liar. In any event, the trial court's response to defense counsel's objection was sufficient to advise the jury to disregard Carbone's statement to the extent it was an expression of personal opinion rather than his view of the evidence. (Cf. People v. Johnson (1989) 47 Cal.3d 1194, 1237.) If misconduct occurred, it was minimal and promptly stopped.

H.    Attempts to Provoke Oldright

Oldright contends Carbone engaged in misconduct by attempting to provoke him into an outburst. Oldright says Carbone often glared at him, tried to stare him down during trial, and silently mouthed "fuck you" to him during pretrial proceedings. In his writ declaration, trial counsel states Carbone stared fixedly at Oldright during many of the pretrial proceedings; that Oldright told counsel on numerous occasions that Carbone was engaging in such tactics; and that counsel personally confirmed Carbone's conduct.

On appeal, Oldright makes much of the fact that during the hearing on the new trial motion, Carbone never denied such actions. However, the transcript of the proceedings gives the clear impression Carbone did not deign the allegations worthy of reply. Thus, we will not consider the failure to deny as an

86

implied admission of truth, as Oldright would have us do.
Moreover, whether someone is staring fixedly, glaring, or
attempting to stare someone down is often a matter of
interpretation.  It would not necessarily be improper for a
prosecutor to "stare" or "glare" at a defendant.

Although Oldright terms the prosecutor's conduct
"execrable beyond description," nowhere does he claim--or
establish--it was prejudicial.  To the extent any misconduct
occurred during pretrial proceedings, no jury was present to be
prejudiced.  Nor does it appear the prosecutor's actions had any
impact on the trial court.  (Contrast People v. Pitts, supra, 223
Cal.App.3d at p. 782.)

Finally, defense counsel's declaration begs the
question:  if counsel was aware of the prosecutor's actions and
found them objectionable, why did he not object?  In his writ
petition, Oldright contends Carbone's conduct in this regard
violated his constitutional right to due process.  However, the
rule of People v. Green, supra, 27 Cal.3d at page 34, regarding
the necessity of a timely objection and request for admonition,
applies even when a defendant asserts a denial of due process due
to prosecutorial misconduct.  (People v. Bell (1989) 49 Cal.3d
502, 535, fn. 17; see People v. Gallego (1990) 52 Cal.3d 115, 187
[failure to object waived, as admonition would have cured,
exchange between prosecutor and defendant during defendant's
closing argument].)

It is not enough here just to say the misconduct was so
pervasive that an admonition could not have cured it.  The rule

87

is settled that error must be affirmatively shown, and the burden
is on the party claiming error to establish it on the record.
Any uncertainty in the record in this respect will be resolved
against that party.  (People v. Green (1979) 95 Cal.App.3d 991,
1001; Lemelle v. Superior Court (1978) 77 Cal.App.3d 148, 156.)
Here the record is silent on the point.  For the same reason,
Oldright cannot present a successful claim that trial counsel was
ineffective for failing to object:  the record is insufficient to
permit us to make such a determination.

I.    Theatrics Designed to Distract Jury

Oldright complains that the prosecutor engaged in
theatrics designed to distract the jury.  In particular, he
asserts Carbone drew loud circles on a legal pad and clicked his
pen during the testimony of defense witnesses, made wildly
animated facial expressions of disbelief and gasped or sighed
while defense witnesses testified, and left his seat during
defense counsel's examination of witnesses and closing argument.

In his motion for new trial, Oldright supported his
contentions with declarations from two jurors.  One, Leonard
Thomas, felt Carbone acted in a "childish way during the trial,"
and said that he clicked his pen, wrote with flourishing strokes,
and made faces during the presentation of evidence.  Mr. Thomas
felt Carbone was "a jerk."  Mr. Thomas found it difficult to say
whether he missed something due to Carbone's "antics," although
he did not believe it influenced his thinking.  The other juror,
Ronald Roberts, was the foreperson.  He felt Carbone carried the

"obvious personal conflict" between the attorneys to an extreme, which distracted his attention from the evidence being presented. Mr. Roberts observed pen-clicking, and facial expressions directed at Oldright and in conjunction with certain testimony which gave the impression of agreement or disagreement. Carbone gave the impression of knowing things the jury did not. Mr. Roberts was "uncertain" if he "was able to fully attend to the evidence." He considered Carbone's actions unprofessional.

