# EXHIBIT B-3

material facts, or those which are deemed to be material, and
endeavor[] to force the court to indicate an opinion favorable to
the defendant as to the effect of such facts, by incorporating
them into instructions containing a correct principle of law
. . . .'" (Wright, supra, at p. 1135.)  As the California
Supreme Court has recognized, "instructions that attempt to
relate particular facts to a legal issue are generally
objectionable as argumentative [citation], and the effect of
certain facts on identified theories 'is best left to argument by
counsel, cross-examination of the witnesses, and expert testimony
where appropriate.' [Citation.]"  (People v. Wharton, supra, 53
Cal.3d at p. 570.)

      C.   Analysis

        1.   Special Instruction No. 4

Oldright challenges the court's refusal to give special
instruction number 4, to wit:

> "Where a defendant has claimed self-defense,
> you may take into consideration the reasonableness
> of his fear by evidence that the victim (Ronald
> Tucker) had committed prior violent acts against
> other persons other than the defendant."

This instruction is not a correct statement of the law
because it is incomplete.  It omits the requirement that where
the evidence focuses on the reasonableness of the defendant's
fear--in other words, his state of mind--the defendant must have
knowledge of the acts of violence.  Thus, in People v. Davis
(1965) 63 Cal.2d 648, the California Supreme Court decided that a
defendant who claims self-defense should be permitted to testify
to specific acts of violence by the decedent which the defendant

witnessed or which were reported to him. (Id. at p. 656.)
Regardless of whether the violent acts were directed toward the
defendant or toward others, such evidence is relevant not to the
victim's character but rather to the defendant's own state of
mind: he is attempting to prove he was in fear for his life and
the reasonableness of that fear. (Ibid.; People v. Mathis (1965)
63 Cal.2d 416, 430; see also 1 Witkin, Cal. Evidence (3d ed.
1986) Circumstantial Evidence, § 342, p. 311.)

Had the instruction in question been aimed at the issue
of whether Tucker was a violent person who acted in conformity
with that character at the time of the shooting, the result might
be different. (Compare, e.g., People v. Rowland (1968) 262
Cal.App.2d 790, 797-798.) However, instruction number 4 clearly
addressed Oldright's state of mind. Oldright's state of mind
could not have been influenced by acts of which he had no
knowledge. Therefore, the instruction was misleading because it
set forth an incomplete statement of the law. It was properly
refusable on that basis (People v. Stewart, supra, 16 Cal.3d at
p. 140; People v. Adamson (1946) 27 Cal.2d 478, 492) and the
trial court was not obligated to modify it (People v. Wharton
(1992) 5 Cal.App.4th 72, 79 [trial court is under no duty to
modify proposed instruction which is incorrect or defective in
form]).

2.    Special Instruction No. 5

Oldright's next contention of error rests on the trial
court's refusal to give special instruction number 5. This
proposed instruction stated:

"In a prosecution for homicide where the accused claims self-defense, the dangerous character of the victim may be shown. If this character was known to the defendant, the evidence tends to show defendant's apprehension of danger; if it was now [sic] known, the evidence nevertheless tends to show that the victim was probably the aggressor. The law recognizes the well established fact in human experience that the known reputation or character of an assailant as to violence and turbulence has a very material bearing on the degree or nature of the apprehension of danger on the part of a person assaulted; also, that one who is turbulent and violent may more readily provoke or assume the aggressor in an encounter."

This is a correct statement of the law. (People v. Brophy (1954) 122 Cal.App.2d 638, 647-648; see also 1 Witkin, Cal. Evidence, supra, Circumstantial Evidence, § 340, p. 309.) However, merely because a proposed instruction incorporates a correct statement of the law which is taken almost verbatim from an appellate opinion (instruction no. 5 came from Brophy), does not mean the instruction is proper. Instruction number 5 is clearly argumentative; not only does it tell jurors they may consider whether Tucker had a violent character, it essentially tells them Tucker did in fact have a dangerous character. More importantly, it does not just tell jurors how they may consider such evidence if they find it exists, but instead specifically tells them what such evidence tends to show. In addition, the instruction assumes Tucker "probably" was the aggressor.

While such statements are proper in an appellate opinion or in a treatise where the issue is admissibility of such evidence (see People v. Brophy, supra, 122 Cal.App.2d at pp. 647,

105

648; 1 Witkin, Cal. Evidence, supra, Circumstantial Evidence, § 340, p. 309), they create a classic argumentative instruction. (See, e.g., People v. Wharton, supra, 53 Cal.3d at p. 571.) Again, the trial court was under no duty to modify the proposed pinpoint instruction. (People v. Wharton, supra, 5 Cal.App.4th at p. 79.)

### 3.    Special Instruction No. 6

Next, Oldright claims the trial court should have given his special instruction number 6, which read:

> "If the victim of a homicide threatened the defendant and the defendant knew of the threat, this is circumstantial evidence of the defendant's fear of attack.  But even if the threat was not communicated so that the declaration is not relevant for the above purpose, it may nevertheless be offered by the defendant on the issue of self-defense as circumstantial evidence that the victim carried out his threat and became the aggressor."

As with instruction number 5, this appears to be a correct statement of the law; it is taken almost verbatim from Witkin's treatise on evidence. (1 Witkin, Cal. Evidence, supra, The Hearsay Rule, § 756, p. 737.)  However, it suffers from the same affliction: it is argumentative.  It tells jurors they must consider particular evidence (Tucker's threats against Oldright and Oldright's knowledge of such threats) in a specific manner (as circumstantial evidence of Oldright's fear of attack). Moreover, it is phrased in terms of admissibility of evidence. The instruction was properly refused. (People v. Wharton, supra, 53 Cal.3d at p. 571.)  The trial court was not required to modify it. (People v. Wharton, supra, 5 Cal.App.4th at p. 79.)

4.    <u>Special Instruction No. 3</u>

Oldright next challenges the rejection of his special instruction number 3, which read:

> "Whether a defendant has personally perceived or received threats, or has been informed of threats by others, is irrelevant so long as his belief in the danger presented by those threats is both reasonable and honest."

This instruction is subject to different interpretations, not all of which are correct statements of the law.  It can be understood to say it was irrelevant whether Oldright knew of threats made against him by Tucker.  This, obviously, is illogical and legally incorrect.

The instruction can also be understood to mean that it did not matter how Oldright came by his knowledge of the threats. Read in this sense, it is a correct statement of the law.  A defendant's knowledge of uncontradicted antecedent threats must be taken into consideration by the jury in determining the reasonableness of the defendant's belief in the necessity of self-defense, and the defendant is entitled to have the jury instructed on the effect of his or her knowledge of antecedent threats.  (<u>People</u> v. <u>Pena</u> (1984) 151 Cal.App.3d 462, 474-476.)

The meaning of instruction number 3 would have been clearer had it been placed after special instruction number 19. That instruction, which was also requested by Oldright and which the court gave, read:

> "One who has received threats against his life or person made by another is justified in acting more quickly and taking harsher measures for his own protection in the event of an assault

107

either actual or threatened, than would be a
person who had not received such threats; and if
in this case you believe from the evidence that
the deceased made threats against the defendant
and that the defendant because of such threats
made previously had reasonable cause to fear
greater peril in the event of an altercation with
the deceased than he would have otherwise, you are
to take such facts and circumstances into your
consideration in determining whether the defendant
acted in a manner in which a reasonable person
would act in protecting his own life or bodily
safety."

The trial court properly refused special instruction
number 3. A trial court may reject a proposed instruction which
is "loosely drawn and consequently confusing in effect." (People
v. Cascino (1934) 137 Cal.App. 73, 78.)

Furthermore, even if we assume the trial court erred in
failing to give the instruction, we would still not reverse. In
the trial court, Oldright relied on four cases as authority for
instruction number 3: People v. Moore (1954) 43 Cal.2d 517, 527-
528; People v. Pena, supra, 151 Cal.App.3d at page 475; People v.
Bush (1978) 84 Cal.App.3d 294, 302-303 and footnote 2; and People
v. Torres (1949) 94 Cal.App.2d 146, 151. Oldright also asserted
that Moore held it was prejudicial error not to give such an
instruction.

Moore, Bush, and Torres all concern rejection of an
instruction phrased in language virtually identical to that of
special instruction number 19, which, as we have noted, was given
here. Although Pena is less clear, it relies heavily on Bush.
Thus, Moore does not stand for the proposition that rejection of

instruction number 3 constituted reversible error.[20]

Oldright claims the trial court's rejection of any or all of the proposed instructions constituted federal constitutional error.  It is true that a defendant's due process rights are violated by a jury instruction which relieves the prosecution of its burden of proving every element of the charged offense beyond a reasonable doubt.  (Carella v. California (1989) 491 U.S. 263, 265.)  Similarly, a trial court is under a sua sponte duty to give a correctly phrased instruction setting forth the general theory relied on by the defendant, and failure to do so is constitutional error.  (People v. Stewart, supra, 16 Cal.3d at pp. 140-141; cf. United States v. Unruh (9th Cir. 1987) 855 F.2d 1363, 1372.)

