# EXHIBIT C

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of:                )      CDC Number H-14131
                           )
WILLIAM OLDRIGHT           )
                           )
_____)

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

NOVEMBER 8, 2005

PANEL PRESENT:

SUSAN FISHER, Presiding Commissioner
ROBERT HARMON, Deputy Commissioner

OTHERS PRESENT:

WILLIAM OLDRIGHT, Inmate
PETER FERGUSON, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

**Ramona Cota**              **Peters Shorthand Reporting**

ii

## INDEX

PAGE

Proceedings........................................... 1

Case Factors.......................................... 9

Pre-Commitment Factors............................ 19

Post-Commitment Factors........................... 33

Parole Plans......................................... 23

Closing Statements................................. 65

Recess............................................... 70

Decision............................................. 71

Adjournment.......................................... 75

Transcriber Certification......................... 76

--oOo--

1

1               P R O C E E D I N G S

2          **DEPUTY COMMISSIONER HARMON:**  You are on

3     the record.

4          **PRESIDING COMMISSIONER FISHER:**  All

5     right, thank you.  And I am going to warn you,

6     Mr. Oldright, I have one of those voices that

7     sort of fades away, so if you can't hear me just

8     remind me to speak up, okay.

9          **INMATE OLDRIGHT:**  Okay.

10         **PRESIDING COMMISSIONER FISHER:**  My voice

11    gets tired at the end of the day.  All right,

12    this is going to be a Subsequent Parole

13    Consideration Hearing for William Oldright, CDC

14    number H-14131.  Today's date is 11/8/05 and we

15    are located at the Correctional Training

16    Facility at Soledad.  The inmate was received on

17    11/1/91 from Kern County.  The life term began

18    on 3/29/93 and the minimum eligible parole date

19    is 3/29/03.  The controlling offense for which

20    the inmate has been committed is second degree

21    murder, case number SC046078, count one, Penal

22    Code Section 187.  There was an additional

23    finding of the use of a firearm, that's Penal

24    Code Section 12022.5(a).  The inmate received a

25    term of 18 years to life with a minimum eligible

26    parole date of 3/29/03.  We are going to be

27    tape-recording today.

2

1        **INMATE OLDRIGHT:**  All right, ma'am.

2        **PRESIDING COMMISSIONER FISHER:**  So for

3    voice identification we are each going to say

4    our first and last name and spell our last name.

5    When I get to you I need your CDC number, okay?

6        **INMATE OLDRIGHT:**  All right, ma'am.

7        **PRESIDING COMMISSIONER FISHER:**  I'm going

8    to start with myself and go to my left.  Susan

9    Fisher, F-I-S-H-E-R, Commissioner.

10       **DEPUTY COMMISSIONER HARMON:**  Robert

11   Harmon, H-A-R-M-O-N, Deputy Commissioner.

12       **ATTORNEY FERGUSON:**  Peter Ferguson, F-E-

13   R-G-U-S-O-N, counsel for Mr. Oldright.

14       **INMATE OLDRIGHT:**  William Oldright, O-L-

15   D-R-I-G-H-T.

16       **PRESIDING COMMISSIONER FISHER:**  Thank

17   you.  And your CDC number?

18       **INMATE OLDRIGHT:**  H-14131.

19       **PRESIDING COMMISSIONER FISHER:**  Thank

20   you.  I would like to also note for the record

21   that we have two correctional officers present

22   who are here for security purposes and will not

23   be participating in the hearing.  And counsel,

24   aside from Mr. Oldright's hearing difficulties

25   are there any other ADA issues that we need to

26   accommodate today?

27       **ATTORNEY FERGUSON:**  No, there are not.

3

1          **PRESIDING COMMISSIONER FISHER:**  Okay.

2     Mr. Oldright, you signed the BPT 1073 form on

3     December 10 of '04 and said that you needed a

4     hearing aid but that there were no other

5     disabilities.

6          **INMATE OLDRIGHT:**  Right.

7          **PRESIDING COMMISSIONER FISHER:**  Is that

8     still correct?

9          **INMATE OLDRIGHT:**  Yes ma'am.

10         **PRESIDING COMMISSIONER FISHER:**  Okay.

11    Are those reading glasses?

12         **INMATE OLDRIGHT:**  Yeah.  That goes with

13    age I'm sorry to say.

14         **PRESIDING COMMISSIONER FISHER:**  I know.

15    We all have that accommodation, I'm afraid.

16    That is considered to be an accommodation under

17    the Americans with Disabilities Act.

18         **INMATE OLDRIGHT:**  Oh, okay.

19         **PRESIDING COMMISSIONER FISHER:**  So I just

20    want to check with you.  Did you do an Olson

21    Review on your file?

22         **INMATE OLDRIGHT:**  Yes ma'am.

23         **PRESIDING COMMISSIONER FISHER:**  And did

24    you have your glasses?

25         **INMATE OLDRIGHT:**  Every year.

26         **PRESIDING COMMISSIONER FISHER:**  Okay.

27         **INMATE OLDRIGHT:**  Yes.

4

1      **PRESIDING COMMISSIONER FISHER:**  All

2   right, good.  This hearing is being conducted

3   pursuant to Penal Code Sections 3041 and 3042

4   and the rules and regulations of the Board of

5   Prison Terms that govern parole consideration

6   hearings for life inmates.  And as you know the

7   purpose of the hearing today is to consider your

8   commitment offense, your prior criminal and

9   social history and your behavior and programming

10  since you've been in prison for this offense.

11  We have had the opportunity to review your file

12  and are going to give you the opportunity to

13  make any corrections that you need to today.

14  All right?

15      **INMATE OLDRIGHT:**  All right.

16      **PRESIDING COMMISSIONER FISHER:**  We are

17  going to reach a decision today as to whether or

18  not we find you suitable for parole.  And if we

19  do find you suitable today we will explain to

20  you what the length of your confinement will be.

21      **INMATE OLDRIGHT:**  All right.

22      **PRESIDING COMMISSIONER FISHER:**  And I

23  know that you had a prior grant so you kind of

24  know how that all works.

25      **INMATE OLDRIGHT:**  Yes ma'am.

26      **PRESIDING COMMISSIONER FISHER:**  Okay.

27  Now before we recess to deliberate I am going to

5

1    give you and your attorney both the opportunity

2    to make a final statement about your

3    suitability.

4           **INMATE OLDRIGHT:**  Good.

5           **PRESIDING COMMISSIONER FISHER:**  I want to

6    remind you that you are not required to admit or

7    discuss the offense but that the panel accepts

8    the findings of the court to be true.  You

9    understand that, right?

10          **INMATE OLDRIGHT:**  Yes ma'am.

11          **PRESIDING COMMISSIONER FISHER:**  Okay.

12   The California Code of Regulation states that

13   regardless of time served a life inmate shall be

14   found unsuitable for and denied parole if in the

15   judgment of the panel he would pose an

16   unreasonable risk of danger to society if

17   released from prison.  You have rights related

18   to your hearing that include the right to a

19   timely notice of the hearing, the right to

20   review your Central File and the right to

21   present relevant documents.  Counsel, have your

22   client's rights been met?

23          **ATTORNEY FERGUSON:**  Yes ma'am.

24          **PRESIDING COMMISSIONER FISHER:**  Okay.

25   You also have the right, Mr. Oldright, to an

26   impartial panel.  Having seen your two panel

27   members today do you have any objections to your

6

1   panel?

2          INMATE OLDRIGHT:  Not right now.

3          PRESIDING COMMISSIONER FISHER:  Okay.

4   Well now would be the time.

5          INMATE OLDRIGHT:  I know.

6          PRESIDING COMMISSIONER FISHER:  Counsel,

7   any objections to the panel?

8          INMATE OLDRIGHT:  None.

9          PRESIDING COMMISSIONER FISHER:  All

10  right.  I am going to give you a written copy of

11  our decision today.  It will be tentative, it

12  will be effective within 120 days.  And then a

13  copy of the decision and a copy of the

14  transcript of today's hearing will be sent to

15  you.  Okay?  Now are you familiar with the

16  changes that took place last year regarding how

17  you appeal a Board decision?

18         INMATE OLDRIGHT:  Oh, I got caught right

19  in the middle of the 1040.  Yes ma'am, I am.

20         PRESIDING COMMISSIONER FISHER:  Okay, all

21  right.

22         INMATE OLDRIGHT:  I am well aware.

23         PRESIDING COMMISSIONER FISHER:  All

24  right.  So you know that now all appeals go to

25  the courts.

26         INMATE OLDRIGHT:  Yes ma'am.

27         PRESIDING COMMISSIONER FISHER:  Okay,

7

1  good, all right.  Okay, is there any

2  confidential to be used today?

3       **DEPUTY COMMISSIONER HARMON:**  No.

4       **PRESIDING COMMISSIONER FISHER:**  All

5  right.  And did we give Mr. Ferguson the

6  checklist?  Should I give him mine?  I'll give

7  him that one.

8       **ATTORNEY FERGUSON:**  We do have some

9  documents to submit today.

10      **PRESIDING COMMISSIONER FISHER:**  Okay,

11  great.  Officer, could you grab those?

12      **ATTORNEY FERGUSON:**  There is a packet for

13  each of you.

14      **PRESIDING COMMISSIONER FISHER:**  That way

15  he doesn't have to hurl them across the table.

16  Thank you.  All right.  Got everything?

17      **ATTORNEY FERGUSON:**  Yes, we acknowledge

18  receipt of all the indicated documents.

19      **PRESIDING COMMISSIONER FISHER:**  All

20  right, thank you.  Any preliminary objections?

21      **ATTORNEY FERGUSON:**  No.

22      **PRESIDING COMMISSIONER FISHER:**  Okay.

23  And is Mr. Oldright going to be speaking with us

24  today?

25      **ATTORNEY FERGUSON:**  Yes, he will be.

26      **PRESIDING COMMISSIONER FISHER:**  Okay.

27  Would you raise your right hand, I'm going to

8

1    swear you in.  Do you solemnly swear or affirm

2    that the testimony you give at this hearing will

3    be the truth and nothing but the truth?

4         **INMATE OLDRIGHT:**  Yes I will.

5         **PRESIDING COMMISSIONER FISHER:**  All

6    right, thank you.  All right.

7         **INMATE OLDRIGHT:**  Yes I do, I should say.

8         **PRESIDING COMMISSIONER FISHER:**  Either

9    way it works.

10        **INMATE OLDRIGHT:**  Yes.

11        **PRESIDING COMMISSIONER FISHER:**  All

12   right.  Let's see here.  Counsel, I think I am

13   going to use the -- I'm going to go back one

14   report because it seems like there was one with

15   a little more information.

16        **ATTORNEY FERGUSON:**  Which date is that?

17        **PRESIDING COMMISSIONER FISHER:**  I'm

18   comparing, let me just double-check.  I think

19   I'll go ahead and use the current April 2005

20   Board Report if you have no objections.

21        **ATTORNEY FERGUSON:**  That's fine with us.

22        **PRESIDING COMMISSIONER FISHER:**  All

23   right.  It's pretty similar.  So I am going to

24   incorporate that by reference.  And

25   Mr. Oldright, I am going to ask you to kind of

26   just tell me in your own words what happened.

27   Because I know that this was your stepson,

9

1   right?

2           **INMATE OLDRIGHT:**  Yes ma'am.