If the prosecutor engaged in such behavior, it was indeed puerile, unprofessional, and demeaning of his office; it cannot be condoned. This court will not hesitate to overturn a conviction where prosecutorial misconduct results in prejudice. (See, e.g., People v. Pitts, supra, 223 Cal.App.3d 606.) Here again, however, we must ask why, if all of these events were occurring, defense counsel did not object before such antics reached the level of being potentially distracting to the jurors. As previously noted, "a timely objection and admonition by the court at the outset might have tempered the prosecutor's aggressiveness before it became so extreme. That being so, it seems reasonable to place on defendant the burden of making a timely objection." (People v. Medina, supra, 51 Cal.3d at p. 895.)

Nor would such an objection have been futile; on more than one occasion, the prosecutor objected that Oldright was making motions which indicated agreement or disagreement, and the trial court promptly admonished Oldright. The record contains

absolutely no suggestion the trial court would not have been equally receptive to a similar objection from the defense.

Judge Randall, who was in the best position to observe what was happening, stated the following in denying the new trial motion:

> "Insofar as those [jurors'] declarations are relevant to the issues of the misconduct of the prosecutor, I would observe this, the declarations both say that the prosecutor made faces, clicked his pen, and that they didn't like it. Now I have been a prosecutor, I have been a defense attorney, and I always was satisfied if a jury disliked my opponent. I don't think that's helpful to the prosecution. I think it's harmful. Very clearly at least two of the jurors did not like Mr. Carbone. The question is whether their dislike for Mr. Carbone caused them to err. It's hard for me to understand that they did.

> "While both of them say that his -- that they perceived his conduct as somewhat distracting, I would make this observation. I believe part of this is on the record. Early on in the proceedings, I don't frankly recall if this was -- we even had brought the panel over at this time, that I did find it necessary to get on the record in chambers with Mr. Carbone and at another time, on another occasion, I talked to both attorneys about their lack of civility one to the other. Up to that point I had seen certain behavior that I did not want to encourage or foster. After those meetings it appeared to me that throughout the trial, at least until such time as there was, I guess, a fracas in the hall, that there was civility between the attorneys. The early problems caused me to be watching the attorneys and I did not see any activity on the part of Mr. Carbone which would have caused me to intervene because I felt he was being disruptive. And I'm

not hesitant to intervene if I feel that's the case."[18]

A trial court is not required to identify or sua sponte correct prosecutorial misconduct. (People v. Bell, supra, 49 Cal.3d at p. 542.)  It has a duty, however, to control all proceedings during trial.  (Ibid.; People v. Pitts, supra, 223 Cal.App.3d at p. 795)  It is apparent that in the instant case, the trial court was fully aware of, and completely discharged, this duty.

J.   Misrepresentation During Opening Statement

Oldright contends the prosecutor misrepresented the facts in his opening statement by saying Oldright "blew Tucker's brains out."  Oldright also contends the prosecutor compounded the failure to disclose Cobb's knowledge about Tucker's drug use by asserting Tucker had changed his ways during the last year of his life.

In his opening statement, Carbone said:  "And they [fire department personnel] saw another man helping the wounded person and that was the Defendant.  In fact, he even tried to give him CPR.  But as you will learn, he had blown his brain out the side of his head and CPR just wasn't going to help him any more."  A moment earlier, Carbone told the jury that Oldright had "shot [Tucker] right in the neck."

---

[18]  The record contains nothing else about a "fracas" in the hall.  There is no suggestion that, if something untoward occurred between the attorneys, it was witnessed by any juror.