Here, the trial court did properly discharge its sua sponte duty:  it instructed on the defense theories of self-defense and accident.  Additionally, the court properly instructed the jury on the prosecution's burden of proof.  Under these circumstances, there was no federal constitutional error and the standard of prejudice applicable to such error does not apply.  (People v. Wharton, supra, 53 Cal.3d at pp. 571-572, fn. 10.)  This being so, "[r]eversal is required only if 'the court,

---

[20]    The instructions at issue in both Moore and Torres contained a phrase concerning the defendant's receipt of information about threats from the decedent or other persons.  However, the gist of the instructions, and the basis for the holdings in those cases, was the effect of antecedent threats as described in special instruction number 19.

"after an examination of the entire cause, including the
evidence," is of the "opinion" that it is reasonably probable
that a result more favorable to [defendant] would have been
reached in the absence of the error.'  [Citations.]"  (Id. at p.
571, citing People v. Watson, supra, 46 Cal.2d at p. 836.)

In our estimation, it is not reasonably probable that
an acquittal would have occurred had the instruction been given.
The trial court gave no instruction which precluded the jury from
considering Tucker's antecedent threats against Oldright, violent
or dangerous character, violent acts directed toward Oldright or
others, the reasonableness of Oldright's fear, or whether Tucker
was the aggressor.  Specifically with regard to special
instruction number 3, the instructions given did not preclude the
jury from considering threats which were conveyed to Oldright by
third persons; and special instruction number 19 ("One who has
received threats . . . made by another . . . .") does not suggest
the jury could only consider threats made directly to Oldright by
Tucker.

In addition, the jury was otherwise given comprehensive
instructions on self-defense, accident, and antecedent threats by
the decedent.  The instructions also told jurors to consider the
reaction of a reasonable person "in a like situation seeing and
knowing the same facts," and "in a similar situation and with
similar knowledge."  This was adequate to tell jurors to consider
Oldright's knowledge of Tucker's violent acts and/or threats.  In
addition, counsel were free to address these issues in argument

to the jury.[21]

Under these circumstances, any error did not preclude the jury from considering the subjects embraced in the refused instructions, or from giving that evidence its due weight. Accordingly, reversal is not required. (Cf. People v. Wharton, supra, 53 Cal.3d at pp. 571-572.)

V.        Failure to Define "Great Bodily Injury"

The trial court used the phrase "great bodily injury" at several points in the instructions. For example, in instructing on voluntary manslaughter, it told the jury, "There is no malice aforethought if the killing occurred upon a sudden quarrel or heat of passion or in the honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury." It subsequently instructed: "A person who kills another person in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully but does not harbor malice aforethought and is not guilty of murder." With regard to justifiable homicide, the jury was told:

> "The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing honestly and reasonably believes:

---

[21]   In fact, at one point defense counsel stated, "And let's review what Bill Oldright knew," after which he proceeded to do just that.

"1.  That there is imminent danger that the
other person will kill him or cause him great
bodily injury, and

"2.  That it was necessary under the
circumstances to kill the other person to prevent
death or great bodily injury to himself.

"To justify killing another person in self-
defense, actual danger or great bodily injury is
not necessary.  On the other hand, a mere fear of
death or great bodily injury is not sufficient."

Additional self-defense instructions which used the

terms "imminent danger" and "great bodily injury" were also

given.  "Imminent danger" and "imminent peril" were defined for

the jury.  "Great bodily injury" was not.

Oldright now claims the trial court erred by failing to

define, sua sponte, the phrase "great bodily injury."  He says

the phrase has a technical meaning peculiar to the law, and

asserts that "a fairly sophisticated understanding of the law is

obviously required before one can say on which side of the 'fine

line' [between injuries which meet the definition and those which

do not] any given physical injury falls."  While he acknowledges

the existence of four pre-1984 cases holding that a trial court

is under no sua sponte duty to define "great bodily injury," he

contends those authorities are not good law after the California

Supreme Court's decision in People v. Burroughs (1984) 35 Cal.3d

824.

As this court stated in People v. Reynolds (1988) 205

Cal.App.3d 776, 779:

"It is the trial court's duty to see that the
jurors are adequately informed on the law
governing all elements of the case to the extent

112

necessary to enable them to perform their
function.  This duty is not always satisfied by a
mere reading of wholly correct, requested
instructions.  [Citation.]  A trial court has a
sua sponte duty (1) to instruct on general
principles of law relevant to issue raised by the
evidence [citations]; and (2) to give explanatory
instructions when terms used in an instruction
have a technical meaning peculiar to the law
[citation].  A defendant has a constitutional
right to have the jury determine every material
issue presented by the evidence . . . ."

"Great bodily injury" is generally defined in the penal

statutes of this state to mean "a significant or substantial

physical injury."  (E.g., §§ 198.5, 12022.7; see 1 Witkin &

Epstein, Cal. Criminal Law (2d ed. 1988) Defenses, § 243, p.

279.)  "When a term is commonly understood by those familiar with

the English language and is not used in a technical sense

peculiar to the law, an instruction as to its meaning is not

required in the absence of a request."  (People v. Williams

(1988) 45 Cal.3d 1268, 1314.)

Abundant case authority holds that "great bodily

injury" need not be defined, absent a request.  For example, in

People v. Roberts (1981) 114 Cal.App.3d 960, the defendant in a

prosecution for assault by means of force likely to produce great

bodily injury argued the jury should have been instructed, sua

sponte, as to the meaning of "great bodily injury."  (Id. at p.

963.)  This court disagreed and found that the trial court had

properly instructed the jury as to the elements of the charged

offense.  (Id. at p. 964.)  In so doing, we distinguished cases

dealing with assault from those imposing enhancements for actual

injury inflicted.  (Ibid.)  In the case of assault, it is the

likelihood that the act would result in great bodily injury, not the actual production of injury, which is the focus of the statute (i.e., § 245, subd. (a)). Given those circumstances, we stated: "We do not believe that any instructional amplification on the words 'likely' or 'great bodily injury' would have significantly enlightened the jury. In the last analysis, it is the jury's province to determine what the ultimately product of the assault might have been." (114 Cal.App.3d at p. 965.)

As in a case of assault, the focus in self-defense is not the actual production of injury by the victim, but the likelihood or imminent danger that death or great bodily injury may occur.

In _People_ v. _Miller_ (1981) 120 Cal.App.3d 233, we again held the trial court was not required to define "great bodily injury" sua sponte in a prosecution for assault by means of force likely to produce great bodily injury. (_Id_. at p. 236.) We cautioned, however, that where the jury indicates confusion during deliberations and specifically requests such a definition, the trial court must honor that request. (_Ibid_.)

The next pertinent case is _People_ v. _Kimbrel_ (1981) 120 Cal.App.3d 869. There, the defendant was charged with assault with a deadly weapon. "Deadly weapon" was defined to include an object capable of producing, and likely to produce, death or great bodily injury. On appeal, the defendant claimed the trial court should have defined "great bodily injury" sua sponte, because under _People_ v. _Caudillo_ (1978) 21 Cal.3d 562, the phrase had acquired a restrictive technical legal meaning. (120

114

Cal.App.3d at pp. 870, 872.)[22]

The Court of Appeal pointed out the settled rule that a trial court has no sua sponte duty to give amplifying or clarifying instructions absent a request, where terms used in the instructions are commonly understood.  It has such a duty, however, where the terms have a "'technical meaning peculiar to the law.'"  (People v. Kimbrel, supra, 120 Cal.App.3d at p. 872.) The appellate court found that "great bodily injury" is a commonly understood phrase, and saw Caudillo as supporting this conclusion.  (120 Cal.App.3d at p. 872.)  Caudillo held the term meant a "'"significant or substantial physical injury."'"  (120 Cal.App.3d at p. 873.)  While the defendant claimed this narrowed the definition of the phrase, the Kimbrel court disagreed: "[T]he [Caudillo] opinion's repeated adherence to a construction of the term "'"according to the usual, ordinary import of [its] language"' [citation], its 'ordinary usage' [citation], and '"'commonsense meaning'"' [citation] is fatal to his

---

[22]  People v. Caudillo concerned whether a forcible rape itself could support a finding of "great bodily injury" for purposes of a sentence enhancement.  The court noted that under section 12022.7 as originally enacted in 1976, "great bodily injury" was defined as meaning "'a serious impairment of physical condition," which included any of a specified laundry list of injuries. (People v. Caudillo, supra, 21 Cal.3d at p. 581.)  In 1977, the section was amended to state the current definition of "great bodily injury."  (21 Cal.3d at p. 581.)  The court concluded the Legislature intended the term to refer to substantial or significant injury beyond that which must be present in every case of rape.  (Id. at p. 585.)  Recently, Caudillo was partially disapproved in People v. Escobar (1992) 3 Cal.4th 740, 745-750 and 751, footnote 5.

interpretation." (120 Cal.App.3d at p. 873.)