3           **PRESIDING COMMISSIONER FISHER:**  And you

4   two had a pretty volatile relationship.

5           **INMATE OLDRIGHT:**  Yes ma'am.

6           **PRESIDING COMMISSIONER FISHER:**  Okay.

7           **INMATE OLDRIGHT:**  Well actually it was --

8   It was mutual.  He had a -- Well you read in the

9   file, I think, how he had that problem.

10          **PRESIDING COMMISSIONER FISHER:**  Yes.

11          **INMATE OLDRIGHT:**  But yes, we had.

12          **PRESIDING COMMISSIONER FISHER:**  Okay.  So

13  at one point I think you described it as

14  personality differences.

15          **INMATE OLDRIGHT:**  Oh.

16          **PRESIDING COMMISSIONER FISHER:**  I think

17  it was a little bit more than that, right?

18          **INMATE OLDRIGHT:**  Actually it was a

19  little more than that, yes, but basically that

20  was it with him.  I had a lot of employees, you

21  know.  I had him hired as an employee but that

22  didn't last too long.

23          **PRESIDING COMMISSIONER FISHER:**  Okay.  He

24  was -- Was he dealing drugs?

25          **INMATE OLDRIGHT:**  Oh yeah, yeah.

26          **PRESIDING COMMISSIONER FISHER:**  Okay.

27  And so what was it?  Because it looks like it

10

1    was an ongoing sort of battle.

2           INMATE OLDRIGHT:  Yes ma'am.

3           PRESIDING COMMISSIONER FISHER:   What was

4    it that you fought about?

5           INMATE OLDRIGHT:  Well what set him off

6    more than anything was he was always going to

7    jail all the time.  Every time he used drugs

8    he'd end up one way or another, either going to

9    jail or helping them find somebody else.  And

10   that's where I met him was in jail.

11          PRESIDING COMMISSIONER FISHER:   Okay.

12          INMATE OLDRIGHT:  And he would -- He had

13   these credit cards from his mother.  I was

14   married to her only five months.  He'd use these

15   credit cards just carte blanche.  And he'd come

16   around and he'd take a television or whatever,

17   you know.  He'd say, well it's his mother's and

18   away he'd go.  And then she said she wanted him

19   to -- She cancelled them.

20          PRESIDING COMMISSIONER FISHER:   Right.

21          INMATE OLDRIGHT:  Well you know who got

22   the blame on that.

23          PRESIDING COMMISSIONER FISHER:   Sure.

24          INMATE OLDRIGHT:  Without any doubt.  And

25   that was it.

26          PRESIDING COMMISSIONER FISHER:   Okay.

27          INMATE OLDRIGHT:  From then on it was --

11

1        **PRESIDING COMMISSIONER FISHER:**  So you

2    two just, you just couldn't -- It sounds like

3    you couldn't be in the room together without one

4    of you --

5        **INMATE OLDRIGHT:**  Oh no, that part seemed

6    to be fine.  It's just anything else other than

7    that.  Just like his other stepfather.

8        **PRESIDING COMMISSIONER FISHER:**  Okay.

9        **INMATE OLDRIGHT:**  I know you read the

10   part about them in there.

11       **PRESIDING COMMISSIONER FISHER:**  Yeah.  It

12   just sounds like you two kind of had things to

13   say to each other every time you crossed paths

14   that were probably not that flattering.  Is

15   that, is that a fair evaluation?

16       **INMATE OLDRIGHT:**  Well no.  Like the last

17   time I seen -- the time before that the same

18   day.  He come up and he wanted to say, okay,

19   everything is fine.  And I said, well, not right

20   yet, let's see how you're going to act.  And

21   that's just what I told him.

22       **PRESIDING COMMISSIONER FISHER:**  All

23   right.  So what was it that sort of set off the

24   situation that day?

25       **INMATE OLDRIGHT:**  Well he called up on

26   the telephone and he cussed me.  He called his

27   mother and then he called me.  When he called

12

1   his mother of course she was very upset because

2   he said that I chased him out of the place.

3   Well I didn't, I just told him the same thing I

4   just told you.

5           PRESIDING COMMISSIONER FISHER:  Okay.

6           INMATE OLDRIGHT:  But he didn't take it

7   at that.  Of course he was on PCP and cocaine at

8   the time.

9           PRESIDING COMMISSIONER FISHER:  Right.

10          INMATE OLDRIGHT:  So I can understand

11  that anything that would be said to him would be

12  elevated.  But I tried to calm her down.  But he

13  called my answering service.  That's how he got

14  a hold of me.

15          PRESIDING COMMISSIONER FISHER:  Okay.

16  Remind who Cobb -- Who was Cobb?

17          INMATE OLDRIGHT:  Oh, Therese (phonetic).

18  That was his girlfriend.

19          PRESIDING COMMISSIONER FISHER:  His

20  girlfriend.

21          INMATE OLDRIGHT:  Yes ma'am.

22          PRESIDING COMMISSIONER FISHER:  Okay.

23          INMATE OLDRIGHT:  As a matter of fact she

24  was -- Well that's -- We've got to back up if

25  you're going to talk about Therese.

26          PRESIDING COMMISSIONER FISHER:  No, no,

27  no, you don't need to do that.  I'm just trying

13

1   to get you to the place where you have the gun

2   with him.

3           **INMATE OLDRIGHT:**  Okay.

4           **PRESIDING COMMISSIONER FISHER:**  He and

5   his girlfriend --

6           **INMATE OLDRIGHT:**  Well see, I -- Okay, he

7   and his girlfriend were parked over there and I

8   didn't want him coming down the road of the

9   house.

10          **PRESIDING COMMISSIONER FISHER:**  Okay.

11          **INMATE OLDRIGHT:**  So I pulled -- His car

12  was here and I pulled in.  And I was going to

13  pull up beside him and talk to him.  But I got

14  to thinking about it, why that would be crazy as

15  blazes because I know him.  So I pulled over

16  here off of the curb onto the dirt.  It's all

17  bare ground there anywhere.  And so I'm parked

18  over here and she's driving.  And he gets out of

19  the car over here on the side and I got out over

20  here.  And I'm scared to death of this guy and

21  have been.  He was no little guy.  He was six-

22  something and I think he weighed about 75 pounds

23  more than me or 100 pounds.  He was a big guy.

24  So what I -- And I had a concealed weapon

25  permit.  And I showed him the gun just like

26  this.  And I put a round in, and stupid me, I

27  didn't put the safety on.

14

1          PRESIDING COMMISSIONER FISHER:  All

2    right.  She and his girlfriend were in the car

3    coming to your house.  Is that right?

4          INMATE OLDRIGHT:  He was parked there.

5          PRESIDING COMMISSIONER FISHER:  Okay.

6    But they were on -- Were they on their way

7    there?

8          INMATE OLDRIGHT:  Right.

9          PRESIDING COMMISSIONER FISHER:  They were

10   on their way there.  And?

11         INMATE OLDRIGHT:  And I had -- Well we

12   have to back up a little bit anyway.  Because I

13   had a friend of mine who worked for me, and a

14   friend of his, same person.  And I went to where

15   he said he wanted to talk.

16         PRESIDING COMMISSIONER FISHER:  Okay.

17         INMATE OLDRIGHT:  Which was down the

18   street.

19         PRESIDING COMMISSIONER FISHER:  Okay.

20         INMATE OLDRIGHT:  And we waited there for

21   awhile and he didn't show up.  So I took this

22   friend home.

23         PRESIDING COMMISSIONER FISHER:  Okay.

24         INMATE OLDRIGHT:  And I was coming back

25   is when I saw him and then this other

26   transpired.

27         PRESIDING COMMISSIONER FISHER:  Okay.  So

15

1    what would make you decide -- Why would you go

2    there?

3          INMATE OLDRIGHT:   It was on my way home.

4          PRESIDING COMMISSIONER FISHER:   I know,

5    but why would you -- Knowing that you were

6    feeling so uncomfortable with him that you had a

7    loaded gun with you why would you even confront

8    him?

9          INMATE OLDRIGHT:   Stupid.  I had already

10   to -- See my daughter, she worked for the

11   sheriff's department.  And I asked her many

12   times, what can I do.  I couldn't take nothing

13   out because they told me the same thing.  He had

14   to commit something before I could do anything

15   about it.  And I just wanted him to leave me

16   alone.  That's all I wanted him to do is just

17   leave me alone.  And that's what I did.  That's

18   the first thing I told him when I got out of the

19   car.  I just want you to leave me alone.

20         PRESIDING COMMISSIONER FISHER:   All

21   right.  So you said you put the gun up in the

22   air and you chambered a round.

23         INMATE OLDRIGHT:   I held it up just like

24   that.

25         PRESIDING COMMISSIONER FISHER:   Okay,

26   chambered a round, showed him the gun.

27         INMATE OLDRIGHT:   And now the pistol is

16

1    one of those that there is no place for the

2    little finger.  So consequently you're holding

3    the pistol with your trigger finger and your

4    other fingers are underneath it.  You can't --

5    What would you say?  You can't get a grip on the

6    grip because there is no grip.  It's one of

7    those Chief Specials.  And when he started to

8    come at me -- I know what happened is

9    automatically my finger went, and I shot him

10   through the neck.  He was about 15 feet away

11   from me.

12         **PRESIDING COMMISSIONER FISHER:**  Okay.

13         **INMATE OLDRIGHT:**  And I started CPR on

14   him and got hold of the fire department and

15   finally got them there.

16         **PRESIDING COMMISSIONER FISHER:**  All

17   right, all right.  Is there any --

18         **INMATE OLDRIGHT:**  I just --

19         **PRESIDING COMMISSIONER FISHER:**  Go ahead.

20         **INMATE OLDRIGHT:**  Every day I go through

21   the same thing, wishing that I had put the

22   safety on.  We might have had a little fight

23   but, I mean, he'd still be here with us.

24         **PRESIDING COMMISSIONER FISHER:**  And so

25   when you chambered the round was it just you

26   were trying to show him that --

27         **INMATE OLDRIGHT:**  I just wanted to show

17

1  him that it was a life weapon and leave me

2  alone.  Don't --

3          PRESIDING COMMISSIONER FISHER:  And you

4  said -- I know you said in here that he seemed

5  wild-eyed and irrational.

6          INMATE OLDRIGHT:  Oh yeah, well.

7          PRESIDING COMMISSIONER FISHER:  You say

8  that he was on PCP, right?

9          INMATE OLDRIGHT:  He was and it's in the

10  evidence.

11          PRESIDING COMMISSIONER FISHER:  Yeah, in

12  the coroner's report.  All right.

13          INMATE OLDRIGHT:  Thank you, the

14  coroner's report.

15          PRESIDING COMMISSIONER FISHER:  All

16  right.  Is there anything else about what

17  happened there that day that I haven't asked you

18  about that you think would be important for us

19  to know?

20          INMATE OLDRIGHT:  Well one thing is that

21  he was out on bail from this last time.  I

22  bailed him out.  His mother refused to.  Then

23  come to find out, Therese told us that he was

24  going to move to Los Angeles.  Well I put my

25  house up.  So I went to the bail bondsman and

26  told him I wanted my bond back.  Well he got a

27  hold of Ron and told him that and they called me

18

1    on the telephone.  And Ron called me and talked

2    to me.  He was talking to his mother but I was

3    on the other line with her at the same time

4    telling me and his mother at the same time that

5    he was going to get his Mexican friends from the

6    jail to come out and take care of me.  So it was

7    an ongoing thing.  And then I knew about his

8    stepfather, when he went at him with the axe.