Carbone also told the jury:

"And I'm not going to hide from you, ladies and gentlemen, the fact that Ronald Tucker, at thirty years of age, had had some problems in his life. He had used drugs. No doubt about it. But his life in the last year before his death had changed. He had met Jerrise, he was engaged, he was making an effort to patch things up with his mother's husband."

"'[P]rosecutorial misconduct in an opening statement is not grounds for reversal of the judgment on appeal unless the misconduct was prejudicial or the conduct of the prosecutor so egregious as to deny the defendant a fair trial.' [Citation.]" (People v. Wrest (1992) 3 Cal.4th 1088, 1109.)

With regard to the reference to blowing out Tucker's brain, we will reject "what appears to be an attempt to elevate hyperbole into misconduct." (People v. Harris (1989) 47 Cal.3d 1047, 1079.) This was a brief statement which was refuted both by the prosecutor's preceding description and by subsequent evidence. No objection was made, and any inconsistency between the opening statement and the evidence was inconsequential. Thus, assuming the statement was misconduct, it was not prejudicial nor did it deny Oldright a fair trial. It is not grounds for reversal. (Wrest, supra, at p. 1109; Harris, supra, at p. 1080.)

As for the reference to Tucker's having changed his life, defense counsel could not object based on Tucker's employment as an undercover operative, because counsel did not have this knowledge. However, the prosecutor did not claim Tucker no longer used drugs, and the assertion Tucker's life had

changed is not necessarily inconsistent with his working for law
enforcement.  Moreover, the jury subsequently learned about
Tucker's recent arrest for drug use.  The prosecutor and defense
counsel both told the jury that opening statements were not
evidence.  Under these circumstances, assuming the prosecutor's
statement could be taken as a claim Tucker no longer used drugs,
it was not prejudicial and did not deny Oldright a fair trial.
(Compare People v. Morris, supra, 46 Cal.3d at pp. 33-35
[nondisclosure of incentives to witness compounded by affirmative
representation to jury that witness received no benefits in
return for testimony; error harmless beyond a reasonable doubt].)

     K.   Cumulative Effect

     Oldright recognizes that no single act of purported
misconduct requires reversal.  However, he says the cumulative
effect of the misconduct, combined with the failure to disclose
discussed in part I, denied him his constitutional right to a
fair trial.

     To constitute a due process violation, prosecutorial
misconduct must be of such significance as to result in the
denial of a fair trial.  (People v. Bell, supra, 49 Cal.3d at p.
534.)  Similarly, "[a] prosecutor's rude and intemperate behavior
violates the federal Constitution when it comprises a pattern of
conduct 'so egregious that it infects the trial with such
unfairness as to make the conviction a denial of due process.'
[Citations.]"  (People v. Espinoza (1992) 3 Cal.4th 806, 820.)
However, a prosecutor's conduct which "does not render a criminal
trial fundamentally unfair is prosecutorial misconduct under

state law only if it involves '"the use of deceptive or
reprehensible methods to attempt to persuade either the court or
the jury."' [Citations.]" (Ibid.) Short of a due process
violation, "[p]rosecutorial misconduct is cause for reversal only
when it is 'reasonably probable that a result more favorable to
the defendant would have occurred had the district attorney
refrained from the comment attacked by the defendant.'
[Citation.]" (People v. Milner (1988) 45 Cal.3d 227, 245.)

In the instant case, most of the complained-of
misconduct was either not misconduct or could have been cured by
a timely request for admonition. (Cf. People v. Bell, supra, 49
Cal.3d at pp. 539-540.) The record does not support Oldright's
assertion the misconduct was too pervasive and/or egregious to be
cured; moreover, the trial court showed itself receptive to
objections to the conduct of opposing counsel and was even
keeping an eye on both attorneys' actions. Assuming some of the
prosecutor's conduct was inappropriate, it does not follow that
reversal is warranted. (Cf. People v. Morris, supra, 46 Cal.3d
at p. 34.) As the California Supreme Court aptly summarized in
People v. Pinholster, supra, 1 Cal.4th at page 950: "We have
identified no misconduct which, taken singly or together,
convinces us that defendant was prejudiced, or, as defendant
claims, subjected to an unfair trial in violation of his state
and federal constitutional rights to due process . . . ."