The defendant in <u>Kimbrel</u> also argued that <u>Caudillo</u> gave implicit sanction to the connotation contained in former CALJIC No. 9.03[23] [assault with a deadly weapon or by means of force likely to produce great bodily harm or with a firearm], which defined great bodily injury as a "'significant or substantial bodily injury or damage; it does not refer to trivial or insignificant injury or moderate harm.'" (<u>People</u> v. <u>Kimbrel</u>, <u>supra</u>, 120 Cal.App.3d at p. 873, fn. omitted.) In words equally applicable to the instant case, the court said:

> "We do not find the CALJIC No. 9.03 definition helpful or necessary to the understanding of 'great bodily injury.' The substitution of 'significant' or 'substantial' for 'great,' in the context of bodily injury, makes no gains on meaning. The substitution of one general term for another results from a misappraisal of its semantic utility. At its best, the practice is an innocuous bit of loquacity. At its worst, it is a misleading refinement which introduces flab for leanness of meaning as with the use of the spongy word 'substantial.' 'Substantial' is one of 'the flexible words, the words which can be squeezed into any shape, or stuffed into any hole that needs plugging--with a soft plug.' [Citation.]
>
> "Also misleading is the attempted negative definition of great bodily injury as 'not refer[ring] to trivial or insignificant injury or moderate harm.' It is, of course, trivially true that a great bodily injury is not a trivial or insignificant or moderate injury. The converse,

---

23    See now CALJIC No. 9.02.

however, is false.  Not every nontrivial or
insignificant or nonmoderate injury is 'great.'
The impulse to define words of ordinary English is
unfortunately pervasive.  It should be curbed.

"We can only conclude that the chief
attraction for the defendant of the CALJIC No.
9.03 definition is that it was not given."
(People v. Kimbrel, supra, 120 Cal.App.3d at pp.
873-874, fns. omitted.)

The Kimbrel defendant also advocated an instruction
which listed the examples of great bodily injury contained in the
1976 version of section 12022.7.  That version of the statute
defined "great bodily injury" in terms similar to those used to
define the words "[s]erious bodily injury" contained in section
243, subdivision (f)(5).  The proposed instruction would have
stated:

"'"As used in this instruction, the term 'great
bodily injury' means a serious impairment of
physical condition including but not limited to
the following:  prolonged loss of consciousness,
severe concussion, protracted loss of any bodily
member or organ, protracted impairment of function
of any bodily member or organ or bone, a wound or
wound requiring extensive suturing, serious
disfigurement, or severe physical pain inflicted
by torture.  For an injury to constitute 'great
bodily injury' it must either be one of the types
of damage just described, or it must be of at
least the same degree of seriousness as those
named."'"  (People v. Kimbrel, supra, 120
Cal.App.3d at p. 875.)

The appellate court found such an instruction helpful
and commended it for general use.  But it then went on to state:

"However, it is not necessary to avoid a legally
intolerable lack of clarity nor must it be given
sua sponte.  [Citation.]

117

"Moreover, there is already present a potent
comparison by which great bodily injury gains
semantic weight.  That is its juxtaposition to the
term death.  It is its capability for <u>death</u> or
great bodily injury which makes a deadly weapon
deadly.  Great bodily injury, although less than
death, is a conceptual neighbor, a point which the
jury is likely to perceive."  (<u>People</u> v. <u>Kimbrel</u>,
<u>supra</u>, 120 Cal.App.3d at p. 875.)

The issue was also addressed in <u>People v La Fargue</u>
(1983) 147 Cal.App.3d 878, 886-887.  There, the court pointed out
that "[t]he term 'great bodily injury' has been used in the law
of California for over a century without further definition and
the courts have consistently held that it is not a technical term
that requires further elaboration."  In <u>People</u> v. <u>Guest</u> (1986)
181 Cal.App.3d 809, 812, the court stated:   "'We are persuaded by
the long acceptance of "great bodily injury" as a term commonly
understandable to jurors that it has not acquired a technical
legal definition requiring in the absence of special
circumstances a clarifying instruction.'"

Oldright claims the prevailing notion that "great
bodily injury" is a commonly understood term was rejected by
<u>People</u> v. <u>Burroughs</u>, <u>supra</u>, 35 Cal.3d 824.  That case concerned
whether a second degree murder conviction could be based on the
felonious unlicensed practice of medicine (Bus. & Prof. Code,
§ 2053).  The California Supreme Court concluded the underlying
felony was not inherently dangerous to human life; hence, it
could not be made the predicate for a finding of murder, absent
proof of malice.  (35 Cal.3d at p. 827.)

In the course of determining whether the felony was
"inherently dangerous," the court found it necessary to consider

the factor which elevated the unlicensed practice of medicine to

a felony:   "'circumstances or conditions which cause or create a

risk of great bodily harm, serious mental or physical illness, or

death." (People v. Burroughs, supra, 35 Cal.3d at p. 830,

emphasis omitted.)  Placed in context of the opinion as a whole,

the portion of Burroughs on which Oldright now relies states:

> "That the Legislature referred to 'death' as a
> separate risk, and in the disjunctive, strongly
> suggests the Legislature perceived that one may
> violate the proscription against the felonious
> practice of medicine without a license and yet not
> necessarily endanger human life.  Our analysis of
> the other two categories of risk delineated in
> Business and Professions Code section 2053 further
> supports this conclusion.
>
> "'Great bodily harm' is not defined in
> [Business and Professions Code] section 2053, but
> the closely analogous term 'serious bodily injury'
> is defined in Penal Code section 243--which
> establishes appropriate punishments for the crime
> of battery when committed under various
> circumstances--as '[a] serious impairment of
> physical condition, including, but not limited to
> the following:  loss of consciousness; concussion;
> bone fracture; protracted loss or impairment of
> function of any bodily member or organ; a wound
> requiring extensive suturing; and serious
> disfigurement.'  Pursuant to this definition, a
> broken arm or leg would constitute serious bodily
> injury--and by implication, great bodily harm as
> well. . . .
>
> "In addition, we acknowledge that '"[s]erious
> bodily injury" and "great bodily injury" are
> essentially equivalent elements.' [Citations.]
> The term 'great bodily injury,' [is] defined for
> purposes of enhancement in Penal Code section
> 12022.7 as 'significant or substantial physical
> injury[.]'" (People v. Burroughs, supra, 35
> Cal.3d at pp. 830-831.)

Oldright maintains that Burroughs has negated the cases which hold "great bodily injury" need not be defined sua sponte. He asserts that when the pre-1984 cases were decided, the phrase merely meant "a significant or substantial physical injury." However, after the California Supreme Court's opinion in Burroughs, he argues, "great bodily injury" means the same thing as "serious bodily injury," an expression he claims "is defined with great technical precision in Penal Code section 243." Given this express definition and the "fine line" which separates qualifying injuries from nonqualifying injuries, he concludes that "great bodily injury" now has a "technical meaning peculiar to the law." As he phrases the crux of his argument, "because 'serious bodily injury,' as used in Penal Code section 243, has a technical meaning, it perforce follows that 'great bodily injury' also has a technical meaning" and hence must be defined, sua sponte, by the trial court.

As an example of paralogism, Oldright's argument will have few peers. It fails because it is based upon the implicit assumption the Supreme Court in Burroughs determined that the statutory definition of "serious bodily injury" reflects a "technical meaning peculiar to the law," a premise which is clearly wrong. Burroughs is barren of even the slightest suggestion the court was taking such a position. This is not surprising since the language of section 243 does not give a peculiar or unexpected connotation to "serious bodily injury." Rather, the statute is not all-inclusive and does nothing more than define one commonly understood phrase, "serious bodily

injury," by reference to another commonly understood phrase, "serious impairment of physical condition," and then use several examples of what would fall within the common understanding of both phrases. Just because the Legislature undertook to set out a detailed definition of a term in a particular statute does not ipso facto mean the term being defined has a technical meaning peculiar to the law.

At least two appellate courts held, prior to Burroughs, that "serious bodily injury" and "great bodily injury" were "essentially equivalent elements." (People v. Corning (1983) 146 Cal.App.3d 83, 90-91; People v. Kent (1979) 96 Cal.App.3d 130, 136-137.) Although neither dealt with the argument Oldright now makes, it is interesting to note that in Kent, the trial court instructed the jury that "great bodily injury" under section 12022.7 was "'a significant or substantial physical injury.'" It gave the detailed definition of "serious bodily injury" in conjunction with a section 243 charge. (96 Cal.App.3d at p. 136.) On appeal, the court noted that the two concepts were substantially similar, and that elimination of the detailed definition from section 12022.7 in 1977 was not intended to change the definition, but to preclude the possibility it would be construed as all-inclusive. (96 Cal.App.3d at pp. 136-137.) It found the present definitions substantially the same, and no reason to suppose the jury was confused. (Id. at p. 137.)

If the two definitions are substantially the same, then one can say, as Oldright does, that "great bodily injury" has essentially the same meaning as "serious bodily injury."