9    And the only reason he didn't kill his

10   stepfather was the axe got stuck in the bathroom

11   door.  And the stepfather got around the corner

12   and started beating on him.

13        **PRESIDING COMMISSIONER FISHER:**  Okay.  On

14   that day when you had the gun.

15        **INMATE OLDRIGHT:**  Yes ma'am.

16        **PRESIDING COMMISSIONER FISHER:**  Did he

17   have -- Was he armed with anything?

18        **INMATE OLDRIGHT:**  I'm sorry?

19        **PRESIDING COMMISSIONER FISHER:**  Was he

20   armed with anything?

21        **INMATE OLDRIGHT:**  Not that I could see at

22   the time.

23        **PRESIDING COMMISSIONER FISHER:**  Okay.  I

24   saw that his fiancée said something about that

25   he had said that he was going to beat you with a

26   baseball bat.  Did he have a baseball bat with

27   him?

19

1        INMATE OLDRIGHT:  No.  His former wife,
2   his widow now, she writes me all the time.  And
3   she said that she heard the same thing from
4   Therese.  That he was going to beat me up with a
5   baseball bat.
6        PRESIDING COMMISSIONER FISHER:  All
7   right, okay.  Let's move on.  And if we need to
8   we can revisit it.  Is there anything that you
9   feel like I have left out or have we covered it
10  pretty well?
11       INMATE OLDRIGHT:  The only thing I can
12  think of is how sorry and remorseful I am that
13  it happened.  I mean --
14       PRESIDING COMMISSIONER FISHER:  All
15  right.
16       INMATE OLDRIGHT:  If there was any way I
17  could take it back --
18       PRESIDING COMMISSIONER FISHER:  Okay.
19  And I'm going to give you an opportunity to talk
20  about your feelings about the offense too.  I
21  just want us to get the facts down on the record
22  for right now.  Let's see here.  According to
23  the information that I have, you have no prior
24  criminal record.
25       INMATE OLDRIGHT:  No ma'am.
26       PRESIDING COMMISSIONER FISHER:  As far as
27  your social history goes I just want to hit on a

20

1  couple of things.  Let's see here.  First of all

2  it says that you were in the Army from '56 to

3  '59.

4          INMATE OLDRIGHT:  Yes ma'am.

5          PRESIDING COMMISSIONER FISHER:  And you

6  received an honorable discharge; is that right?

7          INMATE OLDRIGHT:  Yes ma'am.

8          PRESIDING COMMISSIONER FISHER:  It also

9  says that you have an extensive employment

10  history.  You were a pretty consistent worker

11  prior to prison, right?

12          INMATE OLDRIGHT:  It's in here, yes

13  ma'am.

14          PRESIDING COMMISSIONER FISHER:  Okay.

15  And I'll go through those.  Let me just quickly

16  touch on a couple of things.  You only drank

17  occasionally, right?

18          INMATE OLDRIGHT:  Yes ma'am.

19          PRESIDING COMMISSIONER FISHER:  And no

20  drugs?

21          INMATE OLDRIGHT:  No, no.

22          PRESIDING COMMISSIONER FISHER:  Okay.

23  Now his mom.

24          INMATE OLDRIGHT:  Yes ma'am.

25          PRESIDING COMMISSIONER FISHER:  Are you

26  divorced from her?

27          INMATE OLDRIGHT:  Yes ma'am.

21

1          **PRESIDING COMMISSIONER FISHER:**  Okay.

2          **INMATE OLDRIGHT:**  She passed away years

3    later.

4          **PRESIDING COMMISSIONER FISHER:**  She did?

5    Okay.  I'm just trying to -- I'm trying to get a

6    handle on it because it says you have been

7    married five times.  Is that right?

8          **INMATE OLDRIGHT:**  Yes ma'am.

9          **PRESIDING COMMISSIONER FISHER:**  Okay.

10   And it says in this particular report -- This is

11   back in '01 because this is the one that had a

12   lot of family history in it so that's why I went

13   to it.

14       **INMATE OLDRIGHT:**  Okay, I don't have a

15   copy of that.

16       **PRESIDING COMMISSIONER FISHER:**  It said

17   that -- In this report it says that you still,

18   you were still currently a friend with your ex-

19   wife.  Was that talking about his mom?

20       **INMATE OLDRIGHT:**  Oh yes.

21       **PRESIDING COMMISSIONER FISHER:**  Okay.  So

22   you two stayed on good terms.

23       **INMATE OLDRIGHT:**  And I was also on good

24   terms, and like I said she was writing me, his

25   wife.

26       **PRESIDING COMMISSIONER FISHER:**  Okay, all

27   right.

22

1        **INMATE OLDRIGHT:**  Ron's wife.

2        **PRESIDING COMMISSIONER FISHER:**  Okay.  Is

3   there anything else about your life before

4   coming to prison for this offense that I haven't

5   asked you about that you think would be

6   important for us to know?

7        **INMATE OLDRIGHT:**  I think some of it will

8   be -- It will be -- Coming here, before coming

9   in here.

10       **PRESIDING COMMISSIONER FISHER:**  I have

11  all your information here.  We're going to go

12  through this.

13       **INMATE OLDRIGHT:**  Yeah, I know.  I'm

14  thinking if there is anything that -- No, I

15  think it's all in there.  Between the psych

16  report and what I am going to -- what's in the

17  paperwork there and what I'm going to say I

18  think it's -- Do you see anything else?

19       **ATTORNEY FERGUSON:**  I think if the Board

20  takes a close look at the documentation that has

21  provided.

22       **INMATE OLDRIGHT:**  Oh yeah, that would

23  explain most of it.

24       **ATTORNEY FERGUSON:**  I think it

25  thoroughly --

26       **PRESIDING COMMISSIONER FISHER:**  Goes into

27  everything.

23

1        **ATTORNEY FERGUSON:** -- covers

2   Mr. Oldright's bio.

3        **PRESIDING COMMISSIONER FISHER:** All

4   right. And Mr. Oldright, I'm not trying to

5   trick or anything. I just want to make sure

6   that I give you an opportunity if you think

7   there is anything that we might overlook, all

8   right. So if you receive a parole date you plan

9   to live with your daughter?

10        **INMATE OLDRIGHT:** Yes ma'am.

11        **PRESIDING COMMISSIONER FISHER:** Okay.

12   And she and her husband are in Bakersfield; is

13   that right?

14        **INMATE OLDRIGHT:** Yes ma'am.

15        **PRESIDING COMMISSIONER FISHER:** All

16   right. I know I have some letters here for you.

17   A bunch of letters here for you. There are a

18   couple in particular -- I am going to

19   incorporate these by reference but there are a

20   couple that I think that we want to read for the

21   record here in particular. One is from your

22   daughter.

23        **INMATE OLDRIGHT:** Which daughter, ma'am?

24        **PRESIDING COMMISSIONER FISHER:** Linda,

25   the one that you plan to live with.

26        **INMATE OLDRIGHT:** Okay.

27        **PRESIDING COMMISSIONER FISHER:** She says:

24

1  "I am writing a letter of support for my father.
2  I am 45 years old.  My father raised me until I
3  was 12."  She says:
4          "I believe that despite his
5          mistake he is a good person.  I
6          believe that he is remorseful for
7          his action.  It was an isolated
8          crime.  He will be a law-abiding
9          citizen upon his release from
10          prison as he was before his term."
11  She talks about what you have done in prison.
12  She says:
13          "I am willing to offer any help
14          that he may need.  He is welcome
15          to live with my family.  I would
16          be able to help him secure
17          employment and the necessary tools
18          needed.  If he needed a vehicle I
19          could also help in that area."
20  I also have a letter from your daughter Penny.
21          **INMATE OLDRIGHT:**  Yes.
22          **PRESIDING COMMISSIONER FISHER:**  She talks
23  about the fact that you have been a model
24  prisoner.  She says that you have the support of
25  her and her husband and the whole family in
26  order to help you adjust back into being a
27  productive, community-based citizen.  "He was a

25

1    multi-business and property owner in his prior
2    life and we are sure he will again be an asset
3    to society." And then also I have one from her
4    husband, Michael. He says:
5            "My household is welcome to him
6            for as long as it takes for him to
7            get back on his feet. He'll have
8            a roof over his head, food in his
9            stomach, clothes on his back and
10           will be given a hand up to live
11           the rest of his days with purpose.
12           This same unwavering support and
13           help is offered from our whole
14           family and friends on William's
15           behalf."
16           **INMATE OLDRIGHT:** Also on that one,
17   ma'am, the third paragraph.
18           **PRESIDING COMMISSIONER FISHER:** This is
19   your son-in-law's letter?
20           **INMATE OLDRIGHT:** Yes ma'am.
21           **PRESIDING COMMISSIONER FISHER:** Okay. It
22   says: "Another factor, if the Board would be so
23   kind to consider, is William not being subject
24   to outside influences." Is that the paragraph?
25           **INMATE OLDRIGHT:** No ma'am. The next
26   one, I'm sorry.
27           **PRESIDING COMMISSIONER FISHER:** Okay.

26

```
 1          ATTORNEY FERGUSON:  The next one up?
 2          INMATE OLDRIGHT:  The next one down.  I
 3  was not going to add this.
 4          ATTORNEY FERGUSON:  The third full
 5  paragraph.
 6          PRESIDING COMMISSIONER FISHER:  Okay, I'm
 7  sorry, that's actually the next one up.  It is
 8  actually the third paragraph.  If I could count
 9  I would have read that one first.
10          "I was not going to add this but I
11          do believe it is a factor that
12          should be considered.  I am a
13          correctional sergeant with the
14          California Department of
15          Corrections.  In no way, shape or
16          form and I expecting or believe
17          favorable actions will result from
18          this confession.  I am merely
19          using it as a platform.  I have
20          already disclosed this information
21          when I joined the Department eight
22          years ago and have never written
23          on William's behalf until now.  I
24          review Central Files at least
25          twice a week at a reception center
26          and have worked all levels from
27          Level I to SHU.  And I can
```

27

1        honestly say I have never seen an

2        H number with 14 years of

3        incarceration time with only two

4        disciplinaries throughout

5        incarceration."

6   Thank you for pointing that out.  I also have a

7   letter from Judge Randall who says that he was

8   the trial judge in your case.  He says he has a

9   clear recollection of the evidence presented at

10  trial.  He says:

11       "Had I had other options to me at

12       the time I sentenced Mr. Oldright

13       I almost surely would have

14       selected a probationary sentence

15       for him or a lesser prison term

16       rather than sentencing him to

17       prison for 18 years to life.  I

18       say this because the evidence

19       amply demonstrated that the victim

20       in this case, Ronald Phil Tucker,

21       who was much younger and much

22       larger than the defendant, had a

23       reputation for violent conduct,

24       which reputation was known to the

25       defendant.  Consequently

26       Mr. Oldright had every reason to

27       be in fear of Mr. Tucker.