The trial court's determination, that a new trial was
not warranted because of prosecutorial misconduct, was not
"plainly wrong" and hence will not be disturbed by this court.

94

(People v. Hardy, supra, 2 Cal.4th at p. 213; People v.
Sarazzawski, supra, 27 Cal.2d at p. 15.)  As Oldright has failed
to show prejudice under any standard, he is not entitled to writ
relief or to reversal on appeal.  Finally, assuming he is
claiming or may claim trial counsel's failure to object
constituted ineffective assistance of counsel, he is not entitled
to relief because either no misconduct occurred or none of the
claimed errors were of such significance that it is reasonably
probable the jury would have reached a more favorable result but
for counsel's omissions.  (People v. Adcox, supra, 47 Cal.3d at
pp. 237-238.)

III.      Failure to Give CALJIC No. 2.27

Apparently through inadvertence, the trial court failed
to instruct the jury in the language of CALJIC No. 2.27.
Oldright claims the omission was prejudicial.  The Attorney
General concedes error, but claims no harm resulted.

CALJIC No. 2.27 (1991 rev.)(5th ed. pocket pt.) states:

> "You should give the [uncorroborated]
> testimony of a single witness whatever weight you
> think it deserves.  However, testimony by one
> witness which you believe concerning any fact
> [whose testimony about that fact does not require
> corroboration] is sufficient for the proof of that
> fact.  You should carefully review all the
> evidence upon which the proof of such fact
> depends."

As the People recognize, the trial court was under a
sua sponte duty to instruct in the language of CALJIC No. 2.27.
(People v. Rincon-Pineda (1975) 14 Cal.3d 864, 884-885.)
Accordingly, the court erred by omitting the instruction.

95

The effect of a failure to give CALJIC No. 2.27 is judged according to the standard of People v. Watson (1956) 46 Cal.2d 818, 836, i.e., whether it is reasonably probable a result more favorable to the defendant would have been reached in the absence of the error.  (People v. Pringle (1986) 177 Cal.App.3d 785, 790, disapproved on other grounds in People v. Gammage (1992) 2 Cal.4th 693, 702.)  As the California Supreme Court has recognized,

> "[i]t is well established that the error in failing to give the cautionary instruction is not prejudicial per se.  'The circumstances of each case' must be reviewed on appeal to 'determine whether failure to give the instruction was prejudicial.'  [Citation.]  Such failure 'does not constitute prejudicial error if "the evidence clearly points to the defendant's guilt, or . . . the testimony of the prosecuting witness is amply corroborated, or there are other factors in the case which show that the defendant has been given a fair trial."'  [Citation.]  Under this standard, a finding that failure to give the instruction was harmless error has been far more the rule than the exception.  [Citations.]"  (People v. Rincon-Pineda, supra, 14 Cal.3d at p. 872; see People v. Sutton (1964) 224 Cal.App.2d 708, 712-713 [cases scarce in which failure to give found prejudicial; such cases generally involved inconsistent and inherently improbable testimony and complete absence of corroboration].)

Oldright acknowledges this standard is difficult to meet.  However, he contends the requisite prejudice is present in this case because most of the significant evidence rested on the testimony of a single witness.

We disagree.  Various aspects of Oldright's defense rested as much on the testimony of single witnesses as did

aspects of the prosecution's case.  Thus, the instruction could
have hurt as well as helped the defense.  Oldright argues the
fact the instruction could have impacted both sides does not
render its omission harmless, because if the instruction had
caused the jury to doubt <u>all</u> testimony dependent upon single
witnesses, "the jury would perforce have found a reasonable doubt
as to whether the shooting was done in self-defense."  This is
speculation.  This instruction in part <u>authorizes</u> the jury to
accept the testimony of a single witness if warranted; we are
doubtful it would have caused the jury to <u>discount</u> all facts
dependent upon the testimony of single witnesses.