121

However, one can also say that "serious bodily injury" means
essentially the same thing as "great bodily injury," and it has
long been settled that "great bodily injury" means "a significant
or substantial physical injury." Since this definition is not
"helpful or necessary to the understanding of" the term (People
v. Kimbrel, supra, 120 Cal.App.3d at p. 873), it need not be
given to a jury absent a request or some indication of confusion
(cf. People v. Cordero (1989) 216 Cal.App.3d 275, 282; People v.
Miller, supra, 120 Cal.App.3d at p. 236.) Nothing in Burroughs
changes this or furnishes the least reason to discard the "'long
acceptance of "great bodily injury" as a term commonly
understandable to jurors.'" (People v. Guest, supra, 181
Cal.App.3d at p. 812.)[24]

Accordingly, if Oldright felt the phrase "great bodily
injury" needed amplification or clarification, he should have
made the appropriate request at trial, as he did with regard to
the definition of imminent danger.[25] "A party may not complain
on appeal that an instruction correct in law and responsive to
the evidence was too general or incomplete unless the party has
requested appropriate clarifying or amplifying language."

---

[24]  We express no opinion regarding the inclusion of a
definition of "serious bodily injury" or of "great bodily injury"
in instructions such as CALJIC Nos. 9.12 and 17.20.

[25]  Oldright's special instruction number 1, which defined
imminent danger, was given by the trial court immediately after
it gave CALJIC No. 5.12 [justifiable homicide in self-defense].

(People v. Lang (1989) 49 Cal.3d 991, 1024; cf. People v.
Williams, supra, 45 Cal.3d at p. 1314.)

VI.      Conviction of Second Degree Murder Based on Implied
         Malice Theory

In the case at bench, the jury was instructed on first
degree murder, second degree murder, voluntary manslaughter,
involuntary manslaughter, self-defense, and accident.  With
respect to second degree murder, it was instructed as to both
express and implied malice.  The jury's verdict, while fixing the
offense at second degree murder, did not reveal which theory it
believed.

Oldright now claims he could not properly be convicted
of second degree murder on a theory of implied malice.  He
concedes that a death which results from the brandishing of a
firearm may justify a prosecution under the misdemeanor-
manslaughter rule.  However, he asserts that the brandishing
cannot support a finding of implied malice for purposes of a
conviction of second degree murder, because while the act of
brandishing may pose some inherent danger to human life, it does
not carry a high probability of death.

After briefing was completed in this case, the
California Supreme Court issued its opinion in People v. Nieto-
Benitez (1992) 4 Cal.4th 91.  This decision, which appellate
counsel candidly called to our attention, disposes of Oldright's
argument.

On facts remarkably similar to those of the instant
case, the court in Nieto-Benitez held that the act of brandishing

123

a firearm may supply the implied malice necessary to support a murder conviction.  The court stated:

> "[D]efendant seeks to focus attention on the nature of the underlying act 'in the abstract,' rather than on defendant's specific course of conduct in the present case.  As we shall explain, however, defendant's argument is based upon a distinct body of law that interprets the felony-murder rule and is thus inapplicable in the present context.
>
> "Where the felony-murder rule is applicable, a court looks to the underlying felony in the abstract in order to determine whether the underlying felony was so inherently dangerous that malice can be ascribed to the defendant without reference to the particular facts of the case. [Citations.]   '"The purpose of the felony-murder rule is to deter felons from killing negligently or accidentally, by holding them strictly responsible for killings they commit"' during the course of enumerated felonies.  [Citations.]  For certain felonies deemed inherently dangerous to human life, the rule operates to render irrelevant any evidence of actual malice or of the lack thereof.  [Citations.]
>
> "In contrast, a murder committed with implied malice requires that the prosecution demonstrate the defendant in fact acted with malice. [Citation.]  The concept of implied malice has both a physical and a mental component. [Citation.]  The physical component is satisfied by the performance of '"an act, the natural consequences of which are dangerous to life."' [Citations.]  The mental component . . . involves an act '"deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life. . . ."'  [Citation.]  Whether a defendant's underlying acts are inherently dangerous in the abstract is not dispositive in the jury's determination as to whether a defendant acted with malice.

"Thus, the analytical approach applicable to murder committed with implied malice differs significantly from that applicable to felony murder. [Citations.] Nevertheless, by arguing that misdemeanor brandishing of a firearm is not inherently dangerous, defendant attempts to borrow from the analysis applicable to felony murder in order to escape the applicability of the principles involved in the concept of implied malice. Defendant's contention lacks support. . . .

". . . The very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act. The 'natural consequences' [citation] of a person's act in brandishing a firearm necessarily relate to the context in which the act was committed . . . . Thus, in determining in the case at bar whether defendant intentionally committed an act 'the natural consequences of which are dangerous to life' [citation], the jury was entitled to consider all of the events leading up to the shooting--defendant's dispute with, and threats directed toward, the victim, as well as defendant's retrieval of a loaded handgun and extra ammunition, his prompt return to the scene of the argument, his initiation of the final confrontation, and his drawing of the loaded handgun with his finger on the trigger as the victim lunged toward him." (People v. Nieto-Benitez, supra, 4 Cal.4th at pp. 106-108.)

Thus, a murder conviction may rest upon the commission of a misdemeanor if malice is shown by the particular facts of the case: "[A] defendant who commits an unlawful killing with malice, but whose underlying offense is classified as a misdemeanor, is not insulated by that classification from liability for murder." (People v. Nieto-Benitez, supra, 4 Cal.4th at p. 108.)

125

The court concluded:

"Thus, the classification of the underlying offense as a misdemeanor does not in itself preclude a resulting death from constituting murder.  The circumstance that an act may be punishable as a misdemeanor does not render it incapable of being performed in a manner that, under the circumstances, is sufficiently dangerous to human life to support a jury's finding of implied malice.  Even if the act results in a death that is accidental, as defendant contends was the case here, the circumstances surrounding the act may evince implied malice.  [Citations.]" (People v. Nieto-Benitez, supra, 4 Cal.4th at p. 110, emphasis added, fn. omitted.)

In the instant case, the evidence showed that the relationship between Oldright and Tucker was filled with animosity.  They engaged in a heated verbal exchange shortly before the final affray, and apparently agreed to meet for the purpose of mutual combat.  Regardless of whose version of events (Oldright's or Cobb's) is accepted, their final meeting was not a friendly one.  Oldright purposefully took a loaded handgun to the meeting and intentionally chambered a round, readying the gun for use, after he saw that Tucker's hands were empty.  He then either quickly approached Tucker, or at least moved from the relative safety of his own vehicle, while brandishing the gun.  Under these circumstances, the trial court properly instructed on, and substantial evidence supports a conviction of, second degree murder based on a theory of implied malice.

VII.    CALJIC Nos. 8.11 and 8.31

As earlier noted, the jury was instructed on both express and implied malice.  The trial court defined implied

126

malice pursuant to CALJIC No. 8.11 (5th ed. 1988 bound vol.), as follows:

> "Malice is implied when:
>
> "1.  The killing resulted from an intentional act,
>
> "2.  The natural consequences of the act are dangerous to human life, and
>
> "3.  The act was deliberately performed with knowledge of the danger to and with conscious disregard for human life."

Pursuant to CALJIC No. 8.31 (5th ed. 1988 bound vol.), the trial court further told the jury:

> "Murder of the second degree is also the unlawful killing of a human being when:
>
> "1.  The killing resulted from an intentional act,
>
> "2.  The natural consequences of the act are dangerous to human life, and
>
> "3.  The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life.
>
> "When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

In an argument closely related to that discussed in part VI, _ante_, Oldright claims these instructions were inadequate because they failed to tell the jury that the killing must have resulted from an act inherently dangerous to human life, i.e., one which carries a high probability that death will result.

The California Supreme Court expressly approved the current version of CALJIC No. 8.11 in People v. Dellinger (1989) 49 Cal.3d 1212, 1221-1222. The court reiterated this endorsement in People v. Nieto-Benitez, supra, 4 Cal.4th at page 104, and also rejected the argument that CALJIC No. 8.31 misstates the law because it omits a requirement that the defendant commit an act with a high probability that death will result. The court stated: "[P]resent CALJIC No. 8.31 correctly distills the applicable case law." (4 Cal.4th at p. 111.) Accordingly, it found no error in the trial court's having given the instruction. (Ibid.) We must hold the same to be true here; we are compelled to follow the decisions of the highest court of this state. (Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455.)

VII.    CALJIC No. 3.31.5

Former CALJIC No. 3.31.5 (4th ed. 1979 bound vol.) informed the jury that with respect to the particular crimes charged in the information, "there must exist a union or joint operation of act or conduct and a certain mental state in the mind of the perpetrator and unless such mental state exists the crime to which it relates is not committed." (Emphasis added.) Inexplicably, the 1988 version of the instruction, which was used at the trial in this case, omitted the emphasized words. Thus, the trial court instructed the jury, pursuant to CALJIC No. 3.31.5 (5th ed. 1988 bound vol.):

> "In the crime charged in the information,
> namely murder, there must exist a certain mental
> state in the mind of the perpetrator. Unless such

mental state exists the crime to which it relates
is not committed.

"In the crime of first degree murder, the
necessary mental state is malice aforethought,
deliberation and premeditation.

"In the crime of second degree murder, the
necessary mental state is malice aforethought."[26]

Oldright now contends the instruction given by the
court was incomplete because it did not tell jurors that he could
not be convicted of murder if his malice preceded, but did not
accompany, his firing of the fatal shot. We agree error
occurred; it was, however, not prejudicial because the principle
was adequately covered by other instructions given to the jury.