28

1       Although Mr. Oldright made several

2       foolish choices on the day of the

3       crime, as of then a 54 year old

4       man with absolutely no criminal

5       record, I did not believe and do

6       not now believe that he posed or

7       poses a danger to society if

8       released.  I believe he found

9       himself in a situation not of his

10      making, which lead to the tragic

11      shooting of Mr. Tucker.  This is

12      the first time in my career

13      spanning some 18 years as a judge

14      that I have recommended parole for

15      a person convicted of murder.

16      However, I do believe that this is

17      a case in which the Board of

18      Prison Terms should grant parole,

19      assuming that Mr. Oldright's

20      conduct in prison has been

21      exemplary."

22  And that is signed by Roger D. Randall, R-A-N-D-

23  A-L-L.  Then I have several other letters of

24  support for you that are just generally

25  supportive letters, including from your ex-wife.

26          **INMATE OLDRIGHT:**  Yes ma'am.

27          **PRESIDING COMMISSIONER FISHER:**  Are there

29

```
 1   any of these in particular that you think it
 2   would be important for me to note?
 3        INMATE OLDRIGHT:  Yes ma'am, the one from
 4   my church.  It's Chester Avenue Community
 5   Church.
 6        PRESIDING COMMISSIONER FISHER:  Chester
 7   Avenue, okay.  This is signed by Reverend Keith
 8   Fultz, F-U-L-T-Z.  He says:
 9            "I am the pastor of Chester,
10            that's C-H-E-S-T-E-R, Avenue
11            Baptist Church.  I have been on
12            staff since 1982 and senior
13            minister since 1990.  I was aware
14            of Bill's crime and was and have
15            been pastor to him and his family
16            members."
17   He says he attended a great deal of your trial.
18   He says:
19            "I honestly believe he did not
20            intend to murder his stepson.  But
21            taking a gun in the heat of
22            emotions, and even for protection,
23            still makes the young man dead."
24   He talks about the fact that you were a
25   productive and hardworking individual prior to
26   this crime.  He says:
27            "I have maintained enough contact
```

30

```
 1          with Bill to know that he has more
 2          than jailhouse religion.  But even
 3          if it is a case of jailhouse
 4          religion I do not consider him any
 5          risk for additional crimes."
 6  He says you have learned from your mistake, that
 7  you will be more than able to make a decent
 8  living.  He says:
 9          "I personally look forward to his
10          release from prison.  He will be
11          of personal help in my ministry as
12          he was before his incarceration."
13  He talks about the fact that you were actively
14  involved in the church before and that they
15  would welcome you.
16          "When Bill is released there will
17          be plenty of support from his
18          family and church.  We will be
19          more than happy to help in any
20          needs of housing, transportation
21          and transition issues."
22  All right.
23          INMATE OLDRIGHT:  Thank you.
24          PRESIDING COMMISSIONER FISHER:  All
25  right.  And the others, as I said, I am going to
26  mark them as an Exhibit and have them
27  incorporated, all right?  Is there anything else
```

31

1   about parole plans that I haven't asked you

2   about that you think would be important for us

3   to know?

4          INMATE OLDRIGHT:   There is a job offer.

5   I assume you have seen that one.

6          PRESIDING COMMISSIONER FISHER:   Do you

7   want to tell me a little bit about it.

8          INMATE OLDRIGHT:   Yes.   I have known the

9   gentleman for all of his life.   I was there when

10  they started their business.   They have a

11  heating and air conditioning business.   And I

12  would go to work with them until I'd go out on

13  my own.

14         PRESIDING COMMISSIONER FISHER:   Okay, all

15  right.   And tell me again, where is it located?

16         INMATE OLDRIGHT:   In Bakersfield,

17  California.

18         PRESIDING COMMISSIONER FISHER:   It is in

19  Bakersfield, okay, good.

20         INMATE OLDRIGHT:   I guess you did read

21  the other one about the attorney.

22         PRESIDING COMMISSIONER FISHER:   Which

23  one?   Timothy Lemucchi?

24         INMATE OLDRIGHT:   That was my appellate

25  attorney, Jim Fahey.

26         PRESIDING COMMISSIONER FISHER:   Okay,

27  let's see here.   There it is, all right.   Okay,

32

1   yeah.

2           INMATE OLDRIGHT:  Okay.

3           PRESIDING COMMISSIONER FISHER:  And it's

4   generally very supportive.  He says: "If Bill

5   Oldright does not qualify as someone who should

6   be released after serving the minimum time I

7   can't imagine who does."  The entire letter is

8   very supportive.  It's Jim Fahey, F-A-H-E-Y.

9   And you said he was your appellate attorney,

10  right?

11          INMATE OLDRIGHT:  Yes ma'am.

12          PRESIDING COMMISSIONER FISHER:  All

13  right, okay.  Anything else about your parole

14  plans?

15          INMATE OLDRIGHT:  No, I don't think so,

16  not parole plans.

17          PRESIDING COMMISSIONER FISHER:  All

18  right.  Then if you'll turn your attention to

19  Commissioner Harmon he is going to go through

20  your institutional program with you.

21          DEPUTY COMMISSIONER HARMON:  Yes, hello

22  again, Mr. Oldright.

23          INMATE OLDRIGHT:  I'm sorry ma'am -- sir?

24          DEPUTY COMMISSIONER HARMON:  I said hello

25  again, Mr. Oldright.

26          INMATE OLDRIGHT:  Oh hello.  I am a

27  little hard of hearing, sorry.

33

1      **DEPUTY COMMISSIONER HARMON:** Mr. Oldright,

2  the first thing we are going to do here is we

3  are going to make sure the record is accurate.

4  Please let me know if it's not.  The record does

5  show that your last hearing was April 5 of 2004

6  and at that time you received a one year denial.

7  On April 15 of '02 you had received a grant and

8  that was subsequently reversed by the Governor.

9  You were received at CTF April 1, 1998 from CSP

10  Solano.  Your current custody level is Medium-A

11  with a revised class score of 19.  Does that

12  sound right?

13      **INMATE OLDRIGHT:**  Yes sir.

14      **DEPUTY COMMISSIONER HARMON:**  Okay.  I am

15  going to refer to parts of your counselor's

16  report in terms of your activities and we are

17  going to focus on the period of time since your

18  last hearing.  I am going to take part of your

19  counselor's report here, DeGuzman.  And that's

20  D-E-G-U-Z-M-A-N for the transcriber.  And it

21  shows that from February of '04 to January of

22  '05 you remained at CTF, Medium-A custody.  You

23  remained assigned to the laundry.  There was no

24  group activities, no psychiatric treatment and

25  you have remained disciplinary-free since

26  November of 1999.

27      **INMATE OLDRIGHT:**  I'm sorry, sir.  You

34

1    said there's no group activities?

2        **DEPUTY COMMISSIONER HARMON:**  We're just

3    going over the counselor's report right now so

4    stand by.

5        **INMATE OLDRIGHT:**  Okay.  Okay, I'm sorry.

6        **DEPUTY COMMISSIONER HARMON:**  In fact,

7    there is nothing that goes beyond January of '05

8    on your counselor's report so -- This report

9    covers through January 6 of '05.  So what has

10   happened between January 6 of '05 until today in

11   terms of your activities?  Within that period of

12   time.

13       **INMATE OLDRIGHT:**  I have completed, let's

14   see what the date is on this one here.  This is

15   October.  That's anger management class.  Let's

16   see, what's this other one, what date is it?

17   Where is that other one.  No, that's 9/18.

18   There were three that I completed.

19       **DEPUTY COMMISSIONER HARMON:**  You did the

20   Christian Basics class, that was a 12 week

21   program.

22       **INMATE OLDRIGHT:**  Yes sir.

23       **DEPUTY COMMISSIONER HARMON:**  In January

24   of '05.  What else?

25       **INMATE OLDRIGHT:**  There was the anger

26   management class.

27       **DEPUTY COMMISSIONER HARMON:**  Right, got

35

1  that.

2       **INMATE OLDRIGHT:**  On October the 13, that

3  one.

4       **DEPUTY COMMISSIONER HARMON:**  Right, got

5  that.

6       **INMATE OLDRIGHT:**  And then there was the

7  veterans self-help group.

8       **DEPUTY COMMISSIONER HARMON:**  Right, got

9  that.

10       **INMATE OLDRIGHT:**  And the Impact.  Well

11  the Impact is other than that.

12       **DEPUTY COMMISSIONER HARMON:**  That was in

13  2000.

14       **INMATE OLDRIGHT:**  Correct.  And then you

15  got Dr. Gordon's Family Effectiveness Training?

16       **DEPUTY COMMISSIONER HARMON:**  No.

17       **INMATE OLDRIGHT:**  It's on my -- I have a

18  list in there under my seminars.  There's one in

19  each one of them.  Just before the seminars.

20       **PRESIDING COMMISSIONER FISHER:**  I mixed

21  them all around.

22       **INMATE OLDRIGHT:**  Excuse me, the 128s.

23       **PRESIDING COMMISSIONER FISHER:**  I mixed

24  them all around.  I've shuffled them.

25       **DEPUTY COMMISSIONER HARMON:**  Okay, have

26  we got that caught up?

27       **INMATE OLDRIGHT:**  The ones that are on

36

1   there, yes sir.

2           **DEPUTY COMMISSIONER HARMON:**   Okay.

3           **INMATE OLDRIGHT:**   The only one that is

4   added to that would be the anger management one

5   that you just mentioned.

6           **DEPUTY COMMISSIONER HARMON:**   Okay.   Was

7   there anything else between January and November

8   of 2005?   Have we covered it okay?

9           **INMATE OLDRIGHT:**   As far as groups?   No,

10   I believe that is all, sir.

11           **DEPUTY COMMISSIONER HARMON:**   Okay.   And

12   you're currently -- Are you still assigned to

13   the laundry?

14           **INMATE OLDRIGHT:**   Yes sir.

15           **DEPUTY COMMISSIONER HARMON:**   Okay.   Now

16   in terms of vocational programs.   In your 14 or

17   15 years you have been down you have never

18   completed a vocation, is that right, in the

19   prison system?

20           **INMATE OLDRIGHT:**   Well I believe sir, if

21   you look at this here, it will show that with 27

22   years experience --

23           **DEPUTY COMMISSIONER HARMON:**   I am not --

24   That's not what I asked you.

25           **INMATE OLDRIGHT:**   I'm sorry, I

26   misunderstood.

27           **DEPUTY COMMISSIONER HARMON:**   What did I

37

1  ask you?

2      **INMATE OLDRIGHT:**  How many different vocs

3  I have completed.

4      **DEPUTY COMMISSIONER HARMON:**  And your

5  answer is?

6      **INMATE OLDRIGHT:**  I did complete

7  plumbing.  I did two years of plumbing.

8      **DEPUTY COMMISSIONER HARMON:**  Is that a

9  vocational program?

10      **INMATE OLDRIGHT:**  Yes sir it is.

11      **DEPUTY COMMISSIONER HARMON:**  And you

12  completed it?

13      **INMATE OLDRIGHT:**  Yes sir.  I spent I

14  don't know how many years.  I can look right

15  here.  I've got it on here.  Right here,

16  plumbing, lead man, 1992 to 1994.  Plumbing,

17  1994 to 1997.

18      **DEPUTY COMMISSIONER HARMON:**  Okay, but my

19  question is, do you have a copy of your

20  completion of the vocational plumbing program?

21      **INMATE OLDRIGHT:**  Not that I know of, no

22  sir.