Oldright argues that Cobb's testimony would likely have
been most affected by the giving of the instruction.  This may be
true.  However, it does not mean reversal is required.  There was
ample evidence from which the jury could have found Cobb to have
a bias or interest in testifying; jurors could have scrutinized
her testimony on that basis.

Oldright also claims substantial portions of the
physical evidence refuted Cobb's testimony.  The record does not
support this proposition.  While there was a question regarding
exactly where Tucker was standing at the time he was shot, the
physical evidence did not substantially undermine Cobb's
testimony in this regard.  Moreover, if the physical evidence was
substantially contrary to Cobb's testimony, the jurors would have
been alerted to the possibility her statements were wrong or

untruthful.[19]

Whether we consider the testimony of Jerrise Cobb or of other witnesses, the record as a whole does not support a finding that it is reasonably probable the jury would have reached a more favorable result had CALJIC No. 2.27 been given.

IV.    Refusal to Give Defense Instructions

Oldright claims the trial court committed prejudicial error by refusing to give four instructions requested by the defense. The Attorney General replies that the instructions were properly refused because of the hybrid defense Oldright presented.

A.    Facts

Oldright's defense incorporated both self-defense and accident. Thus, in his opening statement, defense counsel told the jury:

> "What the evidence will show at the time of the fatal confrontation between the two men [was] that Mr. Oldright had a real legitimate fear of death or great bodily harm from Tucker because of who Tucker was, because of his reputation that he had established for uncontrolled anger and violence.

---

[19]    In his reply brief, Oldright chides the Attorney General for failing to mention that the bullet struck Tucker from the side. Oldright claims this fact is "wholly inconsistent with Cobb's testimony that [Tucker] innocently stood still as Mr. Oldright walked straight up and shot him." He fails to explain how it is consistent with his claim, contained in his opening brief, that Tucker was approaching him at the time of the shooting.

"The evidence is going to show that Mr. Oldright, at the time of the fatal confrontation between the two men, was using a gun in a legal and legitimate right of self-defense under the laws of the State of California, that the actual shooting of Tucker was not intentional but was accidental."

In his closing argument, defense counsel referred to Oldright's claim as a "hybrid" or "combination" defense. He argued:

"The unintentional killing of a human being is excusable and not unlawful when committed by accident and misfortune in the performance of a lawful act by lawful means and where the person causing the death acted with that care and caution which would be exercised by an ordinarily careful and prudent individual under like circumstances.

"Well, what does that mean in relationship to this case. Mr. Oldright was performing a lawful act, because he was acting in self-defense . . . . Because of his fear of Ron Tucker, he took a gun with him, he was using the gun by lawful means because he was acting in self-defense, and he was acting as a person would act in self-defense under the same or similar circumstances."

Oldright requested a number of instructions in addition to those contained in CALJIC. Among them were special instructions 3, 4, 5, and 6, which are at issue here. Oldright raised the denial of numbers 4, 5, and 6 in his new trial motion. He claimed the court's refusal of those instructions left the jury without any standards for dealing with (1) threats by Tucker which were not communicated to Oldright, and (2) negative character evidence regarding Tucker. The court denied the motion for new trial--and stated it had rejected these instructions as well--because Oldright presented a combination defense involving

self-defense in arming but accident in shooting.