It is a "fundamental doctrine of criminal law" that "in
every crime, 'there must exist a union, or joint operation of act
and intent . . . .' [Citations.] 'So basic is this requirement
that it is an invariable element of every crime unless excluded
expressly or by necessary implication.' (Fn. omitted.)
[Citation.]" (People v. Green, supra, 27 Cal.3d at p. 53.) The
wrongful intent and physical act must concur in the sense that
the act must be motivated by the intent. (Ibid.) Where a
specific intent crime is involved, an instruction on the
concurrence of act and specific intent must be given sua sponte.
(People v. Turner (1971) 22 Cal.App.3d 174, 184.)

─────────────────────────────

26    The 1992 revision of CALJIC No. 3.31.5 (5th ed. pocket pt.)
once again contains the "union or joint operation" language.

The People, while acknowledging these basic principles, assert the required language appeared in CALJIC No. 3.31, which was also given to the jury:

> "In the crime charged in the information, namely, first degree murder, and in the lesser crimes of second degree murder, and voluntary manslaughter, there must exist an [sic] union or joint operation of act or conduct and a certain specific intent in the mind of the perpetrator. Unless such specific intent exists, the crime to which it relates is not committed.

> "The specific intent required is included in the definition of the crimes of first and second degree murder and voluntary manslaughter." (Emphasis added.)

The problem, as Oldright points out, is that CALJIC No. 3.31 refers only to specific intent, which was not the sole mental state at issue in the instant case. First degree murder requires the mental state of "malice aforethought, deliberation and premeditation." In the crime of second degree murder, the relevant mental state is malice aforethought. As given, neither CALJIC No. 3.31 nor CALJIC No. 3.31.5 informed the jury of the essential concurrent link between these mental states and the commission of the crimes to which they relate.

Although the various case authorities generally speak in terms of a concurrence of act and intent, where, as here, specific intent is not the only mental state at issue, the jury must be instructed on the requisite concurrence of both act and mental state and act and specific intent. In these circumstances, CALJIC No. 3.31.5 must be given in addition to CALJIC No. 3.31. (See, e.g., People v. Green, supra, 27 Cal.3d

130

at pp. 53-54 [where state of mind follows physical conduct,
subsequent mental state not legally related to prior act]; People
v. Fabert (1982) 127 Cal.App.3d 604, 612-613 [CALJIC Nos. 3.31
and 3.31.5 should be given in manslaughter prosecution].)
Accordingly, the instructions given in the instant case were
incomplete.

However, "a single instruction is not to be viewed in
'artificial isolation'; instead, it must be evaluated 'in the
context of the overall charge.' [Citations.]" (People v.
Espinoza, supra, 3 Cal.4th at pp. 823-824.) "'[T]he fact that
the necessary elements of a jury charge are to be found in two
instructions rather than in one instruction does not, in itself,
make the charge prejudicial.' [Citation.] 'The absence of an
essential element in one instruction may be supplied by another
or cured in light of the instructions as a whole.' [Citation.]"
(People v. Burgener (1986) 41 Cal.3d 505, 538-539.) We must
assume jurors are intelligent beings who are capable of
understanding and correlating all instructions given to them.
(People v. Yoder (1979) 100 Cal.App.3d 333, 338.)

Here, the jury was instructed:

"Every person who unlawfully kills a human
being with malice aforethought is guilty of the
crime of murder in violation of Section 187 of the
Penal Code.

"To prove such crime, each of the following
elements must be proved:

"1.  A human being was killed.

"2.  The killing was unlawful.

131

"And 3.   The killing <u>was done with</u> malice aforethought."   (Emphasis added.)

In conjunction with murder in general and second degree murder, the jury was told:

"Malice is implied when:

"1.   The killing resulted from an intentional act,

"2.   The natural consequences of the act are dangerous to human life, and

"3.   The act <u>was deliberately performed with</u> knowledge of the danger to and with conscious disregard for human life."   (Emphasis added.)

In connection with murder, the jury was also instructed:

"When it is shown that a killing resulted from the intentional <u>doing of an act with</u> express or implied malice, no other mental state need be shown to establish the mental state of malice aforethought."   (Emphasis added.)

Each of these instructions clearly expresses the rule that the criminal act must be accompanied by the necessary mental state.   The jury was told to consider the instructions as a whole and each in light of all the others.   The message that the jury had to find a concurrence of act and the mental state of malice aforethought before it could convict Oldright of murder "was all but express in the instructions defining [that crime] . . . ." (<u>People</u> v. <u>Mickey</u>, <u>supra</u>, 54 Cal.3d at p. 676.)   Thus, the instructional error was harmless beyond a reasonable doubt.   (<u>Id</u>. at p. 676; <u>People</u> v. <u>Lee</u> (1987) 43 Cal.3d 666, 674-677; cf. <u>Rose</u> v. <u>Clark</u> (1986) 478 U.S. 570; <u>Chapman</u> v. <u>California</u> (1967) 386 U.S. 18.)

IX.  <u>Failure to Review and/or Admit Tucker's Psychiatric Records</u>

In his petition for writ of habeas corpus, Oldright contends the trial court committed prejudicial error by failing to review and/or admit into evidence certain of Tucker's psychiatric records.

This issue has a complicated procedural history, which is described at length in Oldright's writ petition. We will not detail it here. Essentially, defense counsel obtained Tucker's medical records from Mercy Hospital, and medical and psychiatric records from Charter Hospital and Centre for Neuro Skills (CNS). For various reasons, counsel was subsequently required to turn the records over to the court and resubpoena them from the care providers.

The court ordered disclosure of ordinary physician-patient records. It subsequently determined defense counsel had presented sufficient justification for an in camera review of those records which might be subject to the psychotherapist-patient privilege. During its ruling on the defense request for an in camera review, the following occurred:

> "[THE COURT:] Now, with regard to whatever may be present of patient-psychotherapist records, that doesn't mean that everything that is in those records is subject to being divulged. From my point of view, having heard the opening statements and the testimony of some of the witnesses now, and considering Mr. Lemucchi's declaration, basically what would be relevant would only be any information in those psycho -- psychotherapist records which would be useful in interpreting the actions of the victim at the scene of the event (a), and (b), anything in those records which would be useful in demonstrating the state of mind

133

of the Defendant, which means that there would have to be some sort of a showing made that information about the victim's mental health was possessed by the Defendant.

"Now, that sort of evidence will only be -- let me put it this way. I'm not going to order divulged to the defense any statements that the victim may have made, for example, I'm relying on Mr. Lemucchi's declaration about dreams he had about doing violence to his stepfather, unless and until such time as the defense produces evidence that such information was conveyed to the Defendant. Because the fact that the Defendant might have had -- the victim might have had various ideations which was not conveyed to the Defendant would not be available as a defense in this case.

"So I'll do an in camera review of these records . . . .

"MR. LEMUCCHI: Your Honor, may I make one comment. The Court should keep in mind that the law that states threats communicated or uncommunicated are admissible and relevant to determining who may have been an aggressor in a fatal affray. So if the decedent had dreams of doing violence to his stepfather, that would come under that rule. So the law is that the threats do not necessarily need to be communicated. They would go to the issue of who was the aggressor in the fatal affray. And certainly an expert could testify as to that also that if the man was a sociopath, he was dreaming of threats to his stepfather, that that certainly would be relevant as to what type of action the decedent would be expected to engage in at the time of the fatal affray.

"THE COURT: That might be logical, Mr. Lemucchi, except your defense is one of necessity in arming your client and then of accident in your client having discharged a weapon. And under those circumstances, the question of the mental state of the victim at the time of the incident

134

except insofar as it may have been communicated to the Defendant is not relevant."

The court ultimately reviewed the records in camera and released voluminous portions. Oldright now claims that unbeknown to the court or either attorney, the court utilized an incomplete set of documents because the records submitted in response to the subpoena did not contain all of the papers which counsel had originally obtained. He claims a number of omitted records were admissible to show Tucker's violent character and to show he was dangerous, especially to Oldright. He says their exclusion prejudiced him because had they been reviewed and admitted, "the jury would have been hard-pressed indeed to conclude beyond a reasonable doubt that Mr. Oldright was not reasonably in fear of death or great bodily injury at the time of the shooting."

Despite the lengths to which appellate counsel has gone in an attempt to reconstruct the records, it is still unclear to us what was not reviewed or released. For example, counsel refers to a report by Dr. Ingalls, a neuropsychologist. However, the trial court clearly reviewed and ordered disclosed what it referred to as a workup by Christopher Ingalls, Ph.D., a clinical psychologist. It is impossible to tell if this is the same report. In any event, we have examined all of the records which are before this court, whether or not it appears they were reviewed by the trial court, and have concluded any omission on the part of the trial court was harmless.