23      **DEPUTY COMMISSIONER HARMON:**  Okay.  So

24  you haven't completed a formal Department of

25  Corrections vocational plumbing program; is that

26  correct?

27      **INMATE OLDRIGHT:**  No sir.

38

1       **DEPUTY COMMISSIONER HARMON:**  Okay.  But

2   what you have done is you have developed skills

3   in plumbing through other maintenance.  Okay,

4   now listen very carefully to what I'm asking

5   you.

6       **INMATE OLDRIGHT:**  I'm sorry.

7       **DEPUTY COMMISSIONER HARMON:**  You have

8   never completed a vocational program within the

9   institution.

10      **INMATE OLDRIGHT:**  No.

11      **DEPUTY COMMISSIONER HARMON:**  Okay.  Now

12  you have held a lot of different jobs in the

13  institution; we've talked about some of them.

14  You have been in the laundry, you have been a

15  plumber, in culinary, you've been in recycling,

16  you have been in finishing, engineering, and you

17  have always maintained good work reports.  In

18  the area of self-help and therapy groups, we

19  have talked about those.  You did some NA and AA

20  work in the past.  Are you still doing that?

21      **INMATE OLDRIGHT:**  No sir.

22      **DEPUTY COMMISSIONER HARMON:**  Okay.  Did

23  you ever learn the steps?

24      **INMATE OLDRIGHT:**  I learned up to eight.

25  And since I was doing that, which is the one

26  that you realize the people that you've hurt and

27  you have done what you can to try to correct it,

39

1   which I am in contact with the victim's family

2   and they write me all the time.  And one of

3   their -- I forgot that.  One of the letters in

4   there is from her, one of my support letters.

5         **DEPUTY COMMISSIONER HARMON:**  Okay, let's

6   see here.  You completed high school and it says

7   about two years of college.  However, I didn't

8   find a copy of your college transcript in there.

9         **INMATE OLDRIGHT:**  No, I don't believe

10  there is.  There's a high school transcript in

11  there.

12        **DEPUTY COMMISSIONER HARMON:**  Okay.

13        **INMATE OLDRIGHT:**  Since the last time --

14  You asked about it last time.

15        **DEPUTY COMMISSIONER HARMON:**  Right.  Have

16  you thought about getting that college

17  transcript made part of your record so you can

18  corroborate what you're saying?

19        **INMATE OLDRIGHT:**  No, I hadn't thought

20  about it but I surely will if it's needed.

21        **DEPUTY COMMISSIONER HARMON:**  Well, it's

22  only that -- The only reason I'm saying that, if

23  you say you have something it's probably best to

24  corroborate it, right?  That's all I'm saying.

25  Like if you had a high school diploma, to have a

26  copy of that diploma.  What will happen is in

27  the event that you receive a date and everything

1   is approved they'll probably be doing a

2   background on you.  It just saves a lot of -- It

3   just saves a lot of effort.  Up until the last

4   two years all I had come up with was the Impact

5   program in 2000 and the prior NA/AA.  Was there

6   other programs that you had participated in?

7   You did a -- You did a Dr. Carswell (phonetic)

8   self-help chrono back in April of '01 I found.

9          **INMATE OLDRIGHT:**  Yes.  And that's the

10  only chrono they give.  I have been doing it

11  since then but they do not give except the one

12  chrono with Dr. Carswell.

13         **DEPUTY COMMISSIONER HARMON:**  Okay, good.

14  Is there any other self-help?  I've got the

15  Christian Basics class, yeah.  Is there anything

16  else that you have completed that I need to add

17  on to my list here?

18         **INMATE OLDRIGHT:**  Do you have the

19  veterans self-help group?

20         **DEPUTY COMMISSIONER HARMON:**  Yes.

21         **INMATE OLDRIGHT:**  And you've got the one

22  for Dr. Gordon's Family Effectiveness Training?

23         **DEPUTY COMMISSIONER HARMON:**  No I don't,

24  that's the one you just told me about.

25         **INMATE OLDRIGHT:**  It's on that list that

26  she just gave you a minute ago, sir.

27         **DEPUTY COMMISSIONER HARMON:**  But I mean,

41

1    I don't -- I don't have the chrono I guess I

2    should say.

3            INMATE OLDRIGHT:  I'd be glad to give it

4    to you here.  Here is my copy.

5            DEPUTY COMMISSIONER HARMON:  Okay.

6            INMATE OLDRIGHT:  Right there, the bottom

7    one.  That's my original.  The bottom one.

8            DEPUTY COMMISSIONER HARMON:  And this is

9    September of '04, okay.  Thank you, counsel.

10   Thank you very much.

11           INMATE OLDRIGHT:  Thank you.

12           DEPUTY COMMISSIONER HARMON:  I also found

13   that in '98 you were a certified LABAC tutor.

14           INMATE OLDRIGHT:  That's correct.

15           DEPUTY COMMISSIONER HARMON:  Have we got

16   your accomplishments covered now?

17           INMATE OLDRIGHT:  You have Impact in

18   there, correct?

19           DEPUTY COMMISSIONER HARMON:  Yes.

20           INMATE OLDRIGHT:  Okay.  How about the

21   one on self-help courses on HIV and AIDS and

22   sexually-transmitted diseases and infectious

23   diseases?

24           DEPUTY COMMISSIONER HARMON:  Yes.

25           INMATE OLDRIGHT:  Okay.

26           DEPUTY COMMISSIONER HARMON:  Okay.

27           INMATE OLDRIGHT:  I had it as a chrono

42

 1    too.   That was a pretty good course.

 2        **DEPUTY COMMISSIONER HARMON:**   Okay.   Are

 3    you all caught up now?   You all caught up now?

 4        **INMATE OLDRIGHT:**   Yes sir.

 5        **DEPUTY COMMISSIONER HARMON:**   Okay.   The

 6    115s, you have had two.   The last one was

 7    November 4 of '99 and that was conduct to

 8    violence.   And then the one prior to that in '94

 9    was a smoking in the day room.   Now you and I

10    talked about this last time and, of course, this

11    115 you got in '99, it was a real temper issue

12    involved there.   And I know you told me you

13    never threw him.

14        **INMATE OLDRIGHT:**   Correct sir.

15        **DEPUTY COMMISSIONER HARMON:**   But the

16    officer at the time says that you threw -- You

17    got upset when you were carrying the shorts and

18    they were telling you you couldn't do that.   You

19    threw the under-shorts at the officer causing

20    him to duck reflexively, and put up my right

21    hand in self-defense, and it was witnessed by

22    another correctional officer.   So I guess my

23    question to you is, is anger still a problem?

24        **INMATE OLDRIGHT:**   No sir, and it wasn't

25    then.   What it was is, like I explained it to

26    you last time, was that I tossed it on the table

27    in front of me.   It's the work change over

43

1   there.  And if you have ever -- You know how the

2   metal detectors go.  There's one officer on one

3   side --

4       **DEPUTY COMMISSIONER HARMON:**  You see

5   nothing wrong with your behavior?

6       **INMATE OLDRIGHT:**  Oh yes I do.

7       **DEPUTY COMMISSIONER HARMON:**  Are the

8   officers flinching and ducking every time

9   somebody comes by and throws the shorts or was

10   it just you at the time?

11       **INMATE OLDRIGHT:**  Yes sir I do.  I should

12   have carried them back through and waited until

13   the line got through and carried them back

14   through there and put them on the table.  But

15   like I said, I didn't toss them at him.

16       **DEPUTY COMMISSIONER HARMON:**  But you were

17   upset at the time, weren't you?

18       **INMATE OLDRIGHT:**  No sir, I wasn't upset.

19       **DEPUTY COMMISSIONER HARMON:**  You weren't

20   upset?  Okay, we won't go into it again.  I

21   think we -- I think we have covered most of your

22   accomplishments.  I don't have any 128s.  And of

23   course those are the only two 115s you have ever

24   had.

25       **INMATE OLDRIGHT:**  I would like to comment

26   on the first one if I could, sir.

27       **DEPUTY COMMISSIONER HARMON:**  On what's

44

1    that?  On the smoking?

2         INMATE OLDRIGHT:  Yes sir.

3         DEPUTY COMMISSIONER HARMON:  There's no

4    need to, there's no need to comment on that.  I

5    mean, what is there to comment on?

6         INMATE OLDRIGHT:  May I?

7         DEPUTY COMMISSIONER HARMON:  What is it

8    you want?  We are not going to retry it here.

9         INMATE OLDRIGHT:  Oh no, (overlapping).

10        DEPUTY COMMISSIONER HARMON:  What do you

11   want to say?

12        INMATE OLDRIGHT:  The reason I did it was

13   so I could be near my mother.  And when I left

14   that place she died seven months later.  And the

15   only way I could see her was to be at that

16   place.  She couldn't drive, she was 84 years

17   old, in Lancaster.  And that was the reason I

18   got the smoking 115.

19        DEPUTY COMMISSIONER HARMON:  Okay.  I'm

20   more concerned about violence, weapons, things

21   like that.  Throwing under-shorts in the

22   direction of correctional officers.  That's the

23   stuff I'm concerned about.

24        INMATE OLDRIGHT:  Yes sir, but I tossed

25   it on the table in front of him.

26        DEPUTY COMMISSIONER HARMON:  Yeah, well

27   I'm not going to argue with you about it again.

45

1        **INMATE OLDRIGHT:**  Well I wasn't -- I'm

2   sorry if you thought so, sir.

3        **DEPUTY COMMISSIONER HARMON:**  Yeah, I

4   think so.

5        **INMATE OLDRIGHT:**  I'm sorry, I didn't

6   mean it that way.

7        **DEPUTY COMMISSIONER HARMON:**  Okay, let's

8   go on to your psychiatric reports.  But before I

9   do let me ask you this, Mr. Oldright.  Do you

10  believe you pose a risk to the people outside of

11  the prison walls today?

12       **INMATE OLDRIGHT:**  No I do not, sir.

13       **DEPUTY COMMISSIONER HARMON:**  And what do

14  you believe makes you a different man today than

15  the man that came into prison for the life

16  crime?

17       **INMATE OLDRIGHT:**  I learned the error of

18  my ways of trying to, shall we say, control the

19  situation and just -- this person, asking him to

20  stay away from me.  Number one, there is no way

21  you'd ever get me a pistol or a weapon of any

22  sort in my hand.  I don't care if I was on

23  parole or not.

24       **DEPUTY COMMISSIONER HARMON:**  Anything

25  else?

26       **INMATE OLDRIGHT:**  I have learned that

27  there's other ways of handling things.  I have

46

1  learned there's different ways.  You have got to

2  -- A person can get angry every day.  But it's

3  how you handle that anger.  It should be in a

4  constructive method instead of a -- just, you

5  know, instead of something that isn't

6  constructive.

7          **DEPUTY COMMISSIONER HARMON:**  Anything

8  else, sir?

9          **INMATE OLDRIGHT:**  No, not right now.

10          **DEPUTY COMMISSIONER HARMON:**  Can you hear

11  me okay?  I'm trying to speak up.

12          **INMATE OLDRIGHT:**  I'm sorry, sir.

13          **DEPUTY COMMISSIONER HARMON:**  I'm trying

14  to speak up.  Can you hear me okay as we're

15  going along here?

16          **INMATE OLDRIGHT:**  Yes I can.

17          **DEPUTY COMMISSIONER HARMON:**  Okay.