      B.   <u>Legal Principles</u>

"It is settled law that the trial court must instruct sua sponte on the general principles of law relevant to the issues raised by the evidence." (<u>People</u> v. <u>Jackson</u> (1989) 49 Cal.3d 1170, 1199.)  "'The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citation.]" (<u>People</u> v. <u>Sedeno</u> (1974) 10 Cal.3d 703, 715, disapproved on other grounds in <u>People</u> v. <u>Flannel</u> (1979) 25 Cal.3d 668, 684-685, fn. 12.) "Regarding defenses, <u>Sedeno</u> requires sua sponte instructions on particular defenses if relied on by defendant or if there is substantial evidence supportive of the defense and it is not inconsistent with defendant's theory of the case.  [Citations.]" (<u>Jackson</u>, <u>supra</u>, at p. 1199.)  A defense theory is supported by substantial evidence if a reasonable jury could conclude the particular facts underlying the instruction existed.  (<u>People</u> v. <u>Sullivan</u> (1989) 215 Cal.App.3d 1446, 1450.)  The defendant's testimony alone may constitute substantial evidence to warrant a requested instruction.  (<u>Ibid</u>.)

      Here, the trial court gave a number of pattern instructions on self-defense and accident, including CALJIC No. 5.12 (1989 rev.)(5th ed. pocket pt.) [justifiable homicide in self-defense].  It also gave several of Oldright's requested instructions.  Thus, it instructed the jury on Oldright's defenses.  The question is whether it properly rejected

particular pinpoint instructions.

     The Attorney General claims the trial court properly rejected the instructions now at issue. He says they were not supported by substantial evidence because of Oldright's hybrid defense. However, Oldright's theories of self-defense and accident were intertwined. Oldright's theory was self-defense until the point at which the gun discharged. Thus, he implicitly claimed he was acting in self-defense not only in taking the gun with him when he drove to meet Tucker or in having the gun in his hand when he got out of his truck, but also in chambering the fatal bullet. His theory was that only the actual firing of the shot was an accident, and that it occurred in the performance of a lawful act--defense of self--by lawful means, and therefore that he was not guilty of any crime.

     Doubts regarding the sufficiency of evidence to warrant instructions should be resolved in favor of the accused. (People v. Flannel, supra, 25 Cal.3d at p. 685.) Under the circumstances of this case, it would have been appropriate for the trial court to elaborate, upon request, on the self-defense instructions it gave. However, we need not determine whether the trial court used the correct rationale in rejecting the proposed instructions which are now at issue, because, with one possible exception, the instructions were properly rejected in any event. (See, e.g., People v. Braeseke (1979) 25 Cal.3d 691, 700, judgment vacated and cause remanded (1980) 446 U.S. 932, reiterated (1980) 28 Cal.3d 86 [correct decision of trial court must be affirmed on appeal even if based on erroneous reasons]; People v. Wharton

(1991) 53 Cal.3d 522, 571 [instruction properly refused, albeit for wrong reason].)  Moreover, assuming error occurred, it was harmless.

A defendant has the right, upon request, to an instruction "that directs attention to evidence from a consideration of which a reasonable doubt of his guilt could be engendered." (People v. Sears (1970) 2 Cal.3d 180, 190.)  In a proper instruction, "'[w]hat is pinpointed is not specific evidence as such, but the theory of the defendant's case.' [Citation.]" (People v. Wright (1988) 45 Cal.3d 1126, 1137; see also People v. Mickey (1991) 54 Cal.3d 612, 698.)  Thus, a defense instruction is proper where it spotlights a theory of the defense and "charge[s] the jury on how to relate the evidence of that defense to the prosecution's general burden of proving guilt beyond a reasonable doubt." (Wright, supra, at p. 1138.)

A trial court may properly reject a proposed instruction which is an incomplete statement of the law. (People v. Stewart (1976) 16 Cal.3d 133, 140.)  It may also refuse an instruction which is repetitious. (People v. Wright, supra, 45 Cal.3d at p. 1134.)  It must refuse an instruction which is argumentative. (People v. Mickey, supra, 54 Cal.3d at p. 697.)  Argumentative instructions "invite the jury to draw inferences favorable to the defendant from specified items of evidence on a disputed question of fact . . . ." (Wright, supra, at p. 1135; cf. People v. Gonzales (1989) 209 Cal.App.3d 1228, 1234.)  Such inferences belong in counsel's argument to the jury, not in instructions.  A proper instruction does not select "'certain