First and foremost, Oldright was not precluded from establishing, by other evidence, the troubled relationship between Tucker and himself, Tucker's violent history, or Tucker's

135

size relative to his own, or from attempting to show that Tucker
was the overall aggressor in the fatal incident.  For instance,
the evidence was uncontradicted that it was Tucker who telephoned
Oldright and set the fatal events into motion.  According to
Jerrise Cobb, Tucker told Oldright to tell him a time and place.
According to Velma, however, Oldright said "You know where I am
at."  Cobb admitted Tucker was angry at the time of the telephone
call; she testified that he told her he was going to "kick
Oldright's ass."

The jury was also presented with extensive evidence
regarding Tucker's acts of violence.  For example, Bob West
testified about the ax incident and Tucker's theft of guns.  Tami
Lamas testified about frequent violence directed at her.  She
said Tucker was a heavy user of PCP who became violent when he
used the drug.  She detailed various incidents in which her life
was endangered; the evidence showed Oldright knew about many of
these occasions.  Although, as Oldright now points out, they
occurred several years before Tucker's death, nevertheless the
jury had before it uncontradicted evidence that at least
sometimes, Tucker became extremely violent after having taken
PCP.

The jury also learned Tucker was arrested for being
under the influence of PCP some three months before the shooting.
Although the arresting officer testified he was calm and
cooperative, he also said Tucker mentioned that he sometimes
"freak[ed] out."  Bail bondsman Conners testified to the death
threats Tucker made against Oldright over the bond.  Although

Conners said he did not tell Oldright, Oldright testified that he knew about the threats, and his daughter corroborated this testimony.

Oldright also knew Tucker was treated at CNS for problems which included lack of temper control, and that he had discipline problems while at CNS. Oldright knew Tucker used PCP; he knew something about Tucker's altercation with West; he heard Tucker brag about "stomping" a girlfriend's boyfriend at the fair; he heard Tucker mention fighting in jail; and he overheard Tucker threaten to kill Lamas during a disagreement over visitation with his son. Oldright also testified that Tucker directly threatened to kill him.

The evidence was overwhelming that Tucker had PCP and cocaine metabolite in his system when he died. The evidence was uncontroverted that PCP is a very unpredictable drug, and that the user's environment may stimulate the user to violence.

Dr. Couture's testimony is described in detail in the Statement of Facts, _ante_. Significantly, when asked what response Tucker would have toward a confrontational and stressful situation, Couture testified: "I think Mr. Tucker when stressed would be tempted to not -- would be tempted to -- would be more likely to respond with aggression than conciliation or withdrawal."

Dr. Shannon testified Tucker had an on-going problem with PCP in April 1991. He testified PCP use can result in emotional lability and hostility. Combined with cocaine, it can cause an even greater loss of emotional control. The user will

137

be more likely to respond in an emotional or hostile manner.
Brain problems such as those experienced by Tucker could also
cause behavioral manifestations such as violent outbursts. PCP
and cocaine would have an additive effect, regardless of whether
the discontrol problems arose from trauma or personality.

Many of the records which Oldright claims the court
failed to review chronicled Tucker's complaints that, after his
head injury, he was unable to control his temper. Tucker stated
at one point that he destroyed much of the apartment he was
sharing with his girlfriend. Many of the CNS records revealed
noncooperation with therapy, noncompliance with rules, and angry
and confrontational behavior toward staff. However, Tucker's
penchant for behaving in this manner was covered by Dr. Couture's
testimony. One of the reports from Charter Hospital noted that
Tucker tended to be uncompliant while in the CNS program, and
that he reportedly ripped a motion detector off the wall in the
residence there. However, Tucker recognized his problem with
emotional discontrol and agreed to be admitted to Charter in an
attempt to deal with his problems. Tucker left Charter Hospital
against medical advice.

In short, Oldright's contentions notwithstanding,
virtually all of the omitted records were cumulative of the
testimony presented by the defense expert witnesses or of other
evidence adduced at trial. In his declaration, defense counsel
claims that had the records been reviewed by the court and
released as evidence, counsel would have used them to establish
Tucker's dangerous character. Because Oldright had personal

knowledge of the matters discussed in some of the records,
counsel would have further used the records to establish the
reasonableness of Oldright's fear of Tucker.  However, the
evidence that _was_ presented to the jury fully showed how
dangerous Tucker was, to Oldright in particular.  The jury's
assessment of that danger, and of whether Oldright feared Tucker
and, if so, whether that fear was reasonable, would simply not
have been significantly affected by the omitted material.

　　　　Among the unreviewed information is a record from
Charter Hospital in which it is reported that on February 4,
1991, Tucker "discussed anger towards his mother about financial
issues and dreams of violence towards his stepfather."  As
previously noted, the court excluded such evidence because of
Oldright's hybrid defense.  In his motion for new trial, Oldright
was more explicit about his intended use of this information:

> "[MR. LEMUCCHI:]  Now one of the critical
> pieces of information that the Court would not
> allow into evidence was the records of the Charter
> Hospital that indicated three months before the
> fatal affray that Ron Tucker was having dreams of
> violence, doing violence to his stepfather.
>
> "Now, this evidence should have come in on
> two theories.  No. 1, it should have come in on
> the character evidence and, No. 2, it should have
> come in under the law that provides that threats
> communicated or uncommunicated are admissible to
> show who might be the aggressor in a fatal affray.
>
> "Now based upon the Charter Hospital records
> that Tucker was having dreams of violence toward
> Oldright, and the other evidence of character, the
> specific acts of violence that were found in the
> Centre for Neuro Skills records, Dr. Couture was
> prepared to give an opinion that Mr. Tucker was,

139

in fact, a sociopath and that he was a
particular[ly] dangerous person, maybe not to
society as a whole, but he was a particular[ly]
dangerous person to Bill Oldright because the
threats had been directed or the dreams of
violence had been directed toward Bill Oldright.
And Mr. Couture or Dr. Couture would have been
prepared to give an opinion as to Mr. Tucker's
expected behavior on the date of the fatal affray
between the two men.

"THE COURT: Say that last sentence again
because I'm missing something there.

"MR. LEMUCCHI: All right. Dr. Couture would
have been prepared to testify that based upon the
dreams that Mr. Tucker was having about the
specific acts of violence and aggressiveness that
were found in all of the Centre for Neuro Skills
records, based upon -- again upon the drug history
that Mr. Tucker was a sociopath and presented a
particular danger to William Oldright, and was
prepared to testify that based upon those specific
items that were found in those various records as
to what Tucker's expected behavior could or would
have been on the date of the fatal affray."

Defense counsel apparently forgot that Couture _did_
testify to Tucker's expected behavior:  he testified that when
stressed (as he obviously would have been during the
confrontation with Oldright), Tucker "would be more likely to
respond with aggression than conciliation or withdrawal."
Nothing in the record before this court suggests Couture could
have given any more definite or detailed opinion without entering
the realm of speculation.

In short, all relevant information from Tucker's
records, which Oldright now claims was not reviewed or was
erroneously excluded from evidence, was before the jury in some
form.  Although the excluded information might have added some

140

details of Tucker's aggressiveness, in our estimation it would
not have changed the overall impact of the case or the jury's
analysis of the core issues.  Accordingly, Oldright has failed to
establish prejudice.

Furthermore, there is no reasonable probability any
unreviewed reports could have materially assisted the defense so
as to undermine confidence in the outcome of the trial.  (Cf.
People v. Reber (1986) 177 Cal.App.3d 523, 532-533 [trial court
erred to extent it failed to obtain and examine in camera all
materials under subpoena and determine issues raised by People's
claim of privilege].)  The same is true about any reviewed but
excluded records, in light of the information which was before
the jury, it is not reasonably probable Oldright would have
obtained a more favorable result had the records been admitted.
(People v. Watson, supra, 46 Cal.2d at p. 836.)  Moreover,
because the substance of the information cited in the subject
records was before the jury, any erroneous exclusion, which was
based on application of ordinary rules of evidence, did not
impair Oldright's defense so as to rise to the level of a
constitutional violation.  (See People v. Mincey, supra,
2 Cal.4th at p. 440 [application of ordinary rules of evidence
does not impermissibly infringe on defendant's right to present
defense]; compare Chambers v. Mississippi (1973) 410 U.S. 284
[mechanical application of rules of evidence prevented
presentation of defense witnesses, violating fundamental right to
present witnesses in own defense].)

141

X.        Gun Demonstration

In his writ petition, Oldright contends the trial court committed reversible error by refusing his request for an in-court gun demonstration.

A.    Facts

During cross-examination of Detective Brown, defense counsel was permitted to have the witness show the jury how the clip fit into the handle of the pistol, and the small overhang that resulted.  On direct examination, Oldright discussed how he placed a live round into the gun's chamber in order to show Tucker it was a real weapon.  He further testified:

> "Q. [by defense counsel]  Now did you continue to hold the gun up in clear view?
>
> "A.  Oh, yeah.
>
> "Q.  How were you holding it?
>
> "A.  Like this.
>
> "Q.  You are holding your arms up above your head.
>
> "A.  Yeah.
>
> ". . . . . . . . . . . . . . . . . .
>
> "Q.  Did Ron do anything just before there was a bang?
>
> "A.  Yes.  He looked like he was going to, I don't know, jump at me.  And I told him, Ron, no. And that's when the bang happened.
>
> "Q.  At the time that the bang -- there was a bang, were you pointing the gun at him?
>
> "A.  No, I don't believe I was.