18          **INMATE OLDRIGHT:**  Thank you.

19          **DEPUTY COMMISSIONER HARMON:**  The doctor's

20  report is the -- There's a newer report here.

21  It's from September of '05 and it's from

22  Dr. Macomber.  It's M-A-C-O-M-B-E-R for the

23  transcriber.  And I am going to go directly to

24  the area of clinical assessment.  Under current

25  mental status and treatment needs it's written

26  in part, speaking of you it says:

27          "He is an active, energetic,

| | |
|---|---|
| 1 | pleasant individual.  He was alert |
| 2 | and well oriented.  His thinking |
| 3 | was rational, logical and |
| 4 | coherent.  His speech was normal, |
| 5 | fluent and goal-oriented.  His |
| 6 | affect was appropriate.  There |
| 7 | were no signs of thought disorder, |
| 8 | cognitive impairment or other |
| 9 | mental or emotional problems.  He |
| 10 | is functioning in the high-normal |
| 11 | range intellectually.  His |
| 12 | judgment was sound, his insight |
| 13 | and self-awareness was good.  His |
| 14 | attitude was friendly, outgoing, |
| 15 | cheerful and cooperative.  There |
| 16 | was no indication of hostility or |
| 17 | resentment.  There was no evidence |
| 18 | of antisocial thinking or values. |
| 19 | There is no evidence of any mental |
| 20 | or emotional problems in this case |
| 21 | that would warrant a diagnostic |
| 22 | impression." |
| 23 | Under current diagnostic impressions under Axis |
| 24 | I, no contributory clinical disorder.  Axis II, |
| 25 | no contributory personality disorder.  Axis V, a |
| 26 | GAF of 90.  In the area of the review of the |
| 27 | life crime in part it is written: |

48

1        "He is extremely remorseful over

2        the fact that he failed to put the

3        safety on this weapon and that the

4        weapon was cocked at the time.

5        Inmate Oldright's description of

6        his behavior at the time of this

7        offense is not an attempt to

8        diminish his responsibility or his

9        guilt.  He accepts full

10       responsibility for this offense.

11       He stated he did not intend to

12       shoot the gun but it did go off

13       and he is extremely remorseful.

14       His feelings of sorrow and remorse

15       about this offense do appear to be

16       sincere and genuine.  Inmate

17       Oldright has shown remarkable

18       self-control, patience and

19       cooperation as evidenced by his

20       lack of serious disciplinaries.

21       Oldright is not an aggressive,

22       hostile or dangerous individual.

23       He does not need to attend any

24       further self-help program.  He

25       does not need to participate in

26       individual psychotherapy or group

27       psychotherapy.  He does have good

49

1          understanding or insight into his

2          role in the commitment offense.

3          He also has serious deep remorse."

4  Assessment of dangerousness:

5          "In considering his potential for

6          dangerous behavior in the

7          institutional environment it is

8          evident that Inmate Oldright does

9          not pose a risk to other inmates

10         or staff.  In comparison to other

11         inmates his violence potential is

12         definitely below average.  In

13         considering this inmate's

14         potential for dangerous behavior

15         if released to the community on

16         parole, I agree with the prior

17         psychologist who indicated that

18         his violence potential is seen as

19         being no more than the average

20         citizen in the community.  Inmate

21         Oldright does not have a drug or

22         alcohol abuse history, he does not

23         have a history of criminal

24         behavior.  There are no risk

25         factors in this case."

26  Clinical observations, comments and

27  recommendations:

1           "There are no mental or emotional
2           problems in this case that would
3           interfere with granting parole.
4           The prognosis for successful
5           adjustment in the community is
6           excellent."
7    That's from Dr. Macomber.  The prior report
8    referred to is in December of '01.  That's from
9    Jeff Howlin, H-O-W-L-I-N, staff psychologist.
10   And in that particular report the doctor writes
11   here in part that if granted release that the
12   prognosis for community living is positive.
13   Under clinical assessment, current mental status
14   and treatment needs.  Talking about the day of
15   the interview it says:
16           "He was pleasant, cooperative and
17           coherent throughout the interview.
18           His judgment appeared to be sound
19           and he demonstrated fair insight
20           into his commitment offense."
21   Under current diagnostic impressions under Axis
22   I, rule out attention deficit, hyperactivity
23   disorder not otherwise specified; Axis II, no
24   contributory personality disorder; and Axis V, a
25   GAF of 80.  The doctor goes on to write: "His
26   prognosis is positive for being able to maintain
27   his current mental status in the community upon

51

1    parole."  In the area of the review of the life
2    crime: "He accepts responsibility but admits to
3    reacting in part in self-defense."  Assessment
4    of dangerousness, in part:
5              "The violence potential within a
6              controlled setting is estimated to
7              be below-average relative to the
8              Level II inmate population and if
9              released to the community his
10             violence potential is estimated to
11             be no more than the average
12             citizen in the community.  Inmate
13             Oldright has demonstrated gains
14             since being incarcerated, both
15             psychologically and behaviorally.
16             At this time it does not appear
17             that there are any significant --"
18                  (The tape was turned over.)
19        **DEPUTY COMMISSIONER HARMON:**  Under
20   clinical observations, comments and
21   recommendations:
22             "This inmate does not have a
23             mental health disorder which would
24             necessitate treatment either
25             during his incarceration period or
26             following parole."
27   And that is from -- Dr. Howlin also said:

52

1          "I would recommend individual

2          counseling or psychotherapy when

3          paroled to address relationship

4          dynamics and increasing

5          understanding of self."

6  So what I have done there, Mr. Oldright, is I

7  have taken parts of your doctors' reports, the

8  two most recent.  I have taken parts of your

9  counselors' reports and I have taken parts of

10 your institutional adjustment.  I may have

11 inadvertently left out areas that are important

12 to you.  I am going to return to the Chair here

13 for further questioning.  Before I do is there

14 anything you wish to add in any of those areas

15 at this time?

16         **INMATE OLDRIGHT:**  Yes.

17         **ATTORNEY FERGUSON:**  I think Mr. Oldright

18 just wants to emphasize the most recent

19 psychological report wherein it's stated that

20         "Mr. Oldright has shown remarkable

21         self-control, patience and

22         cooperation, as evidenced by his

23         lack of serious disciplinaries.

24         When interviewed on this date

25         there is no evidence that he is

26         short-tempered, hostile, angry or

27         has any anger management problems.

53

```
 1          He impresses as a very gentle,
 2          mild-mannered, patient, caring and
 3          loving person."
 4       INMATE OLDRIGHT:  And then that other
 5  part.
 6       ATTORNEY FERGUSON:  With respect --
 7       INMATE OLDRIGHT:  That's the other part
 8  of that same thing.
 9       ATTORNEY FERGUSON:  Yes, it just carries
10  on from the prior page.
11       INMATE OLDRIGHT:  Right.
12       ATTORNEY FERGUSON:  Wherein it says:
13          "Opportunities for display of
14          anger, confrontation with inmates,
15          misunderstandings are a common,
16          daily occurrence in this
17          environment."
18  That is the point that needs to be made.
19       DEPUTY COMMISSIONER HARMON:  Thank you
20  sir.  Anything else?
21       INMATE OLDRIGHT:  Nothing right now, no
22  sir.
23       DEPUTY COMMISSIONER HARMON:  I'll return
24  to the Chair.
25       PRESIDING COMMISSIONER FISHER:  All
26  right.  I need to clarify a couple of things.
27  When you pulled up next to their car and you got
```

54

1   out of your car.  What was Mr. Tucker doing at

2   that point?

3          **INMATE OLDRIGHT:**  He was sitting in the

4   car.

5          **PRESIDING COMMISSIONER FISHER:**  Okay.

6          **INMATE OLDRIGHT:**  I didn't pull up beside

7   them.

8          **PRESIDING COMMISSIONER FISHER:**  You

9   pulled up behind them?

10         **INMATE OLDRIGHT:**  No ma'am.  They were

11   parked here and I pulled way out here in the

12   dirt.

13         **PRESIDING COMMISSIONER FISHER:**  Because

14   his girlfriend said that she thought that you

15   were going to run into her car.  That she

16   actually backed up when she saw you coming at

17   them because you were coming at them -- that you

18   came to a skidding stop near them.  Is that

19   right?

20         **INMATE OLDRIGHT:**  I wasn't going to go

21   beside them and didn't.

22         **PRESIDING COMMISSIONER FISHER:**  Okay,

23   you're missing my point.

24         **INMATE OLDRIGHT:**  I'm sorry.

25         **PRESIDING COMMISSIONER FISHER:**  You're

26   missing my point.  When you got there were you

27   angry?

1          **INMATE OLDRIGHT:**  No ma'am.  Not angry.

2     I was upset that he was parked there and trying

3     to, you know, go over towards my house.

4          **PRESIDING COMMISSIONER FISHER:**  All

5     right.

6          **INMATE OLDRIGHT:**  All I wanted was him to

7     just leave me alone.  That's why I pulled over

8     here, because I was scared of that man.

9          **PRESIDING COMMISSIONER FISHER:**  Okay.

10         **INMATE OLDRIGHT:**  I pulled over here out

11    of the way.

12         **PRESIDING COMMISSIONER FISHER:**  Had you

13    two -- Had you two agreed to meet there?

14         **INMATE OLDRIGHT:**  Yes.

15         **PRESIDING COMMISSIONER FISHER:**  Okay.

16    Then why were you angry that he was --

17         **INMATE OLDRIGHT:**  Actually we agreed to

18    meet way over here, out in the middle by where

19    the road is.

20         **PRESIDING COMMISSIONER FISHER:**  All

21    right.  But you agreed to meet him, right?

22         **INMATE OLDRIGHT:**  Over here, yes ma'am.

23         **PRESIDING COMMISSIONER FISHER:**  All

24    right.  But the bottom line is you agreed to

25    meet him, right?

26         **INMATE OLDRIGHT:**  Yes ma'am.

27         **PRESIDING COMMISSIONER FISHER:**  He had at

56

1  some point earlier -- Was it earlier in that day
2  or sometime close to the time of the commitment
3  offense he had tried to shake your hand and
4  apologize to you; is that correct?

5       **INMATE OLDRIGHT:**  Correct.  That's what I
6  was talking about earlier when I said that
7  something had to go on.  He had to just show me
8  that he's changed.

9       **PRESIDING COMMISSIONER FISHER:**  All
10  right.  And so you refused to accept his apology
11  but you agreed to meet him.  Now the way she
12  characterizes your behavior that day it sounds
13  like you were the aggressor.  She says that you
14  got out of the car and that you came at him very
15  fast and you raised he gun over your head as you
16  did that.  Is that the way you approached him?

17       **INMATE OLDRIGHT:**  No ma'am.  I was over
18  here in front of my pickup when I raised it.  I
19  was still a good 15, 18 feet from him.  It was
20  just like the coroner said, it was 15 feet where
21  I actually, how far away I was when the weapon -
22  - when I shot him.

23       **PRESIDING COMMISSIONER FISHER:**  She says
24  you got out of the passenger -- Tucker got out
25  of the passenger door side of the vehicle and
26  was standing next to the open door and that you
27  were messing with the gun.  So I assume that you

57

1    were chambering a round.

2           INMATE OLDRIGHT:  (Overlapping).

3           PRESIDING COMMISSIONER FISHER:  Let me

4    finish, all right, before you answer me.