"Q.  Would you demonstrate with your hands again how you were holding the gun.

"A.  Like this right here.

"Q.  You were holding it up?

"A.  Yes.

"Q.  As far as your right hand was concerned, can you demonstrate to the jury how you were holding the gun.

"A.  Well, I had the gun like this here because I wasn't planning on using it, all I was trying to do was show it to him that I had a live gun here.

"Q.  Did you have your finger on the trigger?

"A.  Yes, I did.  You have to to [sic] hold for the stability of the weapon.

"Q.  Where were your -- where was your second -- your first finger and your second finger and your third and fourth finger?

"A.  Well, let's see.  I had this one here and then this one like this at the time that I was holding this weapon.

"Q.  Did you have a firm grip on the pistol?

"A.  Well, yeah.  These two fingers here, they wrap around the handle of the pistol.

"THE COURT:  Showing the middle two fingers.

"A.  If you could show me the -- well --

"MR. LEMUCCHI:  Can we use the weapon to demonstrate?

"THE COURT:  No."

On cross-examination, the following occurred:

"Q. [by the prosecutor]  Now you're saying

143

that you held this gun up with your finger on the
trigger like so.  Is that right?

"A.  No, sir.

"Q.  How did you hold up your hand, sir?

"A.  Do you want me to show you?

"Q.  I'm not going to give you this gun, but
I want you to hold your hand up the way you held
your hand up on that day.  Pointing like this?

"A.  With it in the trigger.

"Q.  Okay.  Now you told us that the only --

"A.  But my finger sticking out, sir, yours
isn't.

"THE COURT:  Your pinky is sticking out as
well as your index finger.  Is that correct?

"THE WITNESS:  Yes, sir.

"  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Q.  You were facing him [Tucker] like I'm
facing you today.  Is that right?

"A.  Sort of.  He was going this way and I
was coming this way till I stopped.

"Q.  And you were holding the gun like this?

"A.  Up in the air.

"Q.  Like this?

"A.  Just like that.

"Q.  Just like this?

"A.  Yes, sir.

"Q.  And you shot him in the neck?

"A.  He got shot in the neck, yes, sir.

"Q.  Well, correct me if I'm wrong, sir, but the gun is pointing at the ceiling lights right now.

"A.  Yes, sir.

"Q.  And you're saying that this gun pointing at the ceiling lights shot Ron Tucker in the neck?

"A.  I'm saying that's what happened, yes, sir.

"Q.  Now you also told us in order to hold this gun, you had to put two fingers on the handle here?

"THE COURT:  The gun is either down or up, counsel.

". . . . . . . . . . . . . . . .

"Q.  You put two fingers on the handle, sir, you have to put your finger on the trigger.  Did you ever hold the gun with your index finger pointing straight out next to the barrel of the weapon?

"A.  The first part of your question, sir, no.  You would have to put the finger on the trigger.

"Q.  Well, sir, you have to --

"A.  The second part you still didn't have your pinky out here, sir.  That's how I had the weapon because I wasn't planning on using it."  (Emphasis added.)

On redirect examination, Oldright testified that his finger was injured by the clip when the gun discharged and recoiled.  He explained that the gun is held with two fingers on the handle and the other finger curled up underneath.  If that finger is not curled up underneath, the clip sticks out and cuts the finger.  Oldright then claimed he did not have a firm grip on

the handle of the pistol when the gun went off.

In trial counsel's declaration in support of the writ petition, counsel asserts that during Oldright's testimony, there was a side-bar discussion about the need to have Oldright demonstrate for the jury how he was holding the gun. According to counsel, "[t]he Court summarily dismissed the request for a demonstration, saying it was the Court's policy not to allow a defendant to handle a weapon in evidence in the courtroom." Counsel points out that during deliberations, the jury requested both the gun and the clip.

In his argument to the jury, defense counsel remarked on Oldright's testimony that he was holding the gun over his head as he moved toward Tucker. Counsel claimed this was not the action of a person who planned to shoot someone. Defense counsel then stated:

> "The wound on his [Oldright's] finger is an
> important thing. No, he didn't get the wound on
> his finger when the magazine clip did or he shot
> it. He got it because he wasn't holding a firm
> grip on the pistol. You will have the pistol in
> there, you can see what he said. He had this
> finger on the trigger, this finger on the grip and
> these two fingers loose and you will see that
> little clip that comes out maybe a quarter of an
> inch and when the pistol went off and it has a
> back fire it hit him right here and caused a small
> wound. And what does that show. It shows that he
> didn't have a firm grip on the pistol because the
> way to shoot that pistol is to have a firm grip on
> it so that it doesn't do that to you." (Emphasis
> added.)

Oldright based his motion for new trial in part on the court's refusal to permit the demonstration. The court

responded:

> "The refusal to allow the Defendant to use a
> weapon to demonstrate what happened, it has always
> been this Court's policy and the policy of every
> court I know not to allow a person accused of a
> violent crime to handle a weapon in court. In
> this case we had an out of custody Defendant and
> the request was that he be allowed to handle the
> weapon in court. The jury was allowed to see the
> weapon. They could themselves examine its
> workings. The Defendant was allowed to explain
> what happened and to show, as I recall, in
> photographs where he was -- his hand was nicked by
> a portion of the weapon. And I don't see how any
> advantage would have been served by having the
> Defendant handle the weapon. And as I say, I'm
> not aware of any Court that allows people accused
> of violent crimes to handle weapons in Court.
> There are simply too many possibilities of
> untoward accidents or incidents."

B.    Discussion

"A trial judge is not to be unduly and unreasonably

hampered and restricted in the exercise of control over the

proper examination of witnesses and the conduct of the trial

generally. Considerable latitude is, and must be, accorded to

him in this regard." (Commercial U. A. Co. v. Pacific G. & E.

Co. (1934) 220 Cal. 515, 525.) A trial court's ruling on the

admissibility of demonstration evidence will be reversed only

where the trial court abused its broad discretion. (People v.

Gilbert (1992) 5 Cal.App.4th 1372, 1388; cf. People v. Jacobs

(1987) 195 Cal.App.3d 1636, 1656.)

No abuse of discretion appears here. In determining

whether to permit the requested demonstration, the trial court

was permitted to take into account factors involving courtroom

147

security.  Oldright claims the bailiff could have checked the weapon and, if necessary, searched him for bullets.  However, shooting is not the only manner in which a gun can be used as a weapon.  The court was properly concerned that no untoward incident take place in front of the jury.

Moreover, the court's remarks in response to the new trial motion indicate it did not deny the request merely because of a blanket policy concerning a criminal defendant's handling of a weapon.  It properly considered the fact that Oldright was permitted to show how he held the gun.  While it is not clear from the transcript how Oldright held the gun, it is clear that the prosecutor was demonstrating, and that Oldright was permitted to explain precisely what occurred.  In addition, defense counsel was able to demonstrate the grip during argument.  The trial court was in the best position to determine whether a physical demonstration was necessary or advisable under these circumstances.[27]

Oldright relies on People v. Holt (1972) 28 Cal.App.3d 343 (disapproved on other grounds in Evans v. Superior Court (1974) 11 Cal.3d 617, 625, fn. 6), as support for his contention

---

[27]  In his declaration in support of the writ petition, appellate counsel describes how he was unable to understand how Oldright held the weapon until he took his own handgun and had Oldright lead him "finger-by-finger" until he had an accurate picture.  This appears to be precisely what the prosecutor did in cross-examination.  Moreover, Oldright's statement in support of the writ, that "it was obvious from the looks on the jurors' faces that they did not truly understand how" he held the gun, is a mere conclusion on his part.

that he was entitled, upon request, to give a demonstration. However, Holt merely stands for the proposition that a defendant may be required to participate in a demonstration before the jury. (28 Cal.App.3d at pp. 350-351.) It does not hold, nor does it necessarily follow, that a defendant must be permitted to do so upon request.

Oldright also points out that a defendant "has a due process right to present evidence material to his defense so long as that evidence is of significant probative value." (People v. Shoemaker (1982) 135 Cal.App.3d 442, 450, emphasis added.) This is true and, depending upon the circumstances, safety concerns may be required to give way to this right. We need not determine under what circumstances this might occur, however, since it is apparent from the record that, given the extensive testimony and demonstrations which were permitted, a further demonstration by Oldright himself would have been cumulative. Despite Oldright's protestations to the contrary, the proffered evidence (i.e., the demonstration) did not have significant probative value beyond that of the testimony and already-existing demonstrations.

To summarize, the trial court did not abuse its discretion by denying Oldright's request for an in-court demonstration of how he held the firearm. Such a demonstration would have added little to what was before the jury, and denial of the request did not prevent Oldright from presenting material evidence on this point to the trier of fact. The trial court took proper factors into consideration in ruling on the request, and any failure to articulate those factors at the time of the

149

ruling did not prejudice Oldright.  Even assuming the trial court erroneously denied the request merely because of a blanket policy against permitting criminal defendants to handle a firearm, such error was harmless beyond a reasonable doubt because the proffered demonstration was cumulative.  (Cf. People v. Shoemaker, supra, 135 Cal.App.3d at pp. 449-450 [exclusion of cumulative evidence harmless beyond a reasonable doubt].)