5           INMATE OLDRIGHT:  Okay, I'm sorry.

6           PRESIDING COMMISSIONER FISHER:  She says

7    that you walked very fast towards Tucker and she

8    saw you raise the gun above your head as you

9    approached Tucker.  That she thought you were

10   going to hit him with the gun but then she heard

11   the gun go off.  Is that right?

12          INMATE OLDRIGHT:  No ma'am, I was 15 feet

13   away from him.

14          PRESIDING COMMISSIONER FISHER:  All

15   right.

16          INMATE OLDRIGHT:  I did this, yes.  As I

17   came around the front of the pickup.

18          PRESIDING COMMISSIONER FISHER:  So let me

19   -- Let me ask you my question.

20          INMATE OLDRIGHT:  Sure.

21          PRESIDING COMMISSIONER FISHER:  If you

22   agreed to meet him, regardless of where he

23   showed up you had agreed to meet him.  And he

24   wasn't armed.

25          INMATE OLDRIGHT:  I couldn't tell that

26   because he was behind that door.

27          PRESIDING COMMISSIONER FISHER:  All

58

1  right.  But there was no reason for you to

2  assume that he was armed.

3          INMATE OLDRIGHT:  No.

4          PRESIDING COMMISSIONER FISHER:  Okay.

5  Then why would your first reaction be to chamber

6  a round and start heading toward him with the

7  gun pointed at him.

8          INMATE OLDRIGHT:  I didn't head towards

9  him, that's what I was explaining.  I was over

10  there in the front of my pickup.

11          PRESIDING COMMISSIONER FISHER:  All

12  right, all right.

13          INMATE OLDRIGHT:  I had basically the

14  front of the pickup between me and him.  And

15  that's when I showed him. I didn't want him

16  coming any closer.

17          PRESIDING COMMISSIONER FISHER:  All

18  right.  And why did you -- Why did you point the

19  gun at him?

20          INMATE OLDRIGHT:  I didn't, that's what

21  I'm saying, ma'am.  I had it up like this and --

22          PRESIDING COMMISSIONER FISHER:  At some

23  point the gun was pointed at him or it wouldn't

24  have shot him.

25          INMATE OLDRIGHT:  I agree ma'am.

26          PRESIDING COMMISSIONER FISHER:  All

27  right.

59

1      **INMATE OLDRIGHT:**  The only thing I can

2   figure is when he started to come towards me my

3   hand went down and it went off.  Because I still

4   -- It cut my finger because of the --

5      **PRESIDING COMMISSIONER FISHER:**  Okay, all

6   right.

7      **INMATE OLDRIGHT:**  What do you call it?

8      **PRESIDING COMMISSIONER FISHER:**  That's

9   all right.

10      **INMATE OLDRIGHT:**  When the slide comes

11   back.

12      **PRESIDING COMMISSIONER FISHER:**  Okay,

13   that's okay, that's a detail and I'm just trying

14   to picture what was going on there.

15      **INMATE OLDRIGHT:**  I'm not trying to say

16   that I didn't --

17      **PRESIDING COMMISSIONER FISHER:**  No, no,

18   no.

19      **INMATE OLDRIGHT:**  That the weapon didn't

20   go off by me shooting it.

21      **PRESIDING COMMISSIONER FISHER:**  Okay.

22      **INMATE OLDRIGHT:**  But I did not point it

23   at him purposefully.

24      **PRESIDING COMMISSIONER FISHER:**  All

25   right.  Do you have any -- Do you have any

26   questions?

27      **DEPUTY COMMISSIONER HARMON:**  I have a

60

1   couple.

2           **PRESIDING COMMISSIONER FISHER:**   Go ahead.

3           **DEPUTY COMMISSIONER HARMON:** Mr. Oldright.

4           **INMATE OLDRIGHT:**   Yes sir.

5           **DEPUTY COMMISSIONER HARMON:**   Why was it

6   even necessary to confront him with a loaded

7   gun?

8           **INMATE OLDRIGHT:**   Logically speaking,

9   there wasn't any reason.   Logically speaking I

10  should have stayed away from the man like I had

11  been doing.

12          **DEPUTY COMMISSIONER HARMON:**   It's not --

13  Let me ask you this way.   How would the victim

14  know whether your gun was loaded or unloaded at

15  the time of the confrontation?   If the gun was

16  unloaded at the time how would the victim know

17  it was either loaded or unloaded?

18          **INMATE OLDRIGHT:**   I see what you're

19  saying.   I really didn't think about it.   All I

20  knew is if I showed him pulling it back he'd

21  know that it was loaded.   And stupid me, I did

22  not put the safety on.

23          **DEPUTY COMMISSIONER HARMON:** Mr. Oldright,

24  would you describe this incident as an accident?

25          **INMATE OLDRIGHT:**   No way.

26          **DEPUTY COMMISSIONER HARMON:**   Would you

27  describe it as an intentional shooting?

61

1          **INMATE OLDRIGHT:**  No sir.

2          **DEPUTY COMMISSIONER HARMON:**  Well then

3   how would you describe it?

4          **INMATE OLDRIGHT:**  Just exactly as I said,

5   sir.

6          **DEPUTY COMMISSIONER HARMON:**  No.

7          **INMATE OLDRIGHT:**  I'm sorry.

8          **DEPUTY COMMISSIONER HARMON:**  I want you

9   -- I have heard that over and over again.  What

10  you're telling me from across the table through

11  everything you have said today, this incident

12  was an accident.

13         **INMATE OLDRIGHT:**  I would say that it was

14  an accident that it went off, yes sir.  I did

15  not intentionally shoot the gentleman.  It did

16  hit him in the neck but I did not intentionally

17  go there to shoot him.

18         **DEPUTY COMMISSIONER HARMON:** Mr. Oldright.

19         **INMATE OLDRIGHT:**  Yes sir.

20         **DEPUTY COMMISSIONER HARMON:**  The gun you

21  were using at the time was a .380, am I right?

22         **INMATE OLDRIGHT:**  Yes sir.

23         **DEPUTY COMMISSIONER HARMON:**  Are you

24  aware -- How long did you own that gun?

25         **INMATE OLDRIGHT:**  Four or five years.

26         **DEPUTY COMMISSIONER HARMON:**  Had you shot

27  it before?

62

1        INMATE OLDRIGHT:  About a year before

2    then, yeah.

3        DEPUTY COMMISSIONER HARMON:  How many

4    times have you shot the gun?

5        INMATE OLDRIGHT:  Maybe 20 times.

6        DEPUTY COMMISSIONER HARMON:  Then you

7    know that the gun is equipped on that particular

8    model with a double safety.

9        INMATE OLDRIGHT:  Yes sir.  The one where

10   you have to squeeze to do it?

11       DEPUTY COMMISSIONER HARMON:  Your gun was

12   equipped with a double safety.

13       INMATE OLDRIGHT:  Oh, the safety on the

14   handle, yes.

15       DEPUTY COMMISSIONER HARMON:  Both

16   safeties had to be disengaged before that gun

17   would fire.

18       INMATE OLDRIGHT:  Right.

19       DEPUTY COMMISSIONER HARMON:  Not one but

20   two; am I right?

21       INMATE OLDRIGHT:  What was the other

22   safety then, sir?  I guess I'm (inaudible).

23       DEPUTY COMMISSIONER HARMON:  You've got

24   the hammer, right?  You cocked it.

25       INMATE OLDRIGHT:  No.  Well, I pulled the

26   slide back.

27       DEPUTY COMMISSIONER HARMON:  You loaded a

63

1   round and then you had the grip.  Am I right?

2          INMATE OLDRIGHT:  Yes.

3          DEPUTY COMMISSIONER HARMON:  You had to

4   have had the grip safety depressed to fire that

5   gun.  Am I right?

6          INMATE OLDRIGHT:  Oh, that one.  Okay,

7   yes, yes, I see what you're getting at now.

8   Well I'm sorry.  When you said hammer, to me

9   that meant that there was a cocking hammer and I

10  don't know that there is one on there, sir.

11         DEPUTY COMMISSIONER HARMON:  So you had a

12  -- Would you agree you have a double safety on

13  that gun?

14         INMATE OLDRIGHT:  Yes sir.

15         DEPUTY COMMISSIONER HARMON:  Thank you.

16         INMATE OLDRIGHT:  And when you've got the

17  gun up like this and you're squeezing it you're

18  already doing number one.  Because that's the

19  only way you can hold on to that handle with

20  that gun.  You have to squeeze it or you're

21  going to drop it because you do not have a grip

22  with all your fingers around it.  You can't.

23         DEPUTY COMMISSIONER HARMON: Mr. Oldright,

24  I'm real familiar with guns.

25         INMATE OLDRIGHT:  All right sir.

26         DEPUTY COMMISSIONER HARMON:  I'm trying

27  to make a point with you.  You didn't have a

64

1    standard gun that had a single safety.

2         **INMATE OLDRIGHT:**  Oh, right.

3         **DEPUTY COMMISSIONER HARMON:**  Your

4    particular gun was equipped with a double

5    safety.

6         **INMATE OLDRIGHT:**  Correct.

7         **DEPUTY COMMISSIONER HARMON:**  So you're

8    telling me that this shooting was an accident or

9    intentional?

10        **INMATE OLDRIGHT:**  I did not intentionally

11   shoot the man.  Yes, the weapon was in my hand

12   and yes it did go off and yes it did shoot him.

13        **DEPUTY COMMISSIONER HARMON:**  Okay.  I

14   think I'm -- And by the way, I had one other

15   thing.  Your gun permit at the time that you had

16   talked to the Commissioner about.  That permit

17   had expired, hadn't it?

18        **INMATE OLDRIGHT:**  Yes it did.

19        **DEPUTY COMMISSIONER HARMON:**  So you were

20   illegally carrying a firearm?

21        **INMATE OLDRIGHT:**  Yes sir, at the time.

22   And I didn't realize that it had lapsed but yes,

23   it did.  I carried it for safety because of a

24   little business I was in.  I'd go out at all

25   hours.  I was a 24 hour plumber.  And I went in

26   some neighborhoods you wouldn't want to go in.

27        **DEPUTY COMMISSIONER HARMON:**  Thank you

65

1    sir.  Can you hear me?  I'm going to return to

2    the Chair.

3         **PRESIDING COMMISSIONER FISHER:**  Okay.

4         **INMATE OLDRIGHT:**  Thank you.

5         **PRESIDING COMMISSIONER FISHER:**  Counsel,

6    do you have any questions?

7         **ATTORNEY FERGUSON:**  No.

8         **PRESIDING COMMISSIONER FISHER:**  Okay.

9    Would you like to go ahead and close?

10        **ATTORNEY FERGUSON:**  Yes.  I think at it's

11   most egregious the crime in question could be

12   considered, would be considered to be a heat of

13   passion crime.  I say that because I think it is

14   borne out by the letters from the judge of the

15   Superior Court in particular.  Therein he states

16   that he didn't have the alternative at the time.