XI.    Exclusion of Tucker's Past Crimes

Oldright contends the trial court erred by excluding evidence of Tucker's past crimes, specifically (1) the theft of $5,000 from Velma; (2) the theft of guns from Velma; and (3) an incident at a 7-11 store.

A.    Theft of $5,000 from Velma

Defense counsel was permitted to examine the probation officer's report (RPO) prepared in conjunction with People v. Ronald Phil Tucker (Super. Ct. Kern County, 1988, No. 37582). The RPO revealed Tucker pled guilty to one count of grand theft arising from his theft, on or about October 25, 1988, of $5,000 from Velma.  Velma told the probation officer that she would like to see Tucker sentenced to prison, if that is what it took for him to get help for his drug addiction.

During defense counsel's cross-examination of Velma, he asked why she did not post bail for Tucker following his arrest on January 8, 1991.  Velma responded that Tucker had been in trouble before and she had told him not to call her if he got in trouble again.  This ensued:

150

"BY MR. LEMUCCHI:

"Q.  All right.  Now the reason that you had
that conversation with Ron is because he had
committed a crime against you.  Isn't that right?

"A.  Yes.  And I turned him in and I talked -
I had him --

"Q.  He stole $5,000.00 from you?

"MR. CARBONE:  Your Honor, I'm going to
object to counsel's -- ask that counsel be
admonished about bringing --

"THE COURT:  Sustained.

"MR. CARBONE:  Ask that counsel be admonished
about bringing in inadmissible material.

"MR. LEMUCCHI:  I would like to be heard.

"THE COURT:  No.  I have ruled on this
before, counsel.  Sustained.

"BY MR. LEMUCCHI:

"Q.  At the time when this incident with you
occurred, did Ron take some guns from your house?

"MR. CARBONE:  Your Honor, I'm going to
object to counsel's actually bringing in these
matters unless it has some relevance to this
proceeding.

"MR. LEMUCCHI:  I would like to state the
relevancy if I can.

"THE COURT:  I will see counsel at sidebar.

"(A conference was held at sidebar which was
not reported.)

"THE COURT:  That's sustained."

Oldright now claims the proffered evidence was
admissible to impeach Velma's testimony, which was essentially

151

that Tucker was sweet and loving to her, and to impeach Cobb's
testimony, which suggested Oldright was to blame for the poor
relationship between Tucker and Velma.

A trial court has no discretion to admit irrelevant
evidence. (People v. Poggi (1988) 45 Cal.3d 306, 323; Evid.
Code, § 350.) "'Relevant evidence' means evidence, including
evidence relevant to the credibility of a witness or hearsay
declarant, having any tendency in reason to prove or disprove any
disputed fact that is of consequence to the determination of the
action." (Evid. Code, § 210.)

Who was to blame for the poor relationship between
Velma and Tucker was irrelevant to a determination of what
happened at the time Tucker was shot. It simply had no tendency
in reason to prove whether Tucker was the aggressor, or what went
on just prior to and during the shooting. Similarly, whether
Tucker was sweet and loving toward Velma does not tend to prove
how he acted toward Oldright. In fact, the evidence was
undisputed that the two men did not get along. Any impeachment
value the proffered evidence might have had with regard to
Velma's testimony was served by admission of Velma's testimony
that Tucker had committed a crime against her and that she turned
him in. Although the prosecutor's objection was sustained
regarding further questioning along this line, the court never
struck or admonished the jury to disregard this portion of
Velma's testimony. The trial court did not err.

B.   Theft of Guns from Velma

In his writ petition, Oldright (through appellate

counsel) claims the trial court erred by refusing to permit evidence that Tucker stole guns from Velma and Bob West.  In his supporting declaration, trial counsel asserts the evidence should have been admitted to show Tucker had access to firearms and was dangerous, and, since Oldright knew of the theft, to support the reasonableness of his defensive actions.  In his supporting declaration, Oldright also claims the defense was not allowed to introduce evidence of the gun thefts.

It is true that the trial court sustained the prosecutor's objection when defense counsel asked <u>Velma</u> about the incident.  However, on direct examination by defense counsel, Bob West testified Tucker took guns from Velma and West without permission.  West gave the precise number and type of guns taken, and said all but the two pistols were retrieved from a pawn shop. To West's knowledge, the two pistols--which belonged to Velma-- were never returned.

Belatedly acknowledging this testimony after it was pointed out by the Attorney General, appellate counsel questions whether it was an adequate substitute for formal proof of the theft.  One wonders why testimony by West would have been any less adequate proof than testimony by Velma.  In any event, appellate counsel now claims trial counsel was ineffective for failing to convey to the jury the fact Oldright knew of the theft.  Counsel makes this assertion without any citation to authority.  In order to preclude a later claim of ineffectiveness of appellate counsel, we will discuss this subject on its merits.

153

To prevail on a claim of ineffectiveness of counsel,
"defendant must first show that '"counsel's representation fell
below an objective standard of reasonableness . . . under
prevailing professional norms."'  [Citations.]  Second, defendant
must show that the inadequacy was prejudicial, that is, '"there
is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would have
been different.  A reasonable probability is a probability
sufficient to undermine confidence in the outcome."'
[Citations.]"  (People v. Diaz (1992) 3 Cal.4th 495, 557.)

Assuming (without finding) deficient performance by
counsel, no prejudice resulted.  First, the theft occurred during
West's marriage to Velma (between 1975 and 1985), a number of
years before the instant offense, thereby lessening the
reasonableness of an inference Tucker was dangerous because he
had access to firearms.  Second, Oldright never claimed he was
afraid of Tucker because the latter might have access to
firearms.  Instead, he testified that when he got out of the
truck, he took his pistol out of its pouch "[b]ecause I wasn't
going to get out alone, no way.  That guy weighed seventy-five
pounds more than I did."  Oldright subsequently reiterated that
Tucker was larger than him and would "make mush" out of him.  The
jury was also aware Oldright knew Tucker's hands were empty when
Oldright chambered the round in his gun.  Moreover, there was
ample evidence before the jury that Tucker was perfectly capable
of being violent, thereby permitting assessment of the
reasonableness of Oldright's conduct.  In short, it is not

reasonably probable that had counsel elicited Oldright's

knowledge of the gun theft, the result of the trial would have

been more favorable to Oldright.

C.    The 7-11 Incident

Trial counsel has the following to say about the so-

called 7-11 incident, about which we can find only a vague

reference in the record on appeal:

> "On June 24, 1982, Bakersfield Police
> officers were dispatched to a peace disturbance
> call at a 7-11 store. Upon arrival, they were
> told that Tucker was seen in a phone booth with a
> pink towel covering an object. The police then
> found the pink towel lying behind a locked chain-
> link fence next to the 7-11 store. A rifle was
> next to the towel. Tucker was asked why he had
> thrown the rifle over the fence, whereupon he
> stated he became nervous when he saw the police
> arrive at the store. After handcuffing and
> searching Tucker, the officers found 76 white
> double-scored tablets believed to be amphetamines
> in Tucker's pocket. The .22-caliber rifle was
> seized."

Defense counsel asserts, and appellate counsel agrees,

that this evidence should have been admitted to show Tucker had

access to a gun and was potentially dangerous. It appears from

the record, however, that during trial Oldright's attorney sought

to ask Dr. Couture if he was familiar with this and other

incidents in order to elicit testimony concerning the type of

behavior Couture would expect from someone like Tucker when in a

stressful, confrontational situation.

The trial court did not err in excluding the evidence

for either purpose. Possession of a gun in 1982 is too remote,

as a matter of law, to have a tendency in reason to prove access

to firearms in 1991, especially where, as here, that gun was seized by the police.  As for Couture's testimony, as previously discussed, Couture did in fact testify to Tucker's likely reaction if confronted by a stressful situation.  Specifically, he would have expected Tucker to react aggressively.  Evidence about the 7-11 incident would have added nothing to this testimony; if anything, it would have undermined it because Tucker did not act aggressively at that time, even though, by his own admission, he because nervous when he saw the police arrive.

XII.    <u>Cumulative Effect of Errors</u>

In both his appeal and writ petition, Oldright claims he suffered prejudice as a result of the cumulative effect of the various errors.  Arguably, some errors did occur.  However, a defendant is entitled to a fair trial, not a perfect one.  (E.g., <u>Schneble</u> v. <u>Florida</u> (1972) 405 U.S. 427, 432; <u>People</u> v. <u>Morris</u> (1991) 53 Cal.3d 152, 187; <u>People</u> v. <u>Hamilton</u> (1988) 46 Cal.3d 123, 156.)  Oldright received a fair trial.  None of errors we have identified, either singly or as a result of their cumulative effect, was so egregious as to warrant reversal under any standard of prejudice.

DISPOSITION

The judgment is affirmed; the petition for writ of habeas corpus is denied.

_____
Dibiaso, Acting P.J.

WE CONCUR:

_____
Thaxter, J.

_____
Harris, J.