17   He would have sentenced Mr. Oldright to a lesser

18   term.  In any event I believe that Mr. Oldright

19   is a poster boy for suitability otherwise.  This

20   is an isolated event.  He has no precursors to

21   criminality.  There is no juvenile record in

22   this case; there is no criminal record as an

23   adult.  Mr. Oldright otherwise led an exemplary

24   life as a model citizen.  He participated in

25   numerous community activities, gave generously

26   of his time.  He was YMCA Volunteer of the Year

27   in '82, camp director in '82, National Bicycle

66

1    Association track construction director in '81.
2    On and on and on.  Mr. Oldright, as I say, gave
3    generously of his time.  He did what he could to
4    be on the right track in terms of a moral
5    individual living the American Dream,
6    essentially.  With regard to the fact that he
7    was given a date on his first go-through with
8    the Board, I think that speaks volumes in terms
9    of what the circumstances are here.  And with
10   regard to the reversal of that decision.  The
11   psychological report of '05 directly is produced
12   because of the concerns that were addressed in
13   that reversal.  And this psychological report is
14   nothing but positive toward Mr. Oldright and his
15   efforts to program within the institution.  It
16   emphasizes his veritable lack of disciplinary
17   issues that he has presented to the institution.
18   He acknowledges that he would have dealt with
19   the incident regarding the shorts a little bit
20   differently but it seems like that may have been
21   misconstrued as well.  In terms of specifically
22   the assessment of dangerousness.  We address
23   that because the Board always indicates that it
24   is an unreasonable risk of danger which would
25   preclude it from granting a parole date.  With
26   regard to Mr. Oldright's status in that regard
27   it says, in considering his potential for

67

1    dangerous behavior in the institutional

2    environment it is evident that he does not pose

3    a risk to other inmates or staff.  That's

4    evidenced by his lack of serious disciplinaries.

5    And with regard to dangerous behavior should he

6    be released to the community on parole, the

7    doctor agrees with the prior psychologist who

8    indicates that his violence potential is seen as

9    being no more than the average citizen in the

10   community.  That's supported by the level of

11   service inventory that was administered that

12   gives him a score of 0.2 risk level in

13   comparison to other inmates.  And the final full

14   paragraph under assessment of dangerousness

15   states that there are no risk factors in this

16   case.  Not minimal but there are no risk factors

17   in this case.  Mr. Oldright has put a tremendous

18   amount of effort into organizing his parole

19   plans.  He has -- He has not only a primary plan

20   but a fall-back plan and I think a fall-back

21   plan on that.  He has a job offer.  He has

22   multiple family members who are willing to have

23   him into his (sic) home and provide him the

24   necessities of life.  I urge you to give

25   Mr. Oldright a parole date.  I think anything

26   else would be a gross miscarriage of justice.  I

27   submit on that.

68

1      **PRESIDING COMMISSIONER FISHER:**   Thank

2    you.   Mr. Oldright, is there anything you would

3    like to add?

4      **INMATE OLDRIGHT:**   Yes I do.   This isn't

5    about me.   I committed a horrible crime.   The

6    only crime in 68 years and I am remorseful.

7    During my incarceration I have remained employed

8    and active in many groups.   One of the groups

9    was Impact.   It gave me a renewed empathy for

10   survivors of the crime, of my crime, and a deep

11   emotional commitment to be more sensitive and an

12   understanding individual.   Another one was

13   Dr. Gordon's Family Effectiveness Training.

14   This course helped me to see where I could be

15   more flexible in my views and help younger

16   people and see with their relationships to be

17   more tolerable.   And I attend the veterans group

18   and I have gained some understanding of post-

19   traumatic stress disorder and how it affects

20   vets and anyone exposed to major threats.   I

21   lived almost all my life in Bakersfield,

22   California.   I went to local schools, caddied

23   golf while I was in grade school.   I joined the

24   cub scouts.   I was a mechanic's helper in

25   Wayne's Dairy during my high school summers.   At

26   the First Baptist Church I was baptized in

27   spiritual rebirth in 1946.   After graduating

69

1    high school I joined the Army Artillery and was
2    stationed in Germany for three years and was
3    discharged honorably at the rank of Specialist
4    Four. I married and I raised three wonderful
5    daughters who are all perfectly, happily married
6    now. And I worked eight years building oil
7    drilling rigs while attending Bakersfield
8    College. I became a self-employed landscaping
9    contractor. Then in 1986 I purchased and
10   successfully operated a plumbing company at the
11   same time. My two businesses have employed a
12   minimum of 30 people at any one time. I have
13   owned six homes and eight rental properties. I
14   was active in the California Landscape
15   Contractors Association, the Plumbing/Heating
16   Contractors of America, the Loyal Order of
17   Eagles, the Gemological Institute of America and
18   the Boy Scouts. I was a scoutmaster for Troop
19   55, a member of Wood Badge and a Golden Acorn.
20   And of my 50 scouts, two made Eagle Scout. One
21   of them, Nick Shirah (phonetic), is an attorney
22   in New York City. I volunteered at the YMCA
23   building a bicycle track and we could have as
24   many as 100 racers at any one race. When the
25   race track was no longer needed my company, we
26   put in a walking track, landscaping and
27   automatic sprinkling system. I was elected

70

1    volunteer of the year for Kern County.  Then I

2    was elected to be the mountain camp director for

3    their 500 acre camp for scouts to go during the

4    summertime.  Please, see past my crime.  I am

5    more than willing to be a lawful citizen again.

6    Thank you for your consideration.

7              **PRESIDING COMMISSIONER FISHER:**  Thank

8    you.  We're going to go ahead and recess.

9                    **R E C E S S**

10                     --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

71

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2              **D E C I S I O N**

3      **DEPUTY COMMISSIONER HARMON:** You are on

4  record.

5      **PRESIDING COMMISSIONER FISHER:** All

6  right, thank you. I want to note for the record

7  that everyone who was previously in the room and

8  identified themselves have returned to the room.

9  Mr. Oldright, the panel reviewed all of the

10  information received from the public and relied

11  on the following circumstances in concluding

12  that you are not yet suitable for parole and

13  would pose an unreasonable risk of danger to

14  society or a threat to public safety if released

15  from prison. I'm sorry, I started out not

16  speaking up. I'll try to do a little better job

17  here. This is a one year denial and it is -- It

18  is due to the commitment offense alone,

19  primarily, and the fact that we have some, we

20  have some hesitation related to insight and what

21  happened that day. I know you could probably

22  tell from the questions that we were asking that

23  we have, we have concerns about that. I noted

24  as I was going through your support letters that

25  one of them spoke about the accident that

26  brought you to prison. I am going to encourage

27  **WILLIAM OLDRIGHT H-14131 DECISION PAGE 1 11/8/05**

72

1    you over the next year to continue your good

2    program, continue your positive self-help that

3    you have been doing, and really continue to

4    reflect on what happened that day.  Because you

5    can't shoot somebody when you're not aiming the

6    gun at them.  And the way you characterized this

7    offense is that you had the gun in the air, that

8    you were just standing there, and that somehow

9    the gun went off.  And I can tell you that I

10   know something about guns.  Certainly not

11   anywhere near as much about guns as Commissioner

12   Harmon does.  But it gives me pause anytime

13   somebody says, I had the gun in the air and

14   somehow it went off and shot this guy.  You had

15   to, as Commissioner Harmon said, release two

16   safeties to shoot him.  You were clearly angry

17   based on what his girlfriend said about your

18   conduct at the scene.  And you characterize it

19   as if somehow out of a situation where you

20   weren't angry, you were afraid of him, you were

21   concerned about him but you weren't angry and

22   you weren't aggressive, that somehow this gun

23   went off and shot him.  That makes us feel like

24   you need to gain a little more insight related

25   to the offense.  Frankly, as insignificant as it

26   might seem to you, the incident with the officer

27   **WILLIAM OLDRIGHT H-14131 DECISION PAGE 2 11/8/05**

73

1    over going through the metal detector, it just

2    looks like another anger issue.  And that's been

3    a while.  But until you address those issues and

4    you quit trying to explain them away as being

5    something that you are not responsible for it is

6    going to give us pause.  So we want to commend

7    you for the good work that you are doing.  I

8    know that you -- I know that this has to be a

9    disappointment having gotten a date at your

10   initial hearing.  But I can tell you that once

11   you pass muster with us, as you know, you're

12   going to have to pass muster at the Governor's

13   Office.  And if we have issues that give us a

14   feeling of hesitance you can pretty much

15   guarantee that other people are going to also.

16   So I just really encourage you to look at this

17   issue and think about how you are mentally

18   characterizing what happened there that day

19   because it does give us concern.  And if you had

20   shot that gun as many times as you had said that

21   you had clearly you knew how it worked.  So with

22   that I just wish you well and encourage you to

23   keep up the good work and not be discouraged.

24   Do you have anything, Commissioner?

25          **DEPUTY COMMISSIONER HARMON:**  I think you

26   covered it very well and I wish you luck, sir.

27   **WILLIAM OLDRIGHT H-14131 DECISION PAGE 3 11/8/05**

74

1          **PRESIDING COMMISSIONER FISHER:**  Okay,
2    thank you, that completes the hearing.
3          **INMATE OLDRIGHT:**  Is there anything I
4    could add?
5          **PRESIDING COMMISSIONER FISHER:**  Uh-huh.
6          **INMATE OLDRIGHT:**  Is this off the record?
7    Between you and me and the gatepost?
8          **PRESIDING COMMISSIONER FISHER:**  Actually
9    we're still on record.
10         **DEPUTY COMMISSIONER HARMON:**  We can't do
11   that, it has to be on record.
12         **INMATE OLDRIGHT:**  Okay, on the record.
13         **PRESIDING COMMISSIONER FISHER:**  Okay.
14         **INMATE OLDRIGHT:**  My appellate attorney
15   bought the same weapon, put it in the air, when
16   he brought it down it went off.
17         **PRESIDING COMMISSIONER FISHER:**  Okay.
18         **INMATE OLDRIGHT:**  Any time you take that
19   weapon, because of the way it's built with that
20   no grip, he brought it down and it went off.
21         **PRESIDING COMMISSIONER FISHER:**  All
22   right, okay.  Well there were --
23         **INMATE OLDRIGHT:**  It's got nine pound
24   pull.  And I totally agree with what you're
25   saying, it did go off.
26         **PRESIDING COMMISSIONER FISHER:**  All
27   **WILLIAM OLDRIGHT H-14131 DECISION PAGE 4 11/8/05**

75

1    right.  Well there are other issues related to

2    your stance at that point and what was going on

3    that we'd really --

4            **INMATE OLDRIGHT:**  Okay.

5            **PRESIDING COMMISSIONER FISHER:**  We would

6    be more comfortable if you explored it a little

7    bit more.  All right?  That completes the

8    hearing.

9                        --oOo--

10

11

12

13

14

15

16

17

18

19

20

21

22

23    **PAROLE DENIED ONE YEAR**

24    **THIS DECISION WILL BE FINAL ON: Mar. 8, 2006**

25    **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26    **DATE, THE DECISION IS MODIFIED.**

27    **WILLIAM OLDRIGHT H-14131 DECISION PAGE 5 11/8/05**

76

CERTIFICATE AND
DECLARATION OF TRANSCRIBER


I, RAMONA COTA, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total one in number and

cover a total of pages numbered 1 - 75, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF WILLIAM

OLDRIGHT, CDC NO. H-14131, ON NOVEMBER 8, 2005, and

that the foregoing pages constitute a true, complete,

and accurate transcription of the aforementioned tape

to the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated November 27, 2005, at Sacramento County,

California.


RